## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| MELVYN KLEIN, Derivatively On Behalf Of CURO GROUP HOLDINGS CORP., | Case No.: |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| DONALD F. GAYHARDT, CHRIS MASTO, DOUG RIPPEL, DALE E. WILLIAMS, DAVID M. KIRCHHEIMER, MIKE MCKNIGHT, ELIZABETH WEBSTER, CHAD FAULKNER, ANDREW FRAWLEY, GILLIAN VAN SCHAICK, KAREN WINTERHOF, WILLIAM BAKER, AND ROGER W. DEAN, | |
| Defendants, | |
| CURO GROUP HOLDINGS CORP., | |
| Nominal Defendant. | |

Plaintiff Melvyn Klein ("Plaintiff"), derivatively and on behalf of CURO Group Holdings Corp. ("CURO" or the "Company"), by Plaintiff's undersigned attorneys, for Plaintiff's verified complaint against Defendants, allege the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CURO, Company press releases and conference call transcripts, litigation concerning the Company and media and social media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein

after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of CURO against certain of its officers and directors seeking to remedy Defendants' (defined below) breach of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.     The Company provides lending products to nonprime, underbanked consumers in the United States, Canada, and the United Kingdom.[1] The Company operated as a payday lender. For years, the Company's most profitable business was the Canadian payday (or "single-pay") loans, which generated yields in excess of 400% and had modest, predictable credit losses. As a result, the Company's Canadian segment, and the Ontario market (which generated the bulk of the Canadian revenues), was critical to its operations and its ability to meet its financial forecasts. In fact, revenues from Ontario alone comprised approximately 13% of the Company's total consolidated revenues for the year ended December 31, 2017.

3.     As a payday lender, the Company is heavily regulated by agencies at various levels of government in the jurisdictions in which it operates. Regulators in Canada began regulating the payday lending industry by passing laws concerning borrowing disclosure requirements, caps on the cost of borrowing, and restrictions on certain types of lending practices. The new regulations helped protect consumers from becoming trapped in a cycle of debt. For instance, in 2016 and 2017, Alberta, Ontario, and British Columbia passed regulations lowering the amount the Company could charge borrowers for its payday loans, limiting the borrowing rate at C$15 in Alberta and Ontario, and C$17 in British Columbia for every C$100 borrowed.

---

[1]     In February 2019, the Company exited the United Kingdom.

4.      As a result, the yields on the Company's Canadian single-pay loans declined during 2016 and 2017 from approximately 400% in 2016 down to approximately 250% by the first quarter of 2018 ("1Q18"), which had a material adverse effect on the Company's Canadian operations. Given these new lending regulations, Defendants (defined below) knew that the Company's ability to secure a replacement for its highly profitable Canadian single-pay loans was essential to the Company's ongoing financial success and was one of the "key drivers" of its continued growth. Thus, Defendants implemented a strategy to transition the Company's Canadian business from single-pay loans to installment and line of credit ("open-end") loan products.

5.      Although the Company's open-end loans were lower yield, they were not regulated at the provincial level in Canada and, thus, were not subject to periodic rate changes. The Company was also the only payday lender in Canada to offer a line of credit product and, as a result, Defendants viewed the Company's open-end loans as an attractive substitute for its single-pay loans.

6.      As part of the Company's strategy to transition Canada out of the higher-yield, single-pay loans, the Company began converting single-pay customers in Alberta to installment and open-end loans. For example, the Company opened test stores in the Windsor, Ontario market to evaluate the performance and reception of the Company's open-end loan products before introducing them at the Company's 124 branch locations in Ontario. Defendants monitored the results of the Windsor, Ontario test market and had access to real-time detailed customer account data, loan originations, payments, defaults, and payoffs via the Company's proprietary IT platform (the "CURO Platform").

7.      As the Company transitioned customers from smaller balance single-pay loans to higher balance installment and open-end loans, applicable accounting standards required that the

Company record an increased provision for loan losses at the time these loans were originated, even though revenues on installment and open-end loans are recognized over a longer period of time than single-pay loans. Because the Company was required to account for expected loan losses at the time of loan origination, and revenue and yields on those loans take months to build, the Company's open-end loan products were initially less profitable than single-pay loans. These "up-front provisions" were material to the Company's earnings and were an important financial metric that Defendants reported in the Company's SEC filings and routinely discussed.

8.      Based on the results of the Windsor, Ontario test market and additional, impending payday lending regulations in Ontario, in the first quarter of 2018 ("1Q18"), Defendants made the decision to move up the introduction of open-end loans in the broader Ontario market by an entire year. Although the Company was transitioning away from its most profitable single line of business, Defendants nevertheless assured investors that the transition out of single-pay loans in Canada would not be immediate, that revenues from single-pay loans in Canada would be cut in half over the "next few years," and that single-pay loans would remain "viable" during and after the transition.

9.      Defendants also gave investors the false impression that to the extent the Company's operations experienced any negative impact from the transition out of single-pay to installment and open-end loans, the impact would be minimal, confined to the second quarter of 2018 ("2Q18") and had been anticipated and factored into the Company's internal forecast and publicly reported full year 2018 financial guidance ("FY18 guidance"). Therefore, when Defendants reaffirmed the Company's FY18 guidance on April 26 and 27, 2018, the market believed that the Company's guidance was achievable and that the transition to open-end loans in Canada would not materially impact the Company's financial results or its ability to meet

guidance.

10.     However, unknown to the market, starting in May 2018, the Company increased the pace of the transition to open-end loans in Ontario. Although Defendants could have "moderate[d]" the flow of customers from single-pay to open-end loans (and abated the corresponding up-front provisioning), they made the decision not to do so, despite knowing or recklessly disregarding the significant operational risk that came with such a rapid transition, which was concealed from the market.

11.     The market was also not aware that during July 2018, the Company completed its transition to open-end loans in Ontario. As a result of the rapid transition in Ontario, the Company experienced larger open-end loan balances, materially higher up-front loan loss provisions, and increased marketing spend, which decreased the Company's earnings. In addition, the transition to open-end loans destroyed the Company's Canadian single-pay revenues, which dropped by 50% year-over-year in a matter of months rather than over the course of several years. Yet, Defendants continued to conceal from the market the true impact to the Company's operations and fiscal year 2018 ("FY18") guidance resulting from the undisclosed, rapid transition to open-end loans.

12.     On July 30 and 31, 2018, after the "majority" of the losses stemming from the rapid transition to open-end loans in Ontario had already occurred, Defendants reaffirmed the Company's FY18 guidance, falsely informing the market that there was a "good likelihood" that the Company would come out "ahead" of its published guidance, even though they knew or recklessly disregarding that the FY18 guidance was not achievable. Rather than disclose the Company's true financial condition, Defendants continued to provide the market with the false impression that single-pay loans were still extraordinarily viable and that any impact from the initiation of the Canadian transition had occurred in the just-reported 2Q18, but would not

negatively impact the Company's overall financial results for the second half of the year.

13.     By not disclosing the true, negative, near-term financial impact stemming from the Company's rapid transition to open-end loans in Canada, the Company's Forms 10-Q violated SEC disclosure rules, including Item 303 of SEC Regulation S-K, which required the Company to report "any known trends or uncertainties that have had," or that the Company "reasonably expects will have, a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

14.     Defendants' misstatements and omissions had their intended effect, as the price of the Company stock was artificially inflated, reaching $31.33 on September 25, 2018. Taking advantage of the Company's favorable, but misrepresented, financial position, in August 2018, the Company sold $690 million in senior secured notes in a debt offering that would not have been on such favorable terms had the truth been known. Around the time the Company stock reached its high, Defendant Baker sold over 56,000 shares of Company stock for proceeds of almost $1.8 million. Months later, Defendants would reveal the truth about the materially negative, short-term impact to the Company's operations, financial results, and FY18 guidance caused by the Company's rapid transition to open-end loans in Canada.

15.     On October 24, 2018, the Company announced poor third quarter 2018 ("3Q18") financial results, reporting adjusted diluted Earnings Per Share ("EPS") of only $0.23, widely missing analysts' consensus EPS by over 50%. Defendants reported that "[b]y far the biggest impact to quarterly results," including an 8.8% year-over-year decline in Canadian revenue, "was the ongoing product migration in Canada, specifically in the province of Ontario." In addition, despite Defendants' representations just months earlier that they had a "very high degree of confidence" in achieving or even surpassing the Company's FY18 guidance, the Company slashed

its FY18 guidance for adjusted EPS, net income, and adjusted earnings before interest, tax, depreciation, and amortization ("EBITDA").

16.    During the Company's 3Q18 earnings conference call, Defendant Gayhardt "acknowledg[ed] that this quarter fell short of our expectations, and probably your expectations, and quite simply, is not up to our standards" and all but admitted that Defendants knew the Company's FY18 guidance was unachievable at the time they reaffirmed it on April 27 and July 31, 2018, reporting, "we did a less than stellar job of explaining in our – probably our July call or even back into our April call . . . the impact of [the Canadian transition] . . . in the near term  . . we probably didn't lay it out for everybody as explicitly as we probably should have. And we'll try not to make that mistake again." Defendant Dean further confirmed that the "majority" of the loss for 3Q18 "came in July," prior to Defendants' false statements and omissions on July 30-31, 2018. In response to this news, the price of the Company common stock tumbled almost 34%.

17.    Defendants admitted that the decision to move up the introduction of open-end loans in Ontario from 2019 to 2018 was made during 1Q18; they intentionally chose not to moderate the transition to open-end loans in Ontario, despite the known operational risks; the transition to open-end loans in Canada "came at the expense of single-pay loan balances," which declined 50% in 3Q18 year-over-year; the rapid transition was "dilutive to Canadian earnings in the near term"; Canadian adjusted EBITDA dropped more than 50% year over-year as a result of the transition; and the Company had converted almost 40,000 customers to open-end loans in 3Q18, but expected to convert only 4,000 to 5,000 customers a month going forward.

18.    Contradicting certifications on the Company's quarterly reports filed with the SEC, Defendants further disclosed that the Company's "disclosure controls and procedures were not effective" and did not provide reasonable assurance "to ensure that information required to be

disclosed in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms." On May 6, 2019, the Company revealed in its Form 10-Q for the quarter ended March 31, 2019 ("1Q19 10-Q") that it had "received an inquiry from the SEC regarding the Company's public disclosures surrounding its efforts to transition the Canadian inventory of products from Single-Pay loans to Open-End loans."

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: Violations of Sections 10(b) and 20(a) of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is headquartered in this District, a substantial portion of the transactions and wrongs, complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21.     *Plaintiff Melvyn Klein* ("Plaintiff Klein") is a current stockholder of the Company and intends to retain ownership of said shares through the prosecution of the instant matter.

### Nominal Defendant

22.     Nominal Defendant CURO is a Delaware corporation with its headquarters located at 3527 North Ridge Road, Wichita, Kansas 67205. On December 7, 2017, the Company's

common stock began trading on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "CURO." On December 11, 2017, the Company completed its initial public offering ("IPO"), which generated net proceeds of $81.1 million.

**Director Defendants**

23.     *Defendant Donald F. Gayhardt* ("Gayhardt") has served as the Company's Chief Executive Officer ("CEO") since January 2012, as President since July 2013, and as a director since December 2012. Prior to joining the Company, Defendant Gayhardt worked in various capacities at Dollar Financial Corp. (now known as DFC Global Corp. ("DFCGC")), from 1990 to 2008, including as DFCGC's President from 1998 to 2008. Like CURO, DFCGC's business centers on providing financial services to unbanked and underbanked consumers.

24.     *Defendant Chris Masto* ("Masto") has served on the Board since 2008. Defendant Mastro is the co-founder of FFL Partners. As of April 13, 2020, FFL owns 5.59 % of CURO stock. Further, FFL owns a minority stake in Accordion Partners LLC, which provided financial planning and analysis consulting services to the Company in 2018 and 2019.

25.     *Defendant Doug Rippel* ("Rippel") co-founded the Company and has served as the Executive Chairman of the Board since 2012. Defendant Rippel was Chairman of the Board from 2008 to 2012, Chief Executive Officer from 1997 to January 2012 and Secretary and Treasurer from 1997 to 2008. As one of our founders, he led the Company in its geographic and product expansion. Defendant Rippel also serves as a director of certain of the Company's wholly-owned subsidiaries. Further, Defendant Rippel owns 16.94% of the Company's outstanding shares.

26.     *Defendant Dale E. Williams* ("Williams") has served on the Board since December 2017. Defendant Williams is the Chair of the Audit Committee.

27.     *Defendant David M. Kirchheimer* ("Kirchheimer") has served on the Board since

December 2018. Defendant Kirchheimer is a member of the Audit Committee.

28.     **Defendant Mike McKnight** ("McKnight") co-founded the Company and has served on the Board since 1997. From 1997 to 2008, Defendant McKnight served as Vice President of the Company and was involved with the Company's strategic direction and governmental affairs. Defendant McKnight initially managed loan office operations, and then later directed the real estate, construction, media and marketing arms of the Company, utilizing his prior career as a radio advertising executive to build a successful advertising campaign. Further, Defendant McKnight owns 15.71% of the Company's outstanding shares.

29.     **Defendant Elizabeth Webster** ("Webster") has served on the Board since July 2019.

30.     **Defendant Chad Faulkner** ("Faulkner") co-founded the Company and has served on the Board since 1997. Defendant Faulkner served as President and Chief Operating Officer from 1997 to 2013. As one of the Company's founders, Defendant Faulkner led the Company in its entire geographic and product expansion. Defendant Faulkner also serves as a director of certain of the Company's wholly-owned subsidiaries. Further, Defendant Faulkner owns 15.71% of the Company's outstanding shares.

31.     **Defendant Andrew Frawley** ("Frawley") has served on the Board since December 2017. Defendant Frawley is a member of the Audit Committee.

32.     **Defendant Gillian Van Schaick** ("Schaick") has served on the Board since July 2019. Defendant Schaick is a member of the Audit Committee.

33.     **Defendant Karen Winterhof** (Winterhof") has served on the Board since 2016. Winterhof currently serves as a Director of FFL.

34.     Defendants Gayhardt, Masto, Rippel, Williams, Kirchheimer, McKnight, Webster,

Faulkner, Frawley, Schaick, and Winterhof are collectively hereinafter referred to as the "Director Defendants."

**Officer Defendants**

35.     ***Defendants William Baker*** ("Baker") has served as the Company's Chief Operating Officer ("COO") since February 2016.  Prior to that, Baker was the Company's Chief Marketing Officer from September 2011 until 2016 and Vice President of Marketing and Business Development from April 2007 until September 2011.  The Company credits Defendant Baker as leading "the launch of the Company's digital business and the development of the risk and analytics function."

36.     ***Defendant Roger W. Dean*** ("Dean") has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since May 2016.

37.     The Director Defendants and Defendants Baker and Dean are herein referred to as "Defendants."

## THE AUDIT COMMITTEE

38.     Upon information and belief, the Audit Committee responsibilities are:

* appointing, reviewing and approving the compensation, retention and termination of the independent registered public accounting firm engaged to audit our financial statements;

* helping to ensure the independence of and overseeing the performance of the independent registered public accounting firm;

* reviewing and pre-approving audit and non-audit services and fees;

* reviewing reports and communications from the independent registered public accounting firm;

* reviewing financial statements and discussing with management and the independent registered public accounting firm our annual audited and quarterly financial statements, the results of the independent audit and the quarterly reviews and the reports and certifications regarding disclosure controls and procedures;

- preparing the Audit Committee report that the SEC requires be included in an annual proxy statement;

- assisting the Board in overseeing our internal audit function;

- reviewing and overseeing related-party transactions; and

- establishing and maintaining procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls, auditing matters or federal and state rules and regulations, and the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters.

## I.   FACTS

### A.   Background

39.     The Company described itself as "a growth- oriented, technology-enabled, highly diversified consumer finance company serving a wide range of underbanked consumers." The Company provides lending products to nonprime, underbanked consumers in need of cash, targeting consumers with a FICO score of 660 or less.

40.     Through acquisitions and organic growth, the Company expanded across the U.S., Canada, and the U.K.

41.     The Company's Canadian operations accounted for a material amount of the Company's profitability. For instance, during 2017, the Canadian segment generated 19% of the Company's revenues and accounted for approximately 19.5% and 55% of the Company's gross margin and pre-tax income, respectively. During 2018, the Company's Canadian operations accounted for approximately 12% of the Company's gross margin and generated pre-tax income of approximately $17 million, while its U.S. operations generated pre-tax income of only $1.1 million, and its U.K. operations generated a pre-tax loss of $38.7 million. The Company's Ontario market was very important to the Company's operations.  In 2017, 13% of the Company's total consolidated revenues came from Ontario and it was the Company's third largest geographic

region behind California and Texas.

42.     The Company routinely touted its proprietary IT platform, called the "CURO Platform," for the Company's underwriting and scoring of its loan products. The CURO Platform captures transactional history by store and customer, which allows the Company to track loan originations, payments, defaults, and payoffs, as well as historical collection activities on past-due accounts. The CURO Platform allows the Company to make real-time, data-driven changes to its acquisition and risk models. The Company also utilizes the CURO Platform to decide whether to extend credit to prospective customers and the terms on which to provide credit, including the price.

43.     The Company offered single-pay loans, installment, and open-end lines of credit, and a number of ancillary financial products including check cashing, gold buying, and credit protection insurance.

44.     The Company's single-pay loans, commonly referred to as pay-day loans, are generally high yield, but short-term, small denomination loans that provide a customer with immediate cash in exchange for a post-dated personal check or a pre-authorized debit from the customer's bank account. The Company charges customers a fee based on the amount of money borrowed and, in exchange, it defers deposit of the check or debit from the customer's account until the loan due date, which typically falls on the customer's next pay date.

45.     Open-end loans are a lower yield line of credit without a specified maturity date. Customers are free to borrow against their line of credit, and repay with minimum, partial, or full payment and redraw as needed. The Company earns interest on the outstanding loan balances drawn by the customer against their approved credit limit.

46.     Sizeable credit losses are an inherent part of the Company's business. The

Company is thus required to create an accounting reserve, or "allowance for loan losses," for those probable credit losses. To establish and maintain its allowance for loan losses, the Company takes a "provision," which is a periodic charge against its earnings. Calculating the provision for losses requires the Company to consider a variety of quantitative and qualitative factors regarding the loans originated by the Company. With installment and open-end loans, the Company is required to reserve for expected losses through a provision at the time of origination, even though revenues from those loans cannot be recognized until payments on the loan balances are collected from customers over time. Therefore, as the Company transitioned from small, short term single-pay loans to larger, longer-term open-end loans, the Company had to take larger "up-front" provisions against expected credit losses.

47.    Because the Company's open-end loans traditionally had higher loan balances as compared to its single-pay loans, the up-front provisions it was required to take on its open-end loans were also materially higher. The average single-pay loan was approximately $600, while the average open-end loan was approximately $2,400, with the average amount drawn of approximately $1,800, or three times the size of the average payday loan.

**B.    Tightening Payday Lending Regulations in Canada Threaten
The Company's Most Profitable Line of Business, Canadian Payday Loans**

48.    The Company's Canadian single-pay loans were the Company's most profitable single line of business, generating yields as high as *400%*. For the year ended December 31, 2017, single-pay loans comprised 27.9% of the Company's total revenues, almost half of which (15%) were derived from Canada. However, tightening payday lending regulations in Canada threatened the profitability of the Company's single-pay loans.

49.    Payday loans can be expensive, with annual interest rates ranging from 200% to more than 500%, depending on the state or province in which the loan is made. For instance, a

payday loan customer who borrows $500 typically owes about $575 two weeks later, which translates into an annual percentage rate of nearly 400%. If borrowers cannot repay their loans on time, they often borrow more and increase their debt, becoming ensnarled in a cycle of ultra-high interest debt. This cycle of adding on new debt to pay back the original debt can turn a single loan into a long-term debt trap. For instance. a 2018 report from Canada revealed that almost four out of ten insolvencies in Ontario involved payday loans, with the average insolvent payday loan borrower owing C$5,174 on an average of 3.9 different loans.

50.    Given the deceptive nature of these loans, the payday lending industry is heavily regulated. In Canada, payday loans are regulated by each province. The provincial payday lending regulations generally relate to cost of borrowing and related caps, disclosure requirements, collection activity requirements, and restrictions on certain types of lending practices. For instance, in Ontario, the Payday Loans Act of 2008 was created to regulate payday lenders like the Company. A number of Canadian provinces began regulating the payday lenders by passing new legislation that restricted their lending practices to protect Canadians.

51.    In May 2016, the Alberta government introduced Bill 15, "[a]n Act to End Predatory Lending," which lowered the borrowing rate for single-pay loans from C$23 to C$15 for every C$100 borrowed, making it the lowest rate in Canada. The proposed legislation also included provisions requiring lenders to allow borrowers to repay payday loans in installments, rather than all at once, and prohibiting lenders from directly soliciting potential customers, charging a fee to cash a check for a payday loan, and offering a loan when another is outstanding, among other changes. The C$15 rate cap became effective in August 2016 and final regulations for the installment payments became effective in November 2016.

52.    In November 2016, the Ontario Ministry of Government and Consumer Services

(the "Ontario Ministry") passed legislation reducing the total cost of borrowing on single-pay loans from C$21 to C$18 for every C$100 borrowed, with the new law becoming effective January 1, 2017.

53.     Also, on January 1, 2017, the British Columbia Ministry of Public Safety and Solicitor General ("British Columbia Ministry") reduced the total cost of borrowing from C$23 to C$17 for every C$100 borrowed. When the British Columbia Ministry announced this regulatory change, it also stated that it was considering whether, and to what extent, additional regulations may be warranted.

54.     In December 2017, the Ontario Ministry tightened regulations even more, limiting the cost to borrowers of single-pay loans at C$15 for every C$100 borrowed, with the new regulation becoming effective on January 1, 2018. The Ontario Ministry also announced further amendments effective July 1, 2018, that required: (a) a mandatory extended payment plan for borrowers with three or more loans with the same lender within a 63-day period; (b) a requirement that the loan amount cannot exceed 50% of the customer's net pay in the month prior to the loan; and (c) mandatory disclosures in advertisements and loan agreements about the cost of borrowing a payday loan.

55.     Because regulations in Canada had the potential to materially impact the Company's financial results and operations, Defendants closely monitored the Canadian regulatory environment and any proposed or final regulations. Defendants discussed the Canadian regulatory environment in the Company's SEC filings and discussed the topic on every quarterly earnings conference call since becoming a publicly traded Company, providing updates on existing or proposed legislation and answering questions from analysts about the impact of new regulations. Defendants were aware of and "anticipated" the impending regulatory changes in Ontario well

before they went into effect, along with the negative impact those regulations would have on the Company's operations and financial results.

56.     As a result of new regulations in Alberta, British Columbia, and Ontario that lowered the borrowing rates on payday loans, the Company began experiencing declining yields on its single-pay loans.   For instance, in 2016, the yields on single-pay loans in Canada were nearly 400%, but by 1Q18, the yields had declined substantially and were around 250%.

57.     To sustain the market's perception that the Company was a growing company, Defendants knew that the Company needed to transition out of single-pay loans in Canada, which were becoming less profitable for the Company, into other product offerings like installment and open-end loans.   One of the Company's stated "key drivers" of its continued growth was the Company's ability to successfully continue the "mix shift" in its products from single-pay to installment and open-end loans.

58.     Given the importance of the Ontario market to the Company's operations, the Company's ability to replace revenues derived from single-pay loans with revenues from other product offerings was especially critical.   Because open-end products have lower average yields, the Company needed to significantly increase the volume of open-end loans to offset the decline in single-pay revenues and yields.   For instance, open-end loans average a yield of only around 47% to 48% annually due to federal regulations in Canada that put a cap on the annual percentage rate of such loans.

### C.     The Company Starts to Transition Customers in Canada From Single-Pay to Installment and Open-End Loans

59.     As a result of the regulatory changes in Canada, Defendants implemented a strategy to replace single-pay loans in Canada.   The Company started to transition customers in Alberta and Ontario – which together accounted for 80% of the Company's Canadian revenues – away

from single-pay loans and into installment and open-end loans.

60.   The Company began the transition in Alberta where it converted existing single-pay customers into installment and then open-end loans and also acquired new open-end customers. The Company experienced "really good" demand in Alberta and said that "converting existing customers [was] going excellent."  By rolling out open-end loans in Alberta first, the Company was able to collect detailed customer data via the CURO Platform, which helped inform Defendants' expectations for the broader Canadian open-end product transition.

61.   In its fourth quarter 2017 ("4Q17"), the Company started opening small format LendDirect loan offices in Ontario, which focused on unsecured installment and open-end loans, rather than payday loans.  In February 2018, the Company began testing open-end loans in the Windsor, Ontario market and, during the initial test phase, converted nearly 3,000 single-pay loans to open-end loans.  The Company also expanded its LendDirect stores, opening two more stores in Canada during 1Q18.  According to Defendants, the Company was "very pleased" with the foot traffic, take-up rate, and first-pay default rates on the LendDirect open-end loan product.

62.   Based on the positive results in the test markets, and the recent regulatory changes, during 1Q18, Defendants made the decision to move up the transition to open-end loans in the broader Ontario market by an entire year – from 2019 to 2018.  Although the Company was transitioning away from its most profitable single line of business into the lower- yield open-end loans, Defendants reassured the market during the Company's 1Q18 earnings conference call on April 27, 2018 that despite the recent rate changes in Ontario, which the Company had "anticipated," single-pay lending would remain "viable in Ontario."  Defendant Gayhardt made clear to the market that the Company's transition out of single-pay loans in Canada would not be immediate or rapid, but would occur over the "next couple of years."

63.     During the Company's 1Q18 earnings conference call, Defendant Gayhardt also explained that the up-front provisioning resulting from the Canadian transition would have a negligible impact on the Company's operations, stating that as the Company continued to grow its open-end business, "the revenue and profitability from [installment and open-end] products [would] lag *a little bit* just because of the way you have to provision upfront." Defendant Dean similarly told the market that as a result of "open-end and installment growth in Canada," the Company's 2Q18 results could be "depressed," but that any pressure would be relieved by 3Q18, when the Company would start "to come out of that provision on loan growth pressure." Defendants further assured investors that the Company had "anticipated" any increased upfront provisioning from the Canadian transition "when we developed our forecast and our guidance" and that there was nothing "going on in terms of mix shift or the overall kind of growth trends" that was out of line with the Company's forecast.

64.     Defendants' statements led the market to believe that the Company's transition out of single-pay loans in Canada, would not impact the Company's overall financial results and ability to maintain and meet FY18 guidance. In fact, during the April 27, 2018 earnings conference call, Defendants were "very happy to affirm" the Company's FY18 guidance, which included net income in the range of $110 million to $116 million, adjusted EBITDA in the range of $245 million to $255 million, and EPS of $2.25 to $2.40.

65.     The market believed Defendants' statements. For instance, in an analyst report dated April 30, 2018, Jefferies Financial Group ("Jefferies") reported that "following the strong 1Q we have a high degree of confidence in the company's ability to achieve its strong guidance factors."

66.     On May 14, 2018, the Company filed a Registration Statement on Form S-1 with

the SEC for the Selling Stockholders Offering. On May 16, 2018, the SEC declared the registration statement effective, and on May 17, 2018, the Company conducted the Selling Stockholders Offering, which generated $109,250,000 in proceeds for the selling stockholders.

### D. The Company Completes the Transition to Open-End Loans in Ontario, but Conceals the Negative Financial Impact from the Transition and Reaffirms Guidance for 2018

67.     Seeking to capitalize on the favorable results in the Ontario test market, starting in May 2018, the Company increased the transition to open-end loans in Ontario. The Company converted existing single-pay customers into open-end loan products at the Company's remaining 107 branches in Ontario and also targeted new customers. Rather than moderate the transition away from single-pay loans over the "next couple of years," the Company quickly completed the majority of the transition by July 2018, and causing an undisclosed, materially negative, short-term impact to the Company's 3Q18 operations and financial results, and the Company's ability to meet its FY18 guidance.

68.     As part of Defendants' strategy to complete the transition to open-end loans in Ontario, the Company launched a marketing campaign, targeting existing single-pay and potential customers via direct mailing, cable TV, and other mediums. As Defendant Gayhardt described the Company's marketing strategy: "if you live in Ontario . . . unless you're kind of living in a cave, we think we've reached you multiple times with this advertising."

69.     The Company's marketing campaign was successful, as the market would later learn that the Company converted nearly 40,000 customers to open-end loans by the end of 3Q18. The Company's customers borrowed more money via the open-end loan product, which had an average open-end loan balance that was approximately three (3) times the size of the average payday loan. And because the Company targeted existing single-pay customers, the CURO

Platform gave Defendants detailed data about those customers, including information about originations, payments, defaults, and payoffs.    Defendants therefore knew or recklessly disregarded that open-end customers were taking out larger loans, resulting in larger loan balances and higher up-front provisions, which had a material, negative impact on the Company's operations and financial results.

70.    Although Defendants could have moderated the flow of customers from single-pay to open-end loans, thereby abating the increase in loan loss provisions and the decrease in single-pay revenue, as Defendants would later admit, they made the deliberate choice not to do so even though they knew or recklessly disregarded but concealed from the market, that the transition to open-end loans in Ontario came with significant operational risks (risks that later materialized).

71.    Instead of disclosing that the Company's transition to open-end loans had been completed by July 2018 or the resulting negative impact to the Company's operations and FY18 guidance, Defendants continued to conceal the true facts about the Company's Canadian transition. When announcing the Company's 2Q18 earnings results on July 30, 2018, *after* the Company had substantially completed the transition to open-end loans and *after* the "majority" of the losses stemming from the transition had already occurred, Defendants continued to tout their "confidence" in the Company's FY18 guidance and downplayed any impact to the Company's financial results or guidance as a result of the transition.

72.    As an example, during the Company's 2Q18 earnings conference call on July 31, 2018, Defendants provided an update on the "early stage of a very successful introduction transition of a big part of our Ontario lending business of the legacy single-pay loan product to a[n] [open-end] line of credit that's been very well received by our customers." During the July 31, 2018 call, Defendants disclosed for the first time that the Company had moved up the transition

to open-end loans in Ontario from 2019 to 2018, but did not disclose the truth: that the "majority" of the transition and the associated losses had already occurred.

73.     Defendants also provided the market with the false impression that any negative impact resulting from the transition had occurred in the just reported 2Q18, but would normalize in the second half of the year. During the July 31, 2018 earnings conference call, Defendants explained that the transition in Ontario could result in "lower revenue while the book builds and higher provision when larger balance dollars are originated," but provided the market with the false impression that the "higher provision" from the Company's transition had occurred in 2Q18, reporting "diluted earnings for [2Q18]" and explaining that the Company could have had "better earnings [in 2Q18] had we taken a more incremental approach." Defendants assured the market that the "growth rate for provision expense should match up better with revenue growth rates for the next couple quarters," that "our provision in the second half of the year would run about with revenue," and that "the provisioning should be in line with revenue."

74.     Although the Company cautioned that the transition could "impact earnings for the full year versus our plan" and that the ongoing Canadian transition was "too fluid" to completely discount a bit of downside risk, the Company nevertheless affirmed its previously announced FY18 guidance. Indeed, Defendant Gayhardt informed the market that he had a "very high degree of confidence in achieving" full year guidance and that there was "a good likelihood that we'll come out ahead on our internal forecasts and our published guidance."

75.     Analysts and investors believed Defendants' representations. For instance, in an analyst report dated July 30, 2018, Stephens, Inc. observed that, "2Q18 results were strong, and imply to us the need to raise our EPS estimates Since provisions are one-time and revenues are ongoing, that would imply upside to our future EPS estimates."

76.     The market did not know that, at the time of Defendants' statements on July 30 and

31, 2018, the Company had already completed the transition to open-end loans in Ontario, which

had a material, negative impact on the Company's operations, reducing Canadian single-pay

revenues, and meant that the Company would not be able to maintain or meet the FY18 guidance

Defendants told investors they had a "very high degree of confidence in achieving."

77.     Defendants knew or recklessly disregarded but concealed from the market, that the

Company's rapid transition to open-end loans in Ontario had resulted in more loans with larger

loan balances and, in turn, higher up-front provisioning.  Defendants also knew or recklessly

disregarded that the Company's advertising costs had skyrocketed as the Company spent more

money marketing its open-end loan products to existing and new customers. Further, the

Company's transition to open-end loans had destroyed single-pay revenue and, rather than

occurring over the course of a few years, the transition was substantially complete by the time of

Defendants' statements on July 30 and July 31, 2018, causing an undisclosed, negative short-term

impact to the Company's operations and financial results, and rendering the Company's FY18

guidance unachievable.

## E.     The Company Completes a $690 Million Senior Secured
## Notes Offering and Defendant Baker Sells Over $1 Million in Stock

78.     On August 6, 2018, the Company announced that it intended to offer $675 million

aggregate principal amount of its senior secured notes due 2025 in a private placement (the

"Offering"). On August 13, 2018, the Company announced that it had upsized the Offering from

$675 million to $690 million aggregate principal amount and disclosed that the senior secured

notes, due 2025, would be priced at 8.25%. The Company also disclosed that it intended to use

the net proceeds from the sale: (a) to redeem the outstanding 12% senior secured notes due 2022

of the Company's wholly owned subsidiary; (b) to repay the outstanding indebtedness under the

Company's wholly owned subsidiary, five-year revolving credit facility; (c) for general corporate purposes; and (d) to pay fees, expenses, premiums, and accrued interest in connection therewith.

79.     A little over a month later, beginning on September 25, 2018, Defendant Baker began selling 100% of his shares of Company stock. In two days, Defendant Baker sold 56,844 shares of Company stock for proceeds of $1,792,351.00. Just a month after Defendant Baker's stock sales, the Company would report disappointing 3Q18 results and substantially lower its FY18 guidance as a result of the transition to open-end loans in Canada and Ontario specifically.

## F.     The Company Reports EPS Below Analysts' Consensus and Reduces FY18 Guidance as a Result of the Transition to Open-End Loans in Canada

80.     On October 24, 2018, the Company reported its financial results for 3Q18. The Company reported revenue of $283 million, adjusted diluted EPS of only $0.23, and a year-over-year earnings decline "primarily due to required up-front provisioning." In the Company's press release, Defendant Gayhardt stated that the Company's results were "particularly affected by the acceleration of Open-End loan product in Canada" and "[t]he related upfront loan loss provisioning," which caused Canadian "net revenue and Adjusted EBITDA to drop by $10.9 million and $13.2 million sequentially." Canadian revenue also declined 8.8% year-over-year "primarily due to the continued product mix shift from Single-Pay," which was affected "primarily by regulatory changes in Canada (rate changes in Alberta, Ontario and British Columbia) leading to a shift to Open-End loans as well as a continued general product shift from Single-Pay to Installment and Open-End loans in all countries."

81.     Despite Defendants' representations just three months earlier that they had "a very high degree of confidence" in achieving, and even surpassing, FY18 guidance, the Company cut its adjusted EPS guidance for 2018 to $1.84 to $1.88, down from $2.25 to $2.40, lowered adjusted net income guidance to $88 million to $91 million, down from $110 million to $116 million, and

cut adjusted EBITDA guidance to $215 million to $218 million, down from $245 million to $255 million.

82. On October 25, 2018, the Company hosted an earnings conference call to discuss its 3Q18 results. Defendant Gayhardt started the conference call by "acknowledg[ing] that this quarter fell short of our expectations, and probably your expectations, and quite simply, is not up to our standards." Defendant Gayhardt further discussed that nearly the entirety of the operating earnings shortfall related to the Company's "ongoing Canadian product migration and increased loan loss provision related to higher-than-expected loan growth," and confirmed that "[b]y far the biggest impact to quarterly results was the ongoing product migration in Canada, specifically in the province of Ontario," and revealed that the Company was "dramatically reducing [its] Canadian Single-Pay revenue." Defendant Gayhardt also confirmed that "we completed the transition to [open-end] in Ontario and Alberta." In contrast to Defendants' prior representations that the loss provision in the second half of the year would run "about even" with revenue, the Company reported "loan loss as a percentage of revenue at 52.9%." Defendant Gayhardt reiterated that a "significant part" of the reduction in 2018 EPS guidance "relates to the allowance builds for line of credit product," *i.e.*, the up-front provisioning required for open-end loans.

83. Defendant Dean provided additional details on the Company's 3Q18 results, disclosing that adjusted EBITDA for the quarter was down 25.4% year-over-year driven by "elevated loan growth, related loan loss provisioning and higher ad spend" in connection with the Company's transition to open-end loans in Canada. The Canadian business missed expectations by more than $12 million "on loan portfolio mix shift and upfront provisioning on acceleration of Open- End in Ontario."

84. Then, Defendants all but admitted that they knew the Company's FY18 guidance

was unachievable at the time they reaffirmed it on April 27 and July 31, 2018 as a result of the transition from single-pay to open-end loans in Canada. Defendant Gayhardt conceded that "we did a less than stellar job of explaining in our – probably our July call or even back into our April call . . . the impact of this . . . in the near term . . . we probably didn't lay it out for everybody as explicitly as we probably should have. And we'll try not to make that mistake again." Dean also confirmed that the "majority" of the loss for 3Q18 "came in July."

85.     In response to Defendants' revelations, the price of Company stock tumbled 34%, or $7.69, falling from $22.87 per share on October 24, 2018 to a close of $15.18 on October 25, 2018.

86.     Analysts were also shocked by the Company's disclosures and reacted negatively to the Company's 3Q18 financial results, particularly its reported EPS of only $0.23, which missed analysts' consensus EPS of $0.52 by over 50%. In a report dated October 25, 2018, Credit Suisse commented that "the quarter was marred by upfront provisioning due to growth in lower-yield market (*i.e.*, Canada)" and decreased its price target for the Company as a result of its 3Q18 financial results and revised FY18 guidance. In a report dated October 26, 2018, Stephens observed that "[t]he miss and the resulting pain to Curo shares appears to be self- inflicted, driven by 1) over aggressive growth in the Canadian line of credit product, and 2) a lack of visibility into the scenarios of the guide down, either at the 2Q18 call or during the debt raise." Stephens also lowered its price target from $38.00 down to $22.00.

## G.     The Revelations

87.     On November 8, 2018, Defendants Gayhardt, Dean, and Baker presented at the Stephens Fall Investment Conference ("Stephens Conference"), during which they provided details about the Company's transition to open-end loans in Ontario. Defendant Gayhardt reported

that they made the decision to move up the transition to open-end loans in Ontario from 2019 to 2018 in 1Q18 and that they intentionally chose not to moderate the speed of the transition even though they could have done so. Defendant Gayhardt also reported that the bulk of the Ontario transition occurred in "May . . . June in honest," *i.e.*, before Defendants' statements on July 30 and 31, 2018.

88.     On January 31, 2019, the Company reported its financial results for the fourth quarter 2018 ("4Q18") and the year-ended December 31, 2018, disclosing that revenue from single-pay loans in Canada comprised only 7% of the Company's total revenue for 4Q18, compared to 14.6% for the same time period in 2017. For the year, single-pay loans had dropped to 10% of the Company's total revenue in 2018, down from 15% the prior year.

89.     On March 18, 2019, the Company filed its Form 10-K for the fiscal year ended December 31, 2018 ("2018 10-K"). Defendants admitted that the accelerated shift to open-end loans in Canada "came at the expense of single-pay loan balances." In the 2018 10-K, Defendants further disclosed that the Company's "disclosure controls and procedures were not effective" as of December 31, 2018.

90.     Then, on May 6, 2019, the Company filed its 1Q19 10-Q. In it, the Company disclosed that it had "received an inquiry from the SEC regarding the Company's public disclosures surrounding its efforts to transition the Canadian inventory of products from Single-Pay loans to Open-End loans."

## II.     THE COMPANY'S PUBLIC STATEMENTS

91.     Defendants failed to disclose the true extent of the negative short-term impact that the Company's rapid transition from single-pay to installment and open-end loans in Canada, where the Company generated a majority of its Canadian revenue, would have on the Company's

operations, financial results and FY18 guidance. Defendants' statements provided the market with the false impression that the transition would occur smoothly over a number of years; that any negative impact from the initiation of the transition would dissipate by 3Q18; that the transition would not negatively affect the Company's ongoing financial results or ability to maintain and meet FY18 financial guidance; and that the Company's Canadian single-pay loans, its most profitable single line of business, would remain viable during and after the transition. When Defendants elected to make such positive statements, they were under a duty to disclose the additional negative information about the Company and the Canadian transition that would have made such statements not misleading. However, Defendants failed to reveal this material information and, instead, omitted and concealed it from the market.

92.     The Company's rapid transition from high-yield, single-pay loans to lower yield, installment and open-end loans in Canada caused higher up-front provisioning and increased marketing spend, which negatively impacted net income and adjusted EBITDA, and diluted the Company's earnings. This information was material because it would have altered the total mix of information made available to reasonable investors as it related directly to a significant portion of the Company's revenues and involved the Company's most profitable single line of business in its largest Canadian market.

A.     **First Quarter 2018 Financial Results**

93.     On April 26, 2018, the Company issued a press release reporting its financial results for the quarter ended March 31, 2018 and confirmed the Company's FY18 guidance ("1Q18 Press Release"). The 1Q18 Press Release stated:

Fiscal 2018 Outlook

*The Company affirms its full-year 2018 adjusted earnings guidance*, a non-GAAP measure that excludes the $11.7 million of debt extinguishment costs from the

retirement of $77.5 million of the 12.00% Senior Secured Notes due 2022 and stock-based compensation, as follows:

- Revenue in the range of $1.025 billion to $1.080 billion
- *Net Income in the range of $110 million to $116 million*
- *Adjusted EBITDA in the range of $245 million to $255 million*
- Estimated tax rate of 25% to 27% for the full year
- *Adjusted Diluted Earnings per Share of $2.25 to $2.40*

94.     The 1Q18 Press Release also reported the Canadian regulatory changes and made materially false or misleading statements and/or omitted material facts concerning the Company's transition out of single-pay products to installment and open-end products in Canada. For instance, comparing the Company's 1Q18 results to the previous year's financial results, the 1Q18 Press Release noted declining single-pay revenue and increasing open-end loan balances as a result of the Company's intentional "product shift" from single-pay to installment and open- end loans:

> Single-Pay revenues were flat year-over year. The effect of Single-Pay receivables growth was offset by *regulatory changes in Ontario, Canada.* Open- End revenues rose 52.0% on organic growth in the U.S. and *the introduction of Open-End products in Virginia and Canada.*

*     *     *

> Open-End loan balances increased by $25.9 million compared to March 31, 2017 from year-over-year growth in Kansas and Tennessee of 12.2% and 8.6%, respectively, the 2017 launch of Open-End in Virginia and *conversion in the fourth quarter of 2017 of a portion of Canada Unsecured Installment loans to Open-End loans. The provision for losses and Open-End Allowance for loan losses as a percentage of Open- End gross loans receivable remained consistent with the previous quarter.*

*     *     *

> Single-Pay revenue and combined loans receivable during the three months ended March 31, 2018 were affected primarily by regulatory changes in Canada (rate changes in Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries.

95.     Comparing the Company's 1Q18 Canadian segment results to the same period in 2017, the 1Q18 Press Release stated:

Revenue in Canada was impacted by *the product transition in Alberta from Single-Pay loans to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Ontario and British Columbia.* Canada revenue improved $4.7 million, or 11.3% to $46.3 million for the three months ended March 31, 2018 from $41.6 million in the prior year period. On a constant currency basis, revenue was up $2.6 million, or 6.3%.

\* \* \*

The provision for losses increased $2.3 million or 22.7% to $12.6 million for the three months ended March 31, 2018 compared to $10.2 million in the prior year period, *primarily due to relative loan volumes and mix shift from Single-Pay loans to Unsecured Installment and Open-End loans.* On a constant currency basis, provision for losses increased $1.8 million, or 17.2%.

\* \* \*

Operating expenses increased $1.6 million, or 45.5%, to $5.0 million in the three months ended March 31, 2018, from $3.4 million in the prior year period, *due to . . . expansion of the LendDirect business, and product shifts from Single-Pay loans to Unsecured Installment and Open-End loans.*

96.     On April 27, 2018, the Company hosted a conference call with analysts and investors to discuss the Company's operations and 1Q18 financial results. During the call, Defendants Gayhardt, Dean, and Baker spoke positively about the Company's financial results and operations and the Canadian product transition. For instance, Defendant Gayhardt credited the Company's transition out of single-pay products as one of the "key drivers" of the Company's "growth":

Current 4 key drivers for this growth: First is the continued mix shift in our products to install the (inaudible) lines of credit, which, together, accounted for 71.4% of our total revenue, up from 57.2% in the prior year quarter. . . .

97.     Defendant Gayhardt also reported the "anticipated" regulatory changes and their impact on Ontario's single-pay business, and assured the market of the ongoing "viability" of Ontario's single-pay product:

In Canada, new rules came into effect in Ontario and lowered the maximum rate from $18 per $100 lent to $15 per $100 lent effective January 1 of this year. And

we're working to incorporate a new extended payment plan and an ability to repay guideline for release on July 1. *We had anticipated these changes and believe that Single-Pay lending remains viable in Ontario, although we will continue to expand our Installment and Open-End offerings in Ontario and other provinces.*

98.     Defendant Gayhardt further stated: "we're very happy to affirm the guidance we gave you in January" and assured investors that "I'm relatively certain we have a much higher degree of confidence in delivering on those numbers, and we look forward to discussing guidance in more detail after our June quarter."

99.     Defendant Dean also reported that the Company was "affirming full year 2018 adjusted earnings guidance" and noted that the Company "continue[d] to anticipate revenue in the range of $1.025 billion to $1.080 billion and with continued solid growth in the U.S. and U.K. being offset partially by declines in Canada from the additional regulatory changes in the middle of the year." Defendant Dean further "affirm[ed] adjusted EBITDA in the range of $245 million to $255 million, adjusted net income in the range of $110 million to $116 million and adjusted diluted earnings per share in the range of . . . $2.25 to $2.40."

100.    During the April 27, 2018 conference call, analysts questioned Defendants about the Canadian transition and its impact on the Company's ongoing business. For instance, analysts asked about the Company's portfolio "adjusting" towards installment loans and away from single-pay loans, and about the Canadian regulatory changes and any accompanying impact on the Company's overall business. Analysts also inquired about the Company's "confidence level" that credit losses and provisions as a percentage of revenue "would be relatively stable with a year ago as we go through 2018." In response, Defendant Gayhardt stated that the Company's line of credit products (*i.e.*, installment and open-end loans) required "upfront provisioning," and that with the "mix shift," "the revenue and profitability from those products will lag a little bit just because of the way you have to provision upfront," but assured the market that any increased provisioning

"trend" resulting from the product transition was "starting to . . . normalize," stating:

> So there's still some of that, but we're also starting to sort of lap some growth in those products. So it's -- I think what we're kind of getting is that all I call a little bit more of a normalized phase. If we're growing revenues in the mid-teens, and a lot of that is consisting of the shift in the Installment line of credit stuff and we're starting to kind of normalize on those trends a little bit.

101.   Defendant Gayhardt further reported that any upfront provisioning resulting from

the product transition in Canada was already "anticipated" and factored into the Company's "2018

forecast" and "guidance," stating:

> Canada, as you mentioned, we are seeing much more pronounced kind of mix shift from Single-Pay to Installment. We went through that in Alberta. We're growing the LendDirect business in the stores, [went] online in Ontario, which is about 2/3 of our overall Canadian business. You'll start to see more of that as well, so there'll be some of that provisioning, but I think we're -- *we had anticipated that and when we developed our forecast and our guidance, we -- there's nothing really going on in terms of mix shift or the overall kind of growth trends, it's that it's out of line with our forecast.*

102.   When asked about the Company's "earnings" and how the market should view

"quarterly earnings for the next 3 quarters," Defendant Dean highlighted how "Open-End and

Installment growth" in Canada would result in a "depressed" 2Q18, but assured the market that

any "pressure" from provisioning for losses in Canada would dissipate in 3Q18 and 4Q18.

Defendant Dean stated:

> [W]e see good growth in Q2 in earning assets coming out of that trough, and we already are. And that growth in Q2 puts pressure on provision providing on that loan growth coming out of the trough. So Q2 is always seasonally our lowest earnings quarter of the year. And then we pop back up in Q3 and Q4 tend to be -- the balances build through the end of Q2 and into August to peak kind of late in the third quarter and kind of stay there. So -- and so if you think about it, you think about the Open-End and Installment growth in Canada, it basically -- you've got Q2 in a much -- is depressed. Q3 starts to come out of that provision on loan growth pressure, and then Q4 tends to be another high quarter. So -- and typically, Q1 and Q4 are the 2 highest.

103.   Defendant Baker also reported: "[w]ith the new regulatory changes in Ontario, we

still think Single-Pay is going to be viable."

104.    When asked about "targets" for the Company's "mix-shift," Defendant Gayhardt

discussed the Canadian transition and assured the market that the transition out of single-pay

products in Canada would not be rapid or immediate, but, instead, would occur over the "next

couple years":

> So Canada is 13%, Canada Single-Pay is 13% of total revenue, that's down from
> 15% last year. I suspect you'll see that Canada number probably cut in half over
> the next couple of years and maybe even go lower than that depending on how --
> what the take-up rate and success rate of our line of credit product is there. . . .
>
> And Canada, I suspect that 13% will be cut in half over the next couple of years as
> well. So you could see 23% between Canada and U.S. Single-Pay revenue. I think
> you could see that number go, that combined number go below 10% in the next
> couple of years.

105.    Analysts reacted positively to Defendants' statements on April 26 and April 27,

2018, expressing "confidence" in the Company's guidance.  For instance, on April 30, 2018,

Jefferies increased its price target for the Company from $21 to $30, stating "following the strong

1Q we have a high degree of confidence in the company's ability to achieve its strong guidance

factors."

106.    On May 3, 2018, the Company filed its Form 10-Q ("1Q18 10-Q") with the SEC,

signed by Defendant Dean and confirmed the Company's previously announced financial results

and financial position. The 1Q18 10-Q represented that management's disclosures, controls, and

procedures were effective: "Based on an evaluation of our disclosure controls and procedures as

of the end of the period covered by this report conducted by our management, with the participation

of the Chief Executive Officer and Chief Financial Officer, the Chief Executive Officer and Chief

Financial Officer concluded that these controls and procedures were effective as of March 31,

2018."

107.    The 1Q18 10-Q included certifications required by the Sarbanes-Oxley Act of 2002

("SOX") signed by Defendants Gayhardt and Dean:

I, [Don Gayhardt/Roger Dean], certify that:

1.     I have reviewed this quarterly report on Form 10-Q of CURO Group
Holdings Corp. (the "registrant");

2.     Based on my knowledge, *this report does not contain any untrue statement
of a material fact or omit to state a material fact necessary to make the
statements made*, in light of the circumstances under which such statements
were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial
information included in this report, fairly present in all material respects the
financial condition, results of operations and cash flows of the registrant as
of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for
establishing and maintaining disclosure controls and procedures (as defined
in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over
financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-
15(f)) for the registrant and have:

a.     Designed such disclosure controls and procedures, or caused such
disclosure controls and procedures to be designed under our
supervision, to ensure that material information relating to the
registrant, including its consolidated subsidiaries, is made known to
us by others within those entities, particularly during the period in
which this report is being prepared;

b.     (Paragraph omitted pursuant to SEC Release Nos. 33-8238/34-
47986 and 33-8392/34-49313);

c.     *Evaluated the effectiveness of the registrant's disclosure controls
and procedures and presented in this report our conclusions about
the effectiveness of the disclosure controls and procedures, as of the
end of the period covered by this report based on such evaluation*;
and

d.     Disclosed in this report any change in the registrant's internal
control over financial reporting that occurred during the registrant's
most recent fiscal quarter (the registrant's fourth fiscal quarter in the
case of an annual report) that has materially affected, or is
reasonably likely to materially affect, the registrant's internal

control over financial reporting; and

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

108.     The 1Q18 10-Q further stated:

*Open-End loan balances increased by $25.9 million compared to March 31, 2017 from year-over-year growth in Kansas and Tennessee of 12.2% and 8.6%, respectively, the 2017 launch of Open-End in Virginia and conversion in the fourth quarter of 2017 of a portion of Canada Unsecured Installment loans to Open-End loans. The provision for losses and Open-End Allowance for loan losses as a percentage of Open-End gross loans receivable remained consistent with the previous quarter.*

\*    \*    \*

*Single-Pay revenue and combined loans receivable during the three months ended March 31, 2018 were affected primarily by regulatory changes in Canada (rate changes in Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries.*

109.     The 1Q18 10-Q also discussed the Canada segment:

*Revenue in Canada was impacted by the product transition in Alberta from Single-Pay to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Ontario and British Columbia.* Canada revenue improved $4.7 million, or 11.3% to $46.3 million for the three months ended March 31, 2018 from $41.6 million in the prior year period. On a constant currency basis, revenue was up $2.6 million, or 6.3%.

\*    \*    \*

The provision for losses increased $2.3 million, or 22.7% to $12.6 million in the three months ended March 31, 2018 from $10.2 million in the prior year period,

*primarily due to relative loan volumes and the mix shift from Single-Pay loans to Unsecured Installment and Open-End loans.* On a constant currency basis, provision for losses increased \$1.8 million, or 17.2%.

*       *       *

Operating expenses increased \$1.6 million, or 45.5%, to \$5.0 million in the three months ended March 31, 2018, from \$3.4 million in the prior year period, due to increased collections and customer support payroll expenses from seasonality, increased volumes, *expansion of the LendDirect business, and product shifts from Single-Pay loans to Unsecured Installment and Open-End loans. On a constant currency basis, operating expenses increased \$1.3 million, or 39.2%.*

110.    On May 14, 2018, the Company filed its Registration Statement on Form S-1 with the SEC for the Selling Stockholders Offering, and on May 17, 2018, the Company filed its prospectus (the "Selling Stockholders Offering Documents"). The Selling Stockholders Offering Documents incorporated by reference the false and misleading statements and omissions made in the Company's 1Q18 Press Release and 1Q18 10-Q.

111.    Defendants' statements on April 26 and 27, 2018, in the 1Q18 10-Q, as set forth above, and as incorporated into the Selling Stockholders Offering Documents, were materially false or misleading and/or omitted material facts:

(a)    Defendants' statements misrepresented and failed to disclose the true, negative, short-term impact that the Company's transition from single-pay to installment and open-end loans in Canada would have on the Company's financial results, including diluting the Company's Adjusted EBITDA, net income, and EPS.   For instance, Defendants credited the Company's "continued mix shift" to open-end loans as a key driver of the Company's "growth" while failing to disclose that the Canadian transition would negatively impact the Company's financials in the near term.   In addition, Defendants' statements that any increased provisioning relating to the Canadian transition was "starting to normalize," and loan growth in 2Q18 would put "pressure on provision[s]" leading to a

{00226381.DOCX; 1 }36

"depressed" 2Q18, but that 3Q18 would "start[] to come out of that provision on loan growth pressure" gave investors the false impression of a smooth transition to open-end loans and that any negative impact from the initiation of the Canadian transition would dissipate by 3Q18 and would not affect the Company's ability to maintain and meet FY18 financial guidance. The transition would materially impact the Company's ongoing financial results and FY18 guidance.

(b)     Defendants failed to disclose that the transition to open-end loans would come at the expense of the Company's Canadian single-pay revenue, which was historically the Company's most profitable line of business. Rather than remain "viable," single-pay revenue was being destroyed by open-end loans during the transition. Further, instead of being cut in half over "a couple of years," Canadian single-pay revenue would be dramatically reduced, dropping 50%, from approximately 16% of the Company's total revenue in 3Q17 to only 8% of the Company's total revenue by the end of 3Q18.

(c)     Defendants' statements gave investors the false impression that the upfront provisioning associated with the Canadian transition to open-end loans was already "anticipated" and factored into the Company's "forecast" and "guidance." In truth, as a result of the transition to open-end loans in Canada, and Ontario specifically, and the resulting materially higher upfront loan loss provisioning, Defendants had no reasonable basis to expect, and did not in fact expect, that the Company could achieve FY18 net income in the range of $110 million to $116 million, adjusted EBITDA in the range of $245 million to $255 million, and EPS in the range of $2.25-$2.40.

(d)     The Company's 1Q18 10-Q was false and misleading because it failed to disclose the negative effect of the Company's transition from single-pay loans to

installment and open-end loans on the Company's current period results and future financial results in violation of SEC disclosure rules, as set forth below.

(e)     The Company's 1Q18 10-Q and the SOX Certifications Defendants Gayhardt and Dean signed were also false and misleading because they represented that the Company's disclosure controls were operating effectively when they were not.

## B.     Second Quarter 2018 Financial Results

112.     On July 30, 2018, the Company issued a press release announcing its financial results for the quarter ended June 30, 2018 (the "2Q18 Press Release"). In the 2Q18 Press Release, Defendant Gayhardt stated his "confidence" that the Company would meet its "full year guidance":

We are pleased to announce year-over-year loan growth of 26.9% and sequential loan growth of 14.1%, adjusted earnings growth in the first half of 2018 of 18.9%, and the execution of a milestone bank partner agreement that allows us to expand our lending footprint in the U.S. *Our momentum*, improvement in credit metrics *and solid loan growth has further bolstered our confidence in our full year earnings guidance* . . . .

113.     The 2Q18 Press Release "affirm[ed]" the Company's 2018 guidance for adjusted net income, adjusted EBITDA, and adjusted diluted EPS, and again highlighted the Company's "confidence" in meeting guidance objectives:

Fiscal 2018 Outlook

*We affirm our full-year 2018 adjusted earnings guidance Our solid results for the first half of 2018 and above-expectation loan growth has further bolstered our confidence in our guidance*. Our full-year 2018 guidance is as follows:

- Revenue in the range of $1.025 billion to $1.080 billion
- *Adjusted Net Income in the range of $110 million to $116 million*
- *Adjusted EBITDA in the range of $245 million to $255 million*
- Estimated tax rate of 25% to 27% for the full year
- *Adjusted Diluted Earnings per Share of $2.25 to $2.40*

114.     The 2Q18 Press Release also made materially false or misleading statements and/or omitted material facts concerning the Company's transition from single-pay to installment and

open-end loans in Canada, assuring the market that any "accelerated open-end growth" was having

a minimal impact on the Company's single-pay balances. For instance, for the three months ended

June 30, 2018, the 2Q18 Press Release stated:

> *Single-Pay revenues were affected primarily by regulatory changes in Canada (rate changes in Alberta, Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries.* Open-End revenues rose 72.2% on organic growth in the U.S. and the introduction of Open-End products in Virginia and Canada. *Open-End adoption in Canada accelerated this quarter as related loan balances grew $34.3 million sequentially from the first quarter. Even with the accelerated Open-End growth, Single-Pay balances in Canada only shrank sequentially by $1.4 million.*

*     *     *

> Open-End loan balances as of June 30, 2018 increased by $64.3 million, or 240.0%, compared to June 30, 2017 from year-over-year growth in Kansas and Tennessee of 26.9% and 20.6%, respectively, the third quarter 2017 launch of Open-End in Virginia, conversion of most of Alberta's Unsecured Installment loans to Open-End loans *and the launch of Open-End loans in Ontario. Open-End adoption in Canada accelerated this quarter as related loan balances grew $34.3 million sequentially from the first quarter.*

> The Open-End Allowance for loan losses as a percentage of Open-End gross loans receivable declined year-over-year and sequentially, primarily due to geographic mix and seasoning of the U.S. portfolio. At June 30, 2018, Canadian Open-End gross loans receivable comprised 56.4% of the total, compared to none at the end of the prior year quarter.

*     *     *

> Single-Pay revenue and loans receivable during the three months ended June 30, 2018 declined slightly year-over-year, *primarily due to regulatory changes in Canada (rate changes in Alberta, Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries compared to the three months ended June 30, 2017.* Even with the aforementioned accelerated Open-End growth in Canada, Single-Pay balances in Canada only shrank sequentially by $1.4 million. Provision for losses and net charge-offs were consistent for the quarter and Single-Pay Allowance for loan losses as a percentage of gross loans receivable remained consistent sequentially.

115.    Comparing the Company's Canada Segment Results for 2Q18 to 2Q17, the 2Q18

Press Release stated:

Canada revenue improved $3.4 million, or 7.9%, to $47.0 million for the three months ended June 30, 2018 from $43.6 million in the prior year period. On a constant currency basis, revenue was up $1.6 million, or 3.6%. *Revenue growth in Canada was impacted by the product transition from Single-Pay loans to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Alberta, Ontario and British Columbia.*

Single-Pay revenue decreased $1.6 million, or 4.6%, to $33.3 million for the three months ended June 30, 2018 and Single-Pay ending receivables decreased $1.1 million, or 2.2%, to $47.3 million from $48.4 million in the prior year period *due to mix shift in Ontario where we launched Open-End loans in the fourth quarter of 2017.*

Canadian non-Single-Pay revenue increased $5.0 million, or 58.4%, to $13.7 million compared to $8.6 million the same quarter a year ago on $31.9 million, or 74.5%, growth in related loan balances. *The increase was primarily related to the launch of Open-End products in Alberta and Ontario in the fourth quarter of 2017.*

The provision for losses increased $4.1 million, or 39.4%, to $14.4 million for the three months ended June 30, 2018 compared to $10.3 million in the prior year period, *because of upfront provisioning on relative loan volumes* (total Open-End and Installment loans grew sequentially by $20.9 million this second quarter compared to $10.9 million in the second quarter of 2017), and mix shift from Single-Pay loans to Unsecured Installment and Open-End loans. On a constant currency basis, provision for losses increased $3.5 million, or 33.7%.

\*     \*     \*

Operating expenses increased $1.6 million, or 45.5%, to $5.0 million in the three months ended March 31, 2018, from $3.4 million in the prior year period, due to increased collections and customer support payroll expenses from seasonality, increased volumes, *expansion of the LendDirect business, and product shifts from Single-Pay loans to Unsecured Installment and Open-End loans.* On a constant currency basis, operating expenses increased $1.3 million, or 39.2%.

116.    On July 31, 2018, the Company hosted a conference call with analysts and investors to discuss the Company's operations and 2Q18 financial results. During the call, Defendants Gayhardt, Dean, and Baker spoke positively about the Company's financial results and the Canadian product transition. For instance, Defendant Gayhardt reported that the Company's quarter from an "operational standpoint" and highlighted the "successful introduction" of the transition in Ontario:

We made great progress on. . . *the early stage of a very successful introduction transition of a big part of our Ontario lending business of the legacy single-pay loan product to a line of credit that's been very well-received by our customers.*

We'll unpack the Ontario transition in some detail later on, but *it's a big undertaking that's going very well and is running well ahead of schedule.* We did all this while maintaining our credit and other financial disciplines. These are big projects that require many people from many departments to work together, and we're incredibly proud of all of our CURO team members for giving this a huge effort this quarter.

117.    Defendant Gayhardt also commented on the Company's increased "provision

build" and "advertising expenses" in 2Q18:

From a bottom line perspective, the quarter was very good, *but the provision build associated with the second quarter asset growth increased advertising expenses for our newer brands* and the expenses related to the ongoing affordability settlements in the U.K. combined to keep earnings from coming in at a level that we would characterize as excellent. *But the good news is our U.S. business is extremely strong and performing in a way that more than makes up for any shortfall from our international operations.*

118.    Defendant Gayhardt further stated that the Canadian product transition was "too

fluid" to "completely discount a bit of downside risk" on the Company's FY18 guidance, but

nevertheless calmed the market's concerns about any negative impact to the Company's financial

position by re-affirming the Company's FY18 guidance. Defendant Gayhardt further highlighted

the Company's "*high degree of confidence*" in achieving guidance, telling investors that there was

a "good likelihood" that the Company would beat guidance estimates:

*We are affirming our guidance today . . . we have a very high degree of confidence in achieving our guidance objections.* And, obviously, today we're about 60% of the way through the year, so that certainly helps. And our confidence in our core business and products is very high. It's probably just that the Canadian product transition and the U.K. affordability issue are both too fluid for us to completely *discount a bit of downside risk* on both those fronts.

So looking at our current forecast, we expect our Canadian and U.K. *operations to fall short of our operating earnings plan for the full year 2018* in the range of $10 million -- that's U.S. $10 million. So sitting here today, we do think, as I just mentioned, the U.S. business will be able to make – to more than make up for these

projected international shortfalls, and *we believe that there's a good likelihood that we'll come out ahead on our internal forecasts and our published guidance.*

119.   Defendant Gayhardt also informed investors that the Company had "moved up" the

introduction of the transition in Ontario from 2019 to 2Q18, but failed to disclose to investors that

instead of moderating the transition over several years, the majority of the transition had already

occurred:

First, in Canada, as I mentioned earlier, ongoing changes in the provincial regulation of single-pay lending in Canada, coupled with our growing competencies in marketing, underwriting and servicing line of credit products, *brought us to the decision to accelerate the transition of our product offerings, particularly in Ontario, which accounts for about 2/3 of our Canadian revenue.*

Although we anticipated introducing a line of credit product in our Ontario locations during 2019, *early test results we initiated in February of this year were incredibly favorable in terms of acquisition costs, credit performance, take-up rates, line utilization, and really the whole deal, so we moved up our -- we simply moved up our conversions schedule.*

120.   Defendant Gayhardt also explained the Ontario transition's concomitant impact on

the Company's provisioning and marketing:

So what does that mean? It means higher earning asset balances in our line of credit portfolio in Canada than previously forecasted, but lower yields and lower revenue while the book builds *and higher provision when larger balance dollars are originated.*

We started the quarter with just over $53 million in non-single-pay – these are all U.S. dollars, by the way. We started the quarter with just over $53 million in non-single-pay balances, and we ended the quarter with $74.7 million, and *having booked the kind of larger marketing and convergence plan in late June, the balances today sit at over $115 million, so great growth, all driven by tremendous customer communication and service by our store and call center teams in Canada.*

121.   Defendant Gayhardt sought to allay the markets concerns from the Company's

decision to move up the introduction of the transition in Ontario from 2019 to 2Q18 by explaining

that any negative impact would be temporary and, in fact, had already manifested in 2Q18:

As I mentioned, short-term, this approach diluted earnings for the quarter. There's

{00226381.DOCX; 1 }42

really no question we could have had better earnings had we taken a more incremental approach, and it will impact earnings for the full year versus our plan, but long-term, if the portfolio continues to build through the remainder of the year, our exit rate will be very high, and we'll have a much more diverse and stronger business in Canada that will drive substantial operating earnings gains in Canada in 2019.

122.   Defendant Dean further falsely informed the market that he was "happy" that the

worst was behind them when it came to increased loan loss provisioning, noting that Company-

wide provisioning would be "less noisy" in the second half of the year:

> I'm happy to say that we should expect less noisy comps for loss provisioning in the second half of the year. The growth rate for provision expense should match up better with revenue growth rates for the next couple quarters.

123.   Defendant Dean shed some light on the Company's increased advertising expense

for the quarter, blaming the Company's targeted transition away from single-pay loans, expanded

marketing channels, and the ramp up of Canada's LendDirect brand:

> Canadian advertising rose 19.4% for three reasons. Number one, mix. We are targeting and acquiring more installment loan and open-end customers than a year ago. Two, the marketing channels we're using. We have expanded cable TV and direct mail spend in Canada. And three, the new product expansion -- supporting new product expansion, including the LendDirect stores in Canada, and increased spend to support the ramp-up of the LendDirect brand.

124.   Defendant Dean affirmed that while "open-end adoption in Canada accelerated this

quarter," Canada's single-pay revenues decreased a minimal amount:

> [Defendant Gayhardt] mentioned that open-end adoption in Canada accelerated this quarter. The open-end balances actually grew $34 million sequentially from first quarter, and it was encouraging that even with this acceleration of the open-end product, Canadian single-pay balances shrank sequentially just $1.4 million.

125.   Defendant Dean again affirmed guidance and told the market that the Company

was "already at the top end of revenue guidance," that the second half of the year would have more

favorable EBITDA than the first, and downplayed the impact of any mix-shift in Canada:

> Finally, I'll close with our full year outlook for 2018. *Like [Gayhardt] mentioned,*

*we are reiterating -- or we are affirming our full year 2018 adjusted earnings guidance.* That's a non-GAAP measure that excludes one-time items, like the aforementioned share-based compensation.

We continue to anticipate revenue in the range of $1.025 billion to $1.080 billion, with continued solid growth in the U.S. and U.K. being offset partially by *modest declines in Canada from the additional regulatory changes and mix shift there.* In fact, if you do the first half second math -- second half math, at this point, *we'd be surprised if we weren't already at the top end of the revenue guidance range.*

Adjusted EBITDA in the range of -- our adjusted EBITDA will fall in the range of $245 million to $255 million, and our adjusted net income will be in the range of $110 million to $116 million, with adjusted diluted earnings per share in the range of $2.25 to $2.40.

One other thing to point out about the full year, if you look at our last year numbers, adjusted EBITDA for the first half of the year was higher than then second half of the year. There are a lot of reasons for that, but our guidance for this year implies that that will flip this year. In other words, we reported $124 million of adjusted EBITDA through the first 6 months of 2018. *At the midpoint of our guidance, that means we would exceed $126 million of adjusted EBITDA for the second half of the year with related higher year-over-year growth rates.*

126. During the July 31, 2018 conference call, analysts specifically questioned Defendants about the Company's FY18 guidance and any assumptions on the "low end to the high end of the EPS guidance," as well as any seasonality that would impact 3Q18 or 4Q18. In response, Defendant Gayhardt acknowledged that the Company was a "little cautious" in terms of the Ontario transition and did not want to "overpromis[e] or underproject [] on what's happening in Canada," but failed to disclose to the market that the majority of the Ontario transition had already occurred as of July 31, 2018 and would have detrimental effects on 3Q18 and the Company's FY18 guidance. Instead, Defendant Gayhardt falsely reassured analysts and the market that *"we would expect that our provision in the second half of the year would run about with revenue."*

127. Defendant Dean reiterated his previous comments that provisioning would have a less negative impact on revenue in 3Q18 and 4Q18: *"It'll be close. It will be much closer, much*

*less noisy than the first half."*

128.    Defendant Gayhardt also explained that "if revenue is going to grow in that 15%

range, 14%, 15% range, provision grows in that, so net revenue growth should run about with

gross revenue growth." Defendant Gayhardt further discussed the increased advertising initiatives

the Company was undertaking as part of the transition, and – for the third time on the conference

call–confirmed that *"provisioning should be in line with revenue"* for the second half of the year:

> The other, bigger piece of the P&L, from an advertising standpoint, given the
> continued transition in Ontario -- there's some ad support for that. *Again, that's
> transitioning existing customers, but we are getting a really good take-up rate from
> new customers, so we're going to continue to advertise. As we like to say, if you
> live in Ontario, it's very -- unless you're kind of living in a cave, we think we've
> reached you multiple times with this advertising, but we're going to continue to
> push that.* So we would expect -- in that and our Avio product in the U.S., we would
> expect that our ad spend as a percentage of revenue -- last year, I think it was about
> 6.5% in the second half of the year. It'll likely go up maybe 140, 150 basis points,
> in the 7.8% to 8% range, for the back half of the year. So that'll be a bit higher than
> last year, but, again, *the revenue growth is there and the provisioning should be in
> line with revenue.*

129.    Defendant Gayhardt further concluded by assuring the market of "revenue growth"

in Canada for the year, despite reductions "on the earnings side" resulting from the transition in

Ontario, and touted the Company's ability to "afford" and maintain "positive" "numbers":

> And just one more comment, just for the context. As I mentioned, we did $186
> million in revenue in Canada last year, U.S. dollars, *and our forecast is we'll do
> right -- for the full year this year, we'll do right around $200 million, so we'll see
> some revenue growth,* but adjusted EBITDA last year in that business, in U.S.
> dollars, was $54.6 million. We could see in the range of a $20 million reduction in
> that adjusted EBITDA number. *We initially thought it was going to be down in the
> $10 million range. It could be more than double that down, given the acceleration
> of the transition. So that's a really meaningful hit on the earnings side, but the flip
> side of that, as I mentioned, if we get through this transition, the exit rate should
> put us on a path to get back to that 2017 EBITDA number.* Now, this is not a
> forecast, I just want to make it very clear, but that's -- when we talk about objectives
> internally and think about things, it's our idea that we're going to get back to that
> 2017 adjusted EBITDA number. We may not get all the way back there in '19, but
> we're certainly going to be -- we'll get a large measure of it back. *And when you
> look at that from an earnings growth standpoint, and fortunately, the U.S. side of*

*the business is doing well enough for us to be able to sort of, I guess, afford to do that transition and still have our overall numbers be really, really positive.*

130.   When questioned about whether the decline in single-pay in Canada would "accelerate," Defendant Baker discussed the success of the Windsor, Ontario test stores and assured investors that any decline would be temporary before bouncing back and that Canadian single-pay was still "an extraordinary viable product":

I mean, when we ran the test, we did 21 testers in Ontario starting in February, and what we experienced there with single-pay is we did see a decline due to all the things that Don just talked about with the line of credit, but we did see it start to come back, and we expect to see the same thing in the broader Ontario rollout. . . . So we expect that to come back a bit, and I think that will temper the decline on single-pay, but clearly there's a big transition, but we -- if you look at the yields, even with the extended payment plan and the net income limitations, it still yields around 200%, so it's an extraordinary viable product, and we don't necessarily want to be out of that business in Ontario, so it's a bit of a balancing act to make sure we offer the right product to the right customer.

131.   As a result of Defendants' false or misleading statements and/or omissions, analysts and the market were under the false impression that any negative impact from the introduction of the transition to open-end loans in Ontario had occurred in the just-reported quarter and would not impact the Company's future results or FY18 guidance. For example:

(a)   On July 30, 2018, Stephens issued an analyst report stating: "2Q18 results were strong, and imply to us the need to raise our EPS estimates Since provisions are one-time and revenues are ongoing, that would imply upside to our future EPS estimates."

(b)   On July 31, 2018 Credit Suisse gave the Company an "OUTPERFORM" rating and observed: "Results were strong in the U.S., but somewhat weaker in Canada and the U.K., though [management] expressed confidence that the pricing changes in Canada should allow CURO to diversify its business and drive operating earnings in Canada in 2019. Net results were in-line with expectations, though [management] indicated there is a

good likelihood that CURO will come in above guidance range in 2018." Credit Suisse further noted, "CURO accelerated transition towards open line of credit product in Ontario this quarter, resulting in a significant ramp up in Canada open-ended balance."

(c)     On July 31, 2018, Janney Montgomery Scott LLC ("Janney") issued an analyst report reiterating its "buy" rating for the Company common stock and noted: "This rise in the provision expense is really what kept CURO from reporting much better than expected 2Q:18 results." Commenting on open-end loan growth, Janney stated, "Clearly, open-end growth is an outlier, which was driven by an earlier than expected roll out of this product in Canada."

132.     On August 2, 2018, the Company filed its Form 10-Q ("2Q18 10-Q") with the SEC, which confirmed the Company's financial results and financial position from the 2Q18 Press Release, was signed by Defendant Dean, and included Disclosure Control Statements that were substantially similar to the statements above. The 2Q18 10-Q also included SOX Certifications signed by Defendants Gayhardt and Dean that were substantially similar to the Certifications described above.

133.     Discussing the Company's 2Q18 financial results and the Canadian transition, the 2Q18 10-Q stated:

> *Single-Pay revenues were affected* primarily by regulatory changes in Canada (rate changes in Alberta, Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries. Open- End revenues rose 72.2% on organic growth in the U.S. and the introduction of Open-End products in Virginia and Canada. *Open-End adoption in Canada accelerated this quarter as related loan balances grew $34.3 million sequentially from the first quarter. Even with the accelerated Open-End growth, Single-Pay balances in Canada only shrank sequentially by $1.4 million.*
>
> *         *         *
>
> Open-End loan balances as of June 30, 2018 increased by $64.3 million, or 240.0%

compared to June 30, 2017 from year-over-year growth in Kansas and Tennessee of 26.9% and 20.6%, respectively, the third quarter of 2017 launch of Open-End in Virginia, *conversion of most of Alberta's Unsecured Installment loans to Open-End loans and the launch of Open-End loans in Ontario. Open- End adoption in Canada accelerated this quarter as related loan balances grew $34.3 million sequentially from the first quarter.*

The Open-End Allowance for loan losses as a percentage of Open-End gross loans receivable declined year-over-year and sequentially, primarily due to geographic mix and seasoning of the U.S. portfolio. At June 30, 2018, Canadian Open-End gross loans receivable comprised 56.4% of the total, compared to none at the end of the prior year quarter.

134.    Comparing the Company's year-over-year Canada segment results, the 2Q18 10-Q reported:

Canada revenue improved $3.4 million, or 7.9%, to $47.0 million for the three months ended June 30, 2018 from $43.6 million in the prior year period. On a constant currency basis, revenue was up $1.6 million, or 3.6%. *Revenue growth in Canada was impacted by the product transition from Single-Pay loans to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Alberta, Ontario and British Columbia.*

Single-Pay revenue decreased $1.6 million, or 4.6%, to $33.3 million for the three months ended June 30, 2018 and Single-Pay ending receivables decreased $1.1 million, or 2.2%, to $47.3 million from $48.4 million in the prior year *period due to mix shift in Ontario where we launched Open-End loans in the fourth quarter of 2017.*

Canadian non-Single-Pay revenue increased $5.0 million, or 58.4%, to $13.7 million compared to $8.6 million the same quarter a year ago on $31.9 million, or 74.5%, growth in related loan balances. The increase was primarily related to the launch of Open-End products in Alberta and Ontario in the fourth quarter of 2017.

The provision for losses increased $4.1 million, or 39.4%, to $14.4 million for the three months ended June 30, 2018 compared to $10.3 million in the prior year period, *because of upfront provisioning on relative loan volumes (total Open-End and Installment loans grew sequentially by $20.9 million this second quarter compared to $10.9 million in the second quarter of 2017), and mix shift from Single- Pay loans to Unsecured Installment and Open-End loans. On a constant currency basis, provision for losses increased $3.5 million, or 33.7%.*

135.    The statements Defendants made on July 30 and 31, 2018, and in the 2Q18 10-Q, as set forth above, were materially false or misleading and/or omitted material facts:

(a)     Defendants' statements misrepresented and failed to disclose the true, negative, short-term impact that the Company's transition from single-pay to open-end loans in Canada would have on the Company's financial results, including massively diluting the Company's Adjusted EBITDA, net income, and EPS. In fact, unbeknownst to the market, at the time of Defendants' statements on July 30, July 31, and August 2, 2018, the Company had completed the "majority" of its rapid transition to open-end loans in Ontario, which had already resulted in larger open-end loan balances, materially higher up-front provisioning, and increased marketing spend. Therefore, Defendants' statements that the transition "diluted earnings for the [just-reported] quarter" and that "[t]he growth rate for provision expense should match up better with revenue growth rates for the next couple quarters" gave investors the false impression that any negative impact from the Canadian transition had occurred in 2Q18, but would not affect the Company's 3Q18 results or FY18 guidance when, in reality, the transition was already impacting, and would impact, the Company's ongoing financial results and FY18 guidance. Moreover, when Defendants assured the market of "positive" Canadian revenue growth and a reduction in Canada adjusted EBITDA for the year of only "$20 million" instead, the Company would report an 8.8% year-over-year decline in Canadian revenue in 3Q18, and a $28.7 million reduction in Canada adjusted EBITDA for FY18, a decline of approximately 52.6% from the previous year.

(b)     Defendants failed to disclose the rapid nature of the transition in Ontario from single-pay to open-end loans and the negative short-term impact that the expedited transition had already had on the Company's operations and financial results, and, instead, gave investors the impression that Defendants were merely "mov[ing] up" the start date of

the multi-year transition in Ontario from 2019 to 2Q18, concealing that as of July 31, 2018, the majority of the transition was already complete. Further, the Company did not "maintain[] its financial disciplines" during the transition because, in reality, Defendants intentionally did not moderate the flow of customers from single-pay to open-end loans, which resulted in a rapid rate of loan growth, larger open-end loan balances, and higher up-front provisioning.

(c)     Defendants failed to disclose that the transition to open-end loans would come at the expense of the Company's Canadian single-pay revenue, which was historically the Company's most profitable single line of business. Rather than remaining an "extraordinar[ily] viable product" and any "decline on single-pay" being "temper[ed]," single-pay revenue was being cannibalized by open-end loans during the transition. Indeed, Canadian single-pay revenue would be dramatically reduced, dropping 50%, from approximately 16% of the Company's total revenue in 3Q17 to only 8% of the Company's total revenue by the end of 3Q18.

(d)     As a result of the rapid transition to open-end loans in Ontario, which resulted in materially high upfront loan loss provisioning and increased marketing spend, the majority of which had already occurred when Defendants' reaffirmed guidance on July 30 and July 31, 2018, Defendants had no reasonable basis to expect or have "confidence" in, and did not in fact expect, that the Company could achieve FY18 net income in the range of $110 million to $116 million, adjusted EBITDA in the range of $245 million to $255 million, and EPS in the range of $2.25-$2.40.

(e)     The Company's 2Q18 10-Q was false and misleading because it failed to disclose the negative effect of the Company's transition from single-pay to installment and

open-end loans on the Company's current period results and future financial results in violation of SEC disclosure rules, as set forth below.

(f)     The Company's 2Q18 10-Q and the SOX Certifications Defendants Gayhardt and Dean signed were also false and misleading because they represented that the Company's disclosure controls were operating effectively when, in fact, they were not.

136.     Approximately two months later, between September 25 and 26, 2018, Defendant Baker sold a total of 56,844 shares of Company common stock for proceeds totaling $1,792,351.

## THE TRUTH EMERGES

137.     The truth about the Company's transition from single-pay to open-end loans in Canada, and the materially negative impact to the Company's current and future financial results caused by the rapid transition, was revealed to the market after the market closed on October 24, 2018. On that day, the Company issued an after-hours press release announcing its financial results for the quarter ended September 30, 2018 (the "3Q18 Press Release"). The 3Q18 Press Release shocked the market by reporting dismal financial results and withdrawing the Company's FY18 guidance. The Company reported EPS of $0.23 and adjusted EBITDA of $38 million for the quarter, both substantially below consensus and analysts' estimates of $0.52 and $58 million, respectively, and revised and lowered FY18 guidance as follows:

- Adjusted Net Income in the range of $88 million to $91 million compared to prior range of $110 million to $116 million
- Adjusted EBITDA in the range of $215 million to $218 million compared to prior range of $245 million to $255 million
- Adjusted Diluted Earnings per Share of $1.84 to $1.88 compared to prior range of $2.25 to $2.40

138.     Despite Defendants' multiple assurances that the Company had "anticipated" and factored into the Company's guidance any increased provisioning from the Canadian transition, Defendants nevertheless blamed the substantial earnings miss and lowered guidance on the

Canadian transition:

> We were pleased with our team's ability to drive robust loan growth ahead of plan in all three countries in the third quarter, but this rate of growth resulted in elevated provisioning levels which drove earnings below our expectations. Results were particularly affected by the acceleration of Open-End loan product in Canada where we added $87.4 million of Open-End loan balances during the third quarter, which well exceeded our expectations. The related upfront loan loss provisioning caused Canadian net revenue and Adjusted EBITDA to drop by $10.9 million and $13.2 million sequentially, respectively, compared to the second quarter of 2018.

139.    The 3Q18 Press Release further disclosed:

- Canadian revenue decreased $4.4 million, or 8.8%, to $46.2 million for the three months ended September 30, 2018 from $50.7 million in the prior year period.

- Canadian provision for losses increased $8.7 million, or 55.5%, to $24.4 million for the three months ended September 30, 2018 compared to $15.7 million in the prior year.

- The cost of providing services in Canada increased $2.0 million, or 10.3%, to $21.3 million for the three months ended September 30, 2018, compared to $19.3 million in the prior year period, due, in part, to rising advertising costs, which rose $0.8 million, or 28.2%.

- Canadian Adjusted EBITDA decreased $15.36 million from $11.9 million to ($3.39 million) for the three months ended September 30, 2018, compared to the prior year period.

- Canadian Net Revenue decreased $13.16 million, or 37.7%, to $21.77 million from $34.94 million for the three months ended September 30, 2018, compared to the prior year period.

- Canadian Operating Income decreased $16.8 million from $10.9 million to ($5.9 million) for the three months ended September 30, 2018, compared to the prior year period.

140.    On October 25, 2018, the Company hosted a conference call with analysts and investors to discuss the disappointing financial results. Defendant Gayhardt acknowledged that the quarter "fell short" and that "[b]y far the biggest impact to quarterly results was the ongoing product migration in Canada, specifically in the province of Ontario." Defendant Gayhardt

elaborated on the Canadian transition, revealing that the Company's single-pay business was

suffering:

> For reference, Ontario accounts for approximately 2/3 of our Canadian business. .
> . . The downside, of course, is we're dramatically reducing our Canadian Single-
> Pay revenue which historically has been our most profitable single line of business,
> very high yields with modest and very consistent credit losses, but a business line
> which has been impacted by a steady run of provincial regulatory reviews that
> resulted in lower fees and a range of other provisions and increased operational
> complexities and reduced the attractiveness of a Single-Pay product for our
> Canadian consumers. But in reviewing detail in the release, we did lose money in
> Canada in the third quarter as an 8.8% drop in year-over-year revenue, coupled with
> provisions for loan loss as a percentage of revenue at 52.9% versus 31% in the prior
> year generated an adjusted EBITDA loss of $3.4 million, which is $15.4 million
> lower than last year's adjusted EBITDA of $12 million and $13.2 million lower
> sequentially than the second quarter of 2018.

141.    Defendant Dean explained that "[t]he Canadian business missed adjusted EBITDA

by $12.1 million on loan portfolio mix shift and upfront provisioning on acceleration of Open-End

in Ontario." Contrary to Defendants' previous assertions that loan loss provisioning would be "in

line" with revenues for 3Q18 and 4Q18, Defendant Dean stated:

> [W]e missed our expectation by $17 million, $18 million, something -- for the
> quarter. 2/3 or 3/4 of that was with Canada, and the combination in Canada was not
> just with the provisioning on the loan book, but I also mentioned that our Single-
> Pay balances, we liquidated or converted almost $12 million of Single-Pay
> balances. So the revenue -- in the quarter, the revenue was well below our
> expectations from that conversion and the provision was much higher.

142.    When questioned by analysts about the "tension between the growth rate and

meeting guidance" and the Company's "decision process" to pursue Canadian open-end loans,

Defendant Gayhardt admitted that Defendants failed to explain to the market in April or July 2018

the then-known negative consequences of the Canadian transition from single-pay to installment

and open-end loans:

> I think it's a very fair criticism that we did a less than stellar job of explaining in
> our -- probably our July call or even back into our April call, what was going -- the
> impact of this on sort of -- in the near term. It accelerated faster than we thought,

the people up there did a great job with customers, et cetera, but we probably didn't lay it out for everybody as explicitly as we probably should have. And we'll try not to make that mistake again.

143.    Defendants further disclosed that instead of phasing out single-pay loans over the course of a few years, the "transition to line of credit in Ontario and Alberta was . . . complete."

144.    Defendant Dean also admitted that Defendants knew in July 2018, when Defendants confidently reaffirmed the Company's FY18 guidance, that their decision to move up and rapidly complete the Canadian transition had already had a negative effect on the Company's financial results:

I mean, if you just look at Canada, and we're sensitive to the earnings impact, and doing what we say we're going to do. But I think if you just look at the loss in the quarter, I mean, the majority of that actually came in July when we did it. It does rebound very quickly, and I think one option would have been to kind of grind through this over a quarter or 2, which may have, short-term, lessened the earnings impact but, I think, long-term, we're all going to be very happy that we put the focus and effort into the conversion.

145.    Defendants revealed what had previously not been disclosed to investors: the transition to open-end loans in Ontario was abrupt and massive. Defendant Dean explained that in 3Q18 alone, open-end loan balances grew $87.4 million – almost "90%" of that from Ontario, and that single-pay loan balances declined $11.2 million "entirely because of conversion of Single-Pay customers in Ontario to Open-End."

146.    Defendant Dean further disclosed that in connection with moving up and rapidly completing the transition in Ontario, the Company's advertising expense had risen 28.2% in 3Q18 compared to the previous year:

First was mix. We were acquiring more Installment and Open-End customers versus Single-Pay. Two, the marketing channels. We've expanded cable TV and direct mail spend and other media spend, especially in July when we launched -- when we introduced Open-End in Ontario; and three, new product expansion, including our LendDirect stores    As a result, Canadian costs per funded was $112, that's up $24 from the same quarter a year ago and up sequentially from $87

last quarter.

147.    On this news, the price of the Company common stock dropped, falling 33.6%, or

$7.69 per share, from a closing price of $22.87 per share on October 24, 2018, to $15.18 per share

on October 25, 2018.

148.    Analysts were quick to comment on the Company's surprisingly disappointing

results. For instance, on October 26, 2018, Stephens issued an analyst report lowering its price

target for the Company from $38 to $22 and commented that:

> The miss and the resulting pain to CURO shares appears to be self- inflicted, driven
> by 1) over aggressive growth in the Canadian line of credit product, and 2) a lack
> of visibility into the scenarios of the guide down, either at the 2Q18 call or during
> the debt raise.

## III.    BY FAILING TO DISCLOSE THE TRUE IMPACT OF THE RAPID TRANSITION TO OPEN-END LOANS IN CANADA, DEFENDANTS VIOLATED SEC DISCLOSURE RULES

149.    SEC rules and regulations required Defendants to disclose the financial

ramifications associated with the Company's strategy to rapidly complete the transition from

single-pay to installment and open-end loans in Canada.

150.    Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, required the Company's

quarterly Forms 10-Q to describe "any known trends or uncertainties that have had, or that the

registrant reasonably expects will have, a material favorable or unfavorable impact on net sales or

revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). This regulation

mandates that the Forms 10-Q the Company filed with the SEC disclose "any unusual or infrequent

events or transactions or any significant economic changes that materially affected the amount of

reported income from continuing operations and, in each case, indicate the extent to which income

was so affected."

151.    The instructions to Item 303(a) of Regulation S-K explain that the Company's

Management's Discussion and Analysis ("MD&A") disclosure was to "focus specifically" on

material events and uncertainties that would cause the Company's reported financial information

not to be necessarily indicative of future operating results, including "matters that would have an

impact on future operations and [matters that] have not had an impact in the past":

> The discussion and analysis shall focus specifically on material events and
> uncertainties known to management that would cause reported financial
> information not to be necessarily indicative of future operating results or of future
> financial condition. This would include descriptions and amounts of (A) matters
> that would have an impact on future operations and have not had an impact in the
> past, and (B) matters that have had an impact on reported operations and are not
> expected to have an impact upon future operations.

152.    Regarding material events and uncertainties, in 1989, the SEC issued interpretative

guidance on Item 303 of Regulation S-K, which states:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty
> is both presently known to management and reasonably likely to have material
> effects on the registrant's financial condition or results of operation.

* * *

> Events that have already occurred or are anticipated often give rise to known
> uncertainties. For example, a registrant may know that a material government
> contract is about to expire. The registrant may be uncertain as to whether the
> contract will be renewed, but nevertheless would be able to assess facts relating to
> whether it will be renewed. More particularly, the registrant may know that a
> competitor has found a way to provide the same service or product at a price less
> than that charged by the registrant, or may have been advised by the government
> that the contract may not be renewed. The registrant also would have factual
> information relevant to the financial impact of non-renewal upon the registrant. In
> situations such as these, a registrant would have identified a known uncertainty
> reasonably likely to have material future effects on its financial condition or results
> of operations, and disclosure would be required.

153.    In December 2003, the SEC issued additional interpretative guidance on Item 303

of Regulation S-K (the "2003 Interpretive Release"). This guidance makes clear that the

Company's MD&A disclosure was required to provide disclosure about known demands, events

or uncertainties, like its strategy to transition customers from single-pay to installment and open-

end loans in Canada, unless management determined: (a) they were not reasonably likely to occur; or (b) they would not have a material effect on the Company's operating results. The 2003 Interpretive Release states:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

154.   As detailed herein, given their high annual percentage rate, short-term nature, and high yields, the Company's single-pay loans were historically the Company's most profitable single line of business.

155.   Defendants understood that the Company was at risk of losing a material amount of its lucrative single-pay revenue stream in Canada when regulators and public advocates increasingly demanded that lenders provide consumers with more hospitable loans.

156.   The regulatory changes in Alberta, Ontario, and British Columbia began to adversely affect the Company's single-pay loan yields and revenues during 2017, particularly because Ontario, Canada is one of the Company's largest markets, accounting for approximately 13% of the Company's total revenues.

157.   Recognizing that these, and possible additional, regulatory changes were adversely impacting the Company's most profitable single line of business, Defendants designed and implemented a strategic business initiative to transition borrowers away from the Company's single-pay loans and move them to installment and open end loans.

158.   As illustrated in the chart below, after Defendants implemented their strategic business initiative to transition borrowers away from single-pay loans, the amount of the Company's open-end loans skyrocketed, increasing nearly threefold in just nine months, from $48

million at the end of December 2017 to $184 million at the end of September 2018:



159.    Given the Company's upfront provisioning methodology for open-end loans and the marketing expenditures it budgeted in advance to promote its rapid product transition initiative, Defendants knew, but failed to disclose, that the Company's operating results were reasonably likely to be adversely effected.

160.    This was particularly true because the Company's Canadian operations accounted for a material amount of the Company's profitability. For instance, during 2017, the Company's Canadian operations accounted for approximately 20% and 55% of the Company's gross margin and pre-tax income, respectively. During 2018, the Company's Canadian operations accounted for approximately 12% of the Company's gross margin and generated pre-tax income of approximately $17 million, while its U.S. operations generated pre-tax income of only $1.1 million and its U.K. operations generated a pre-tax loss of $38.7 million.

161.    The Company eventually disclosed that "[i]n Canada, the accelerated transition from Single-Pay to Open-End loans in Ontario was dilutive to Canadian earnings in the near term" and that the transition to open-end loans "came at the expense of single-pay loan balances." Defendants also admitted that the Company's "disclosure controls and procedures were not effective" and did not provide reasonable assurance "to ensure that information required to be disclosed in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms." This admission, along with the SEC's inquiry into "the Company's public disclosures surrounding its efforts to rapidly transition the Canadian inventory of products from single-pay loans to open end loans," provides further evidence that the Company's 1Q18 and 2Q18 10-Qs failed to disclose the information the Company was required to disclose under Item 303.

## IV.    DEFENDANTS' KNOWLEDGE

162.    The following allegations support a strong inference of Defendants' knowledge.

163.    Defendants admitted that they knew or recklessly disregarded but failed to disclose to the market, that the Company's rapid transition from single-pay to installment and open-end loans in Canada would have a detrimental impact on the Company's operations and financial

results, including its FY18 guidance. During the October 25, 2018 earnings conference call, Defendant Gayhardt apologized to investors for doing a "less than stellar" job "explain[ing]" the "near term" negative impact of the transition during the Company's April 27 and July 31, 2018 conference calls. Defendants further admitted that despite reaffirming guidance on July 30 and July 31, 2018, the "majority" of the losses stemming from the Ontario transition (which caused the Company to alter its FY18 guidance) actually occurred in "July" of 2018, before Defendants reaffirmed guidance.

164.    Defendants also admitted that they could have "lessened" the negative "earnings impact" from the transition had they chosen to "grind this over a quarter or [two]" instead of making the deliberate but undisclosed decision to rapidly accelerate the Ontario transition in 3Q18, despite the known, but concealed, operational risks. During the November 8, 2018 Stephens Conference, Defendants admitted that they "intentional[ly]" refused to put any "speed-bumps" in place to moderate the speed of the transition in Ontario, due to fear of losing customers. Defendants also admitted that the rapid transition to open-end loans in Canada "came at the expense of single-pay loan balances" and that the transition was "dilutive to Canadian earnings in the near term."

165.    Defendants have also admitted that the Company's "disclosure controls and procedures were not effective" and did not provide reasonable assurance "to ensure that information required to be disclosed in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms." This admission, along with the SEC's inquiry into "the Company's public disclosures surrounding its efforts to transition the Canadian inventory of products from Single-Pay loans to Open-End loans," provides further evidence that the Company's 1Q18 and 2Q18 10-Qs failed to

disclose the information the Company was required to disclose under Item 303 and that the SOX Certifications signed by Defendants Gayhardt and Dean attesting to the effectiveness of the Company's disclosure controls were false when made.

## A.   Importance of Ontario, Canada to the Company's Operations

166.   Ontario was the Company's largest Canadian region, comprising two-thirds of the Company's Canadian revenues and nearly 13% of the Company's total consolidated revenues as of December 31, 2017. Defendants knew that tightening regulations in Canada had the potential to materially impact the Company's operations and financial results.   Defendants closely monitored changing regulations in Canada (and Ontario specifically) and discussed the Canadian regulatory environment in the Company's press releases and SEC filings. Defendants also spoke about the Canadian regulatory environment during their prepared remarks on every quarterly earnings call and were asked and answered detailed questions by analysts about the topic.

167.   For instance, the Company's Form 10-K, filed with the SEC on March 13, 2018 ("2017 10-K"), dedicated three pages to a discussion about "Canadian Regulations" and discussed the new regulations in Ontario effective January 1 and July 1, 2018. During the April 27 and July 31, 2018 earnings conference calls, Defendant Gayhardt discussed the new regulations in Ontario and informed the market that the Company had "anticipated these changes." Defendants' repeated reference to the Canadian regulations supports the inference that they had personal knowledge of the regulatory changes in Canada and were monitoring any actual or potential impact to the Company's operations as a result.

168.   This inference is bolstered by the fact that the Company's Canadian single-pay loans were historically the Company's "most profitable single line of business," generating yields of almost 400%. As Alberta, Ontario and British Columbia lowered the rates the Company could

charge on payday loans, the yields on those loans declined dramatically and were hovering around 250% by 1Q18. In fact, during the Stephens Conference, Defendants admitted that increasing regulations prompted Defendants to make a "real decision" regarding the profitability of single-pay loans in Ontario, Canada, which prompted the Ontario transition. Given the importance of single-pay loans in Ontario to the Company's overall operations and financial condition, and Defendants' statements during the Stephens Conference, it is reasonable to infer that Defendants were closely involved in the decision to rapidly complete the transition to open-end loans and, therefore, knew or recklessly disregarded that the Company's operations and financial results would experience a negative, short-term impact as it quickly transitioned away from its most profitable, high-yield product to lower yield, open-end loans.

## B.  Defendants' Substantial Experience and Monitoring of Test Markets

169.  Defendants also knew or recklessly disregarded that the Company's open-end loan product would be received favorably by customers in Ontario, which would result in more open-end loans with larger loan balances and, in turn, higher up-front provisioning.

170.  The rapid transition in Ontario in 3Q18 was timed to coincide with what was seasonally a quarter of increased demand in Canada. As noted in the Company's 2017 10-K, the Company "typically experience[d]" its "highest demand in Canada in the third and fourth calendar quarters." Defendant Dean acknowledged Defendants' understanding of Canada's seasonality on the April 28, 2018 conference call when he commented that Canada's earnings typically "pop back up in Q3 and Q4."

171.  Defendants had years of experience with open-end loans and multiple months of data demonstrating the Canadian consumer's preference for such loans. During the Stephens Conference, Defendants explained that the Company had been "operating a line of credit for 11

years" reporting, we "know how to do" open-end loans. The Company had been offering open-end loans in the U.S. for five years. Thus, Defendants had substantial experience with the performance of open-end loans from which to draw from, which would have informed their expectations for the performance of open-end loans in Canada.

172.    Since 4Q17, Defendants had been closely monitoring the conversion to open-end loans in Canada, beginning first in Alberta. As a result of the transition in Alberta, Defendants "had a lot of experience in the data" the Company collected from its customers there before the Company "pulled the trigger on Ontario." Further, the Company also launched open-end test stores in Windsor, Ontario. Defendants closely tracked the performance and results of these test stores and markets, monitoring metrics like acquisition costs, credit performance, foot traffic, take-up rates, first-pay defaults, line utilization, adjusted EBITDA margins, revenue per store, and provision for losses. According to Defendants, the Windsor, Ontario test stores had "incredibly favorable" results with positive "take-up rates," good "conversion rates" from existing customers, and a "healthy number of new customers." As Defendant Baker would later admit during the Stephens Conference, Defendants had "five months of seasoning in [the open end loan] universe in Ontario" before rapidly completing the majority of the transition in July.

173.    Moreover, during the transition in Ontario, the Company focused primarily on converting existing single-pay customers to open-end loans and had access to pre-existing detailed customer data via the CURO Platform, including prior payment history, which Defendants called "the most predictive element" in gauging loan performance. The Company converted 38,000 existing single-pay customers to open-end loans in 3Q18 alone.

174.    Because the Company targets a highly vulnerable demographic as its customer base – nonprime, unbanked, or underbanked consumers with an immediate need for cash or who

otherwise fail to qualify for traditional banking services – it should have come as no surprise to Defendants that the Company's single-pay customers would jump at the opportunity to have access to more cash, resulting in larger open-end loan balances and increased up-front provisioning. The Company's average single-pay loan was approximately $600, while the average line of credit was approximately $2,400, with the average amount drawn of around $1,800, or three times the size of the average payday loan. And, unlike payday loans, which require a new application and loan when additional cash is needed, customers taking out a line of credit only have to apply once and, if approved, can request cash advances as often as they need up to the available credit limit. Based on these facts, it is reasonable to infer that Defendants knew or recklessly disregarded that the Company would experience a sudden increase in the amount of open-end loans when it rapidly completed the transition to open-end loans in Ontario in 3Q18.

175.    Defendants also knew or recklessly disregarded that as they made the deliberate decision to move up and rapidly complete the transition to open-end loans in Ontario, the Company's loss provisions would increase concomitantly with the increase in open-end loan balances. Defendants were well aware that the Company was required to take an upfront provision on the open-end loans it originated, as Defendants closely monitored loan loss provisions and reported both Company-wide and Canadian segment-specific loan loss provisions to investors as a performance metric in the Company's SEC filings and press releases. Defendants also discussed loan loss provisions on quarterly conference calls, both in their prepared remarks and in response to analyst inquiries.

176.    Defendants also knew or recklessly disregarded that the Company's aggressive multi-channel marketing plan, which was finalized at the end of June 2018, would result in more customers taking out open-end loans and cause an increase in the corresponding up-front

provisioning as well as increased advertising costs, which would have a further negative impact on the Company's financials. According to Defendant Baker, the Company had "absolute control of our marketing spend" and "there's not a dime that doesn't get spent that [Defendant Gayhardt] and [Defendant Dean] and I don't approve" and, therefore, Defendants would have known about the Company's plan to aggressively market open-end loans. As to Ontario, Defendant Gayhardt noted: "if you live in Ontario . . . unless you're kind of living in a cave, we think we've reached you multiple times with this advertising." The cost of the Company's marketing strategy was reflected in its 3Q18 results, which reported a 37% increase in advertising costs from the prior quarter due to "acquiring more installment and open-end customers versus single-pay," expanding "cable TV and direct mail spend and other media spend, especially in July" when the Company "introduced open-end in Ontario," and "new product expansion, including our LendDirect stores."

## V.   THE COMPANY'S STOCK REPURCHASE

177.   In April 2019, the Board authorized a share repurchase program under which the Company was authorized to repurchase up to $50.0 million of the Company common stock.

## VI.   DUTIES OF THE DIRECTOR DEFENDANTS

178.   By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

179.   Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the

Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

180.   To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or

practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)        ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)        ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

181.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

182.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

183.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, waste of corporate assets, unjust enrichment, violations of Section

10(b) of the Exchange Act and SEC Rule 10b-5 against the Director Defendants, and Section 20(a) of the Exchange Act.

184.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

185.    Plaintiff is a current owner of the Company stock and has continuously been an owners of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and are prepared to do so.

186.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

187.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

188.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. The Board was comprised of the following ten (11) defendants: Gayhardt, Masto, Rippel, Williams, Kirchheimer, McKnight, Webster, Faulkner, Frawley, Schaick, and Winterh. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board as six (6) Board members are interested and thus a demand on the Board would be a futile and useless act.

189.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

190.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

191.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

A.      **Defendant Gayhardt**

192.    The principal professional occupation of Defendant Gayhardt is his employment with the Company as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. Additionally, Defendant Gayhardt was a named defendant in the securities class action entitled *Yellowdog Partner, LP v. CURO Group Holdings Corp., et al.*, Case 2:18-cv-02662-JWL-KGG (D. Kan.) (the "Securities Class Action"). The Securities Class Action just recently settled with the payment by Defendants of $8,980,000 to a class of affected CURO shareholders. Upon information and belief, the Company suffered monetary and reputational damage as a result of the pendency and settlement of the Securities Class Action, including the monies paid by the Company for its self-insured retention, defense costs, and the higher costs of capital.

**B.     Defendants Rippel**

193.    Defendant Rippel is one of the co-founders of the Company.

194.    Defendant Rippel co-owns with Defendants Faulkner and McKnight certain real estate companies from which the Company leases some of our corporate stores and offices.

195.    The Company's DEF 14A, dated April 29, 2020 states: "Rippel [is] not independent because [he] previously served as an officer[] of the Company."

**C.     Defendants Faulkner**

196.    Defendant Rippel is one of the co-founders of the Company.

197.    Defendant Faulkner co-owns with Defendants Rippel and McKnight certain real estate companies from which the Company leases some of our corporate stores and offices.

198.    The Company's DEF 14A, dated April 29, 2020 states: "Faulkner [is] not independent because [he] previously served as an officer[] of the Company."

**D.     Defendants McKnight**

199.    Defendant McKnight is one of the co-founders of the Company.

200.    Defendant McKnight co-owns with Defendants Rippel and Faulkner certain real estate companies from which the Company leases some of our corporate stores and offices.

201.    The Company's DEF 14A, dated April 29, 2020 states: "McKnight [is] not independent because [he] previously served as an officer[] of the Company."

**E.     Defendants Rippel, Faulkner and McKnight**

202.    Defendants Rippel, Faulkner and McKnight own a combined total of 48.36% of the outstanding shares of the Company.

**F.     Defendants Williams, Frawley, Kirchheimer and Schaick**

203.    Demand is excused because Defendants Williams, Frawley, Kirchheimer and

Schaick face a substantial likelihood of liability for their misconduct.

204.    During the Relevant Period, Defendants Williams, Frawley, Kirchheimer and Schaick served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing the Company's financial statements, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

205.    Plaintiff has pleaded sufficient particularized facts to show that beyond Defendants Williams, Frawley, Kirchheimer and Schaick membership in the Audit Committee, they had to have known that (a) the Company's conversion from Single-Pay Loans to Open-End Loans was materially undermining its ongoing financial performance and 2018 full-year guidance, including massively diluting its adjusted EBITDA and net revenue; and (b) consequently, the Company's 2018 full-year fiscal guidance was materially false and misleading at all relevant times. Plaintiff's allegations are sufficient to support an inference that the Audit Committee knew of the failure to comply with regulations and failed to act.

206.    Defendants Williams, Frawley, Kirchheimer and Schaick breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Williams, Frawley, Kirchheimer and Schaick face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## G.    Defendants Mastro and Winterhof

207.   Defendant Mastro is the co-founder of FFL Partners. As of April 13, 2020, FFL owns 5.59 % of Company stock. Moreover, Defendant Winterhof is a director of FFL. Because her directorship at FFL Partners is predicated on remaining in Defendant Mastro's good graces, she cannot objectively assess whether to bring claims against Defendant Mastro.

## COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

208.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

209.   The Director Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

210.   The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

211.   The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

212.   As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

213.   As a direct and proximate result of the Director Defendants' breach of their

fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### (Against the Director Defendants for Waste of Corporate Assets)

214. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

215. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

216. As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions in the Securities Class Action and to settle same.

217. As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

218. Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT III

### (Against Defendant Baker For Unjust Enrichment)

219. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

{00226381.DOCX; 1 } 73

220.    By their wrongful acts and the omissions of material fact that they caused to be made, Defendant Baker were unjustly enriched at the expense of, and to the detriment of, the Company.

221.    Around the time the Company stock reached its high, Defendant Baker sold over 56,000 shares of Company stock for proceeds of almost $1.8 million.

222.    Plaintiff, as a shareholder and representative of the Company, seeks restitution from Defendant Baker and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by Defendant Baker due to his wrongful conduct and breach of his fiduciary duties.

## COUNT IV

### (Against Defendants for Violations of
### Section 10(b) of the Exchange Act and SEC Rule 10(b)-5)

223.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

224.    During the Relevant Period, Defendants disseminated or approved public statements that failed to disclose that (a) the Company's conversion from Single-Pay Loans to Open-End Loans was materially undermining its ongoing financial performance and 2018 full-year guidance, including massively diluting its adjusted EBITDA and net revenue; and (b) consequently, the Company's 2018 full-year fiscal guidance was materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of Defendants. Despite this artificial inflation in the price of the Company's shares, Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing financial harm to the Company.

225.    As alleged herein, Defendants acted with scienter in that they knew that the public

documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

226. Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the time in issue without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including Defendants.

227. At a minimum, Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at the Company, Defendants knew and/or recklessly disregarded the extent and scope of their statements during the relevant period.

228. Likewise, Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and

financial condition, as alleged herein.

229.    As such Defendants caused the Company to violate section 10(b) of the Exchange
Act and SEC Rule 10b-5 in that they:

       (a)    employed devices, schemes, and artifices to defraud; and

       (b)    made untrue statements of material facts or omitted to state material facts
necessary in order to make the statements made, in light of the circumstances under which
they were made, not misleading.

## COUNT V

### (Derivative Claim for Violations of Section 20(a) of the Exchange Act Against Defendant Gayhardt)

230.    Plaintiff incorporates by reference and realleges each and every allegation
contained above, as though fully set forth herein.

231.    This Count is asserted on behalf of the Company against Defendant for violations
of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

232.    In his capacity as the senior executive, and Chairman of the Board, Defendant
Gayhardt had direct involvement in and oversight over the day-to-day operations of the Company
officers and the Company's employees, who would not act unless Defendant Gayhardt agreed with
his course of conduct.

233.    As a result of the foregoing, Defendant Gayhardt, individually, was a controlling
person of the other Company officers within the meaning of Section 20(a) of the Exchange Act.

234.    As a direct and proximate result of Defendant Gayhardt's conduct, the Company
suffered damages in connection with its purchase of Company common stock at materially inflated
prices.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

        A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

        B.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

        C.     Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

        D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

        E.     Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

Dated: July____, 2021

By: /s/ E. Wayne Taff
Earl Wayne Taff USDC No. 70588
Law Office of E. Wayne Taff
1133 Main Street
Blue Springs, Missouri 64015
816-229-2579
816-786-5083 (Cell)
877-518-1942 (Fax)
ewt@tafflawfirm.com

Thomas J. McKenna
Gainey McKenna & Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiff*

## VERIFICATION

I, MELVYN KLEIN, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of CURO GROUP HOLDINGS CORP. common stock at all relevant times.

Executed this 1st day of JULY 2021.

/s/ Melvyn Klein
MELVYN KLEIN