## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| CINDY MALONEY, Derivatively on Behalf of CURO GROUP HOLDINGS CORP. and as Executrix of Estate of Melvyn Klein,<br><br>        Plaintiff,<br><br>   v.<br><br>DONALD F. GAYHARDT, CHRIS MASTO, DOUG RIPPEL, DALE E. WILLIAMS, DAVID M. KIRCHHEIMER, MIKE MCKNIGHT, ELIZABETH WEBSTER, CHAD FAULKNER, ANDREW FRAWLEY, GILLIAN VAN SCHAICK, KAREN WINTERHOF, WILLIAM BAKER, AND ROGER W. DEAN,<br><br>        Defendants,<br><br>   and<br><br>CURO GROUP HOLDINGS CORP.,<br><br>        Nominal Defendant | Case No. 2:21-cv-02308-KHV-TJJ |

*Additional Caption on Next Page*

| | |
|---|---|
| PATRICK AYERS AND JOHN WATT, Derivatively on Behalf of CURO GROUP HOLDINGS CORP., | Case No. 2:21-cv-02311-KHV-TJJ |
| Plaintiff, | |
| v. | |
| CHAD FAULKNER, ANDREW FRAWLEY, DON GAYHARDT, DAVID M. KIRCHHEIMER, CHRIS MASTO, MIKE MCKNIGHT, DOUG RIPPEL, DALE E. WILLIAMS, KAREN WINTERHOF, WILLIAM BAKER, ROGER W. DEAN, FRIEDMAN FLEISCHER & LOWE CAPITAL PARTNERS II, L.P., FFL EXECUTIVE PARTNERS II, L.P., AND FFL PARALLEL FUND II, L.P., | |
| Defendants, | |
| and | |
| CURO GROUP HOLDINGS CORP., | |
| Nominal Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND OF THE ACTIONS AND
        THE SETTLEMENT ...............................................................................................3

        A.      Factual Background ....................................................................................3

        B.      Procedural History .....................................................................................6

        C.      The Related Securities Action ...................................................................8

        D.      Terms of the Settlement .............................................................................8

III.    THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL ...................10

        A.      Settlements Are Generally Favored .........................................................10

        B.      Standards for Final Approval of Settlement of a Derivative Action .....11

        C.      The Proposed Settlement Was Fairly and Honestly Negotiated and Is Not
                the Product of Collusion or Fraud............................................................11

        D.      The Ultimate Outcome of the Litigation Was Unquestionably In Doubt.............12

        E.      The Proposed Settlement Confers a Substantial Benefit on CURO .......13

        F.      The Parties Believe the Settlement Is Fair, Adequate and Reasonable ................17

        G.      The Parties Provided Adequate Notice To Current CURO Shareholders .............18

IV.     PLAINTIFFS' COUNSEL'S MOTION FOR ATTORNEYS' FEES AND
        EXPENSES SHOULD BE GRANTED .................................................................20

        A.      Attorneys' Fees Should Be Awarded Pursuant to the Substantial Benefit
                Doctrine.....................................................................................................20

        B.      Courts Accord Great Weight to the Fee Negotiated by the Parties ........21

        C.      Applicable Legal Standards for Consideration of the Fee Award .........23

                1.      The Time and Labor Required ......................................................24

2.      Novelty and Difficulty of the Issues ..............................................................24

3.      Skill Required: the Experience, Reputation, and Ability of the
        Attorneys ........................................................................................................25

4.      The Preclusion of Other Employment ............................................................26

5.      The Customary Fee and Awards in Similar Cases .........................................26

6.      Whether the Fee Is Fixed or Contingent .......................................................27

7.      The Amount Involved and the Results Obtained............................................27

8.      The Undesirability of the Case ......................................................................28

9.      Plaintiffs' Counsel's Expenses Were Reasonable and Necessary to
        Litigate This Case ..........................................................................................28

D.      Plaintiffs' Requests for Service Awards Should Be Approved. ............................29

CONCLUSION..............................................................................................................30

## **TABLE OF AUTHORITIES**

**CASES**

*Alvarado Partners, L.P. v. Mehta*,
  723 F. Supp. 540 (D. Colo. 1989) ................................................................... 17

*Alyeska Pipeline Serv. Co. v. Wilderness Society*,
  421 U.S. 240 (1975) ....................................................................................... 20

*Amoco Prod. Co. v. Fed. Power. Comm'n*,
  465 F.2d 1350 (10th Cir. 1972) ..................................................................... 10

*Blum v. Stenson*,
  465 U.S. 886 (1984) ....................................................................................... 24

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ....................................................................................... 21

*Burford v. Cargill, Inc.*,
  2012 WL 5471985 (W.D. La. Nov. 8, 2012) ................................................. 26

*In Re Capstone Turbine Corp. Stockholder Derivative Litigation*,
  Case No. 2:16-cv-01569 (C.D. Cal.) ............................................................. 26

*In re Caremark Int'l Inc. Deriv. Litig.*,
  698 A.2d 959 (Del. Ch. 1996) .......................................................... 12, 13, 25

*Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan.*,
  157 F.3d 1243 (10th Cir. 1998) ..................................................................... 22

*In re Cendant Corp. Deriv. Action Litig.*,
  232 F. Supp. 2d 327 (D.N.J. 2002) .......................................................... 28, 29

*Cohn v. Nelson*,
  375 F. Supp. 2d 844 (E.D. Mo. 2005) ................................................. 22, 26, 27

*In re Comverse Tech., Inc. Sec. Litig.*,
  Case No. 06-cv-1825, 2010 U.S. Dist. LEXIS 63342 (E.D.N.Y. June 24,
  2010) ............................................................................................................... 24

*Cook v. Niedert*,
  142 F.3d 1004 (7th Cir. 1998) ....................................................................... 29

*In re Davita Healthcare Partners, Inc. Derivative Litig.*,
  2015 U.S. Dist. LEXIS 74372 (D. Colo. June 5, 2015) .......................... 12, 14

*EEOC v. St. Louis-San Francisco Ry. Co.*,
    1982 U.S. Dist. LEXIS 12255 (N.D. Okla Jan. 22, 1982)................................................ 23

*Gubricky v. Ells*,
    2018 U.S. Dist. LEXIS 57123 (D. Colo. Apr. 4, 2018).................................. 11, 12, 24, 29

*Hall v. AT&T Mobility LLC*,
    2010 U.S. Dist. LEXIS 109355 (D. N.J. Oct. 13, 2010)................................................... 28

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)........................................................................................................ 22

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    Case No. 12-cv-8557, 2014 U.S. Dist. LEXIS 177175 (S.D.N.Y. Dec. 19,
    2014) ................................................................................................................................ 24

*Horton v. Leading Edge Mktg., Inc.*,
    2008 U.S. Dist. LEXIS 11761 (D. Colo. Feb. 4, 2008) ................................................. 25

*In Re Ideanomics, Inc. Derivative Litigation*,
    Case No. 20-cv-05333 (S.D.N.Y.)................................................................................... 26

*Johnson v. Ga. Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ......................................................................... 2, 22, 23, 26

*Jones v. Nuclear Pharmacy, Inc.* 741 F.2d 322, 324 (10th Cir. 1984) .................. 1, 11, 13, 17, 18

*Katz v. China Century Dragon Media, Inc.*,
    No. LA CV11-02769, 2013 U.S. Dist. LEXIS 189987 (C.D. Cal. Oct. 10,
    2013) ................................................................................................................................ 28

*In re King Res. Co. Securities Litig.*,
    420 F. Supp. 610 (D. Colo. 1976)............................................................................. 11, 27

*Konits v. Valley Stream Cent. High Sch. Dist.*,
    350 Fed. Appx. 501 (2d Cir. 2009) ................................................................................ 24

*Lucas v. Kmart Corp.*,
    No. 99-cv-01923, 2006 U.S. Dist. LEXIS 51420 (D. Colo. July 27, 2006).................... 27

*Maher v. Zapata Corp.*,
    714 F.2d 436 (5th Cir. 1983) .......................................................................................... 12

*Make a Difference Found., Inc. v. Hopkins*,
    2012 U.S. Dist. LEXIS 36251 (D. Colo. Mar. 19, 2012) .......................................... 11, 15

*Matter of Hunt's Health Care, Inc.*,
    161 B.R. 971 (Bankr. N.D. Ind. 1993)............................................................................ 22

*McNeely v. Nat'l Mobile Health Care, LLC*,
    2008 U.S. Dist. LEXIS 86741 (W.D. Okla. Oct. 27, 2008)............................................ 12

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970)...................................................................................................... 21

*Mohammed v. Ells*,
    2014 U.S. Dist. LEXIS 118796 (D. Colo. Aug. 26, 2014) ............................ 10, 12, 14, 27

*In re New Mexico Nat. Gas Antitrust Litig.*,
    607 F. Supp. 1491 (D. Colo. 1984).................................................................................. 17

*In Re Ormat Technologies, Inc. Derivative Litigation*,
    Case No. 18-cv-00439 (D. Nev.) .................................................................................... 26

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) .......................................................................................... 28

*In re Qwest Commc'n Int'l, Inc. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 71039 (D. Colo. 2006) .............................................................. 12

*In re Rambus Inc. Deriv. Litig.*,
    2009 U.S. Dist. LEXIS 131845 (N.D. Cal. Jan. 20, 2009) .............................................. 21

*Ryskamp v. Looney*,
    2012 U.S. Dist. LEXIS 114190 (D. Colo. Aug. 14, 2012) ................................... 13, 14, 25

*Salone v. United States*,
    645 F.2d 875 (10th Cir. 1981) ....................................................................................... 23

*Shlensky v. Dorsey*,
    574 F.2d 131 (3d Cir. 1978)........................................................................................... 21

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) ........................................................................................ 13, 25

*Strube v. Am. Equity Inv. Life Ins. Co.*,
    2006 U.S. Dist. LEXIS 28582 (M.D. Fla. May 5, 2006)................................................. 22

*Sved v. Chadwick*,
    783 F. Supp. 2d 851 (N.D. Tex. 2009) ........................................................................... 15

*Taubenfeld v. AON Corp.*,
    415 F.3d 597 (7th Cir. 2005) ........................................................................................ 22

*Tuten v. United Airlines, Inc.*,
 41 F. Supp. 3d 1003 (D. Colo. 2014) ............................................................. 27, 29

*Uselton v. Commercial Lovelace Motor Freight, Inc.*,
 9 F.3d 849 (10th Cir. 1993) ........................................................................... 24

*Wilkerson v. Martin Marietta Corp.*,
 171 F.R.D. 273 (D. Colo. 1997) .................................................................... 11

*Yellowdog Partners, LP v. CURO Group Holdings Corp. et al.*,
 Case No. 18-cv-2662-JWL-KGG ................................................................... 8

**STATUTES**

Securities Exchange Act of 1934 ...................................................................... 3

**RULES**

Fed. R. Civ. P. 23.1(c) ................................................................................... 18

## I.     INTRODUCTION

These are two related stockholder derivative actions (the "Related Derivative Actions" or "Actions") brought by Cindy Maloney, Patrick Ayers, and John Watt ("Plaintiffs") on behalf of nominal defendant CURO Group Holdings Corp. ("CURO" or the "Company") against defendants Chad Faulkner ("Faulkner"), Andrew Frawley ("Frawley"), Don Gayhardt ("Gayhardt"), David M. Kirchheimer ("Kirchheimer"), Chris Masto ("Masto"), Mike McKnight ("McKnight"), Doug Rippel ("Rippel"), Dale E. Williams ("Williams"), Karen Winterhof ("Winterhof"), William Baker ("Baker"), Roger W. Dean ("Dean"), Elizabeth Webster ("Webster"), and Gillian Van Schaick ("Van Schaick") (together, the "Individual Defendants"), Friedman Fleischer & Lowe Capital Partners II, L.P., FFL Executive Partners II, L.P., and FFL Parallel Fund II, L.P. (the "FFL Defendants" and together with the Individual Defendants and CURO, "Defendants").  Defendants and Plaintiffs collectively are the "Settling Parties."[1]

As set forth below, the proposed Settlement satisfies each of the *Jones* factors[2] which courts in this Circuit consider in evaluating derivative settlements.  First, and foremost, if the Settlement is approved, the benefits secured by Plaintiffs for CURO and Current CURO Shareholders are substantial, and far outweigh the remote possibility of any future relief in the event the Settlement is not approved.  Plaintiffs brought the Actions to remedy the Individual Defendants' alleged failures to adequately oversee CURO's internal controls and the accuracy of its public statements. With the proposed Settlement, Plaintiffs have secured CURO's agreement to adopt a series of corporate governance reforms (the "Reforms") that will ensure: (i) enhanced oversight of material

---

[1] All capitalized terms used herein that are not otherwise defined herein have the same meanings ascribed to them in the Amended Stipulation and Agreement of Settlement, dated June 24, 2022 (ECF No. 35-1) (the "Amended Stipulation").

[2] *Jones v. Nuclear Pharmacy, Inc.* 741 F.2d 322, 324 (10th Cir. 1984).

risk and compliance issues; (ii) improvement of internal controls; (iii) enhanced Board education; and (iv) creation of a new, stand-alone Whistleblower policy to encourage stakeholders to come forward if false public statements or faulty internal corporate controls are identified. These Reforms to be adopted by CURO's Board – which they are required to maintain for a period of no less than five years – are squarely aimed at reducing the chances of a recurrence of the wrongdoing alleged by Plaintiffs.

Second, the Settlement is the product of months of hard-fought, arm's length negotiations among sophisticated parties represented by experienced counsel. Third, the Settlement was reached through a fair process and is in the best interests of all parties given the complexity and likely duration of ongoing litigation, and the significant risks that Plaintiffs might not be able to prove liability or damages. As further detailed *infra*, courts recognize that derivative actions are complex, difficult, and notoriously unpredictable, further supporting the Settlement as a salutary result. Finally, the recovery falls well within the range of what courts in this Circuit and elsewhere have found to be reasonable and adequate, the notice provided to Current CURO Shareholders provided adequate information and an opportunity to be heard, and, importantly, no objections to the Settlement or the requested Fee Award have been received.

The Court should also approve the agreed-upon Fee Award for Plaintiffs' Counsel, which falls squarely within the range of attorneys' fee awards in similar derivative settlements where plaintiffs have achieved important corporate governance reforms. As described *infra,* the proposed Fee Award satisfies each of the *Johnson*[3] factors that courts in this Circuit consider in determining an appropriate fee award.

For these reasons, as amplified below, Plaintiffs respectfully submit that the Settlement

---

[3] *Johnson v. Ga. Highway Express, Inc.* 488 F.2d 714 (5th Cir. 1974).

and agreed-upon Fee Award should be finally approved.

## II.   FACTUAL AND PROCEDURAL BACKGROUND OF THE ACTIONS AND THE SETTLEMENT

### A.   <u>Factual Background</u>

The Actions were brought on behalf of CURO against the Individual Defendants, certain of CURO's current and former officers and/or directors, seeking to remedy alleged breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  ¶ 1.[4]

CURO provides primarily payday lending products to nonprime, underbanked consumers in the U.S., Canada, and the U.K.  For years, CURO's most profitable business was the Canadian payday (or "single-pay") loan, which generated yields in excess of 400% and had modest, predictable credit losses.  As a result, CURO's Canadian segment and the Ontario market, which generated the bulk of Canadian revenues, was critical to CURO's operations and ability to meet its financial forecasts.  Revenues from Ontario alone comprised approximately 13% of the Company's total revenues for calendar year 2017.  ¶ 2.

As a payday lender, CURO is heavily regulated by government agencies in jurisdictions in which it operates.  In 2016 and 2017, Canadian regulators passed a series of payday lending regulations that called for additional borrowing disclosure requirements, caps on the cost of borrowing, and restrictions on certain lending practices.  The new regulations were designed to protect consumers from becoming trapped in a cycle of debt.  As a result of these changes, yields on Canadian single-pay loans declined from approximately 400% in 2016 to approximately 250% by the first quarter of 2018 ("1Q18"), which had a material adverse effect on CURO's Canadian

---

[4] Unless otherwise noted, all references to "¶ __" or "¶¶ __" are to the Verified Shareholder Derivative Complaint (ECF No. 1) filed by Plaintiff Klein on July 15, 2021.

operations.   Given these new lending regulations, the Actions allege that Defendants knew CURO's ability to secure a replacement for its highly profitable Canadian single-pay loans was essential to CURO's ongoing financial success, and transitioned CURO's Canadian business from single-pay loans to installment and line of credit ("open-end") loan products.   ¶ 4.

Applicable accounting standards required CURO to record an increased provision for loan losses at the time these installment and open-end loans were originated, even though revenues on installment and open-end loans are recognized over a longer period of time than single-pay loans. Because CURO was required to account for expected loan losses at the time of loan origination, and revenue and yields on those loans take months to build, open-end loan products were initially less profitable than single-pay loans.   These "up-front provisions" were material to CURO's earnings and were an important financial metric that Defendants reported in CURO's SEC filings and routinely discussed.   ¶ 7.

The Actions allege that Defendants gave the market the false impression that to the extent the Company's operations experienced any negative impact from the transition out of single-pay to installment and open-end loans, the impact would be minimal, confined to the second quarter of 2018 ("2Q18") and had been anticipated and factored into the Company's internal forecast and publicly reported full year 2018 financial guidance ("FY18 guidance").   ¶ 9.

The Actions allege that on July 30 and 31, 2018, after the "majority" of the losses stemming from the rapid transition to open-end loans in Ontario had already occurred, Defendants falsely reaffirmed CURO's FY18 guidance, representing that there was a "good likelihood" that CURO would come out "ahead" of published guidance, knowing or disregarding that FY18 guidance was not achievable.   Rather than disclose CURO's true financial condition, the Actions allege Defendants continued to provide the market with the false impression that single-pay loans were still extraordinarily viable, and that any impact from the initiation of the Canadian transition had

occurred in the just-reported 2Q18, but would not negatively impact CURO's overall financial results for the second half of the year.  ¶ 12.  The Actions allege that by not disclosing the true, negative, near-term financial impact stemming from CURO's rapid transition to open-end loans in Canada, the Company's Forms 10-Q violated SEC disclosure rules, including Item 303 of SEC Regulation S-K, which required CURO to report "any known trends or uncertainties that have had," or which CURO "reasonably expects will have, a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  ¶ 13.

Moreover, the Actions allege that Defendants' misstatements and omissions had their intended effect, as the price of CURO stock was artificially inflated, reaching $31.33 per share on September 25, 2018.  Plaintiffs alleged that taking advantage of the Company's inflated financial position, in August 2018, CURO sold $690 million in senior secured notes in a debt offering that would not have been on such favorable terms had the truth been known.    ¶ 14.

On October 24, 2018, CURO announced poor third quarter 2018 ("3Q18") financial results, reporting adjusted diluted Earnings Per Share ("EPS") of only $0.23, widely missing analysts' consensus EPS by over 50%.  Defendants reported that "[b]y far the biggest impact to quarterly results," including an 8.8% year-over-year decline in Canadian revenue, "was the ongoing product migration in Canada, specifically in the province of Ontario."  In addition, the Actions allege that despite Defendants' representations just months earlier that they had a "very high degree of confidence" in achieving or even surpassing FY18 guidance, CURO slashed FY18 guidance for adjusted EPS, net income, and adjusted earnings before interest, tax, depreciation, and amortization ("EBITDA").  ¶ 15.

During CURO's 3Q18 earnings conference call, Defendant Gayhardt "acknowledg[ed] that this quarter fell short of our expectations, and probably your expectations, and quite simply, is not up to our standards" and, according to the Actions, all but admitted that Defendants knew that

FY18 guidance was unachievable at the time they reaffirmed it on April 27 and July 31, 2018, reporting, "we did a less than stellar job of explaining in our – probably our July call or even back into our April call . . . the impact of [the Canadian transition] . . . in the near term  . . we probably didn't lay it out for everybody as explicitly as we probably should have. And we'll try not to make that mistake again."  Defendant Dean further confirmed that the "majority" of the loss for 3Q18 "came in July," prior to Defendants' allegedly false statements and omissions on July 30-31, 2018. In response to this news, the price of CURO common stock tumbled by almost 34%. ¶ 16.

The Actions allege that Defendants admitted (i) the decision to move up the introduction of open-end loans in Ontario from 2019 to 2018 was made during 1Q18; (ii) they intentionally chose not to moderate the transition to open-end loans in Ontario, despite the known operational risks; (iii) the transition to open-end loans in Canada "came at the expense of single-pay loan balances," which declined 50% in 3Q18 year-over-year; the rapid transition was "dilutive to Canadian earnings in the near term"; (iv) Canadian adjusted EBITDA dropped more than 50% year over year as a result of the transition; and (v) the Company had converted almost 40,000 customers to open-end loans in 3Q18, but expected to convert only 4,000 to 5,000 customers a month going forward.  ¶ 17.

The Actions additionally allege Defendants, contradicting certifications on CURO's quarterly SEC reports, further disclosed that the Company's "disclosure controls and procedures were not effective" and did not provide reasonable assurance "to ensure that information required to be disclosed in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms." ¶ 18.

### B.   Procedural History

Plaintiffs' initial derivative complaints, entitled *Klein v. Gayhardt et al.*, Case No. 2:21-cv-02308-KHV-TJJ (D. Kan.) (the "Klein Complaint") and *Ayers et al. v. Faulkner et al.*, Case

No. 2:21-cv-02311-KHV-TJJ (D. Kan.) (the "Ayers-Watt Complaint"), were filed in the U.S. District Court for the District of Kansas (the "Court") on July 15, 2021 and July 16, 2021, respectively.

On March 10, 2022, the Settling Parties informed the Court that they had reached an agreement in principle to settle the Related Derivative Actions and jointly requested that the Court vacate Defendants' March 14, 2022 deadline to answer or otherwise respond to the Related Derivative Action Complaints.  The Court granted this joint motion on March 11, 2022, which provided that Plaintiffs file a Stipulation of Settlement and motion for preliminary settlement approval by May 9, 2022.  The terms of the agreement to settle the Related Derivative Actions were memorialized in a Memorandum of Understanding, executed on March 14, 2022.  Thereafter, the Settling Parties drafted a formal Stipulation of Settlement with supporting exhibits, executed on May 6, 2022, and filed the Stipulation of Settlement along with an Unopposed Motion for Preliminary Approval.

On May 11, 2022, the Court issued a text order overruling Plaintiffs' Motion for Preliminary Approval, stating that "the Court cannot find that publication of the Notice in the manner set forth in 3.3 of the Stipulation is the best notice practicable under the circumstances and constitutes due and sufficient notice to all persons entitled to notice of the proposed settlement. Specifically, the parties have not shown that . . . individual notice in addition to notice set forth in 3.3 is otherwise impracticable."  Text Order, *Maloney v. Gayhardt*, Case No. 2:21-cv-02308-KHV-TJJ (D. Kan.), ECF No. 31; Text Order, *Ayers and Watt v. Faulkner,* Case No. 2:21-cv-02311-KHV-TJJ (D. Kan.), ECF No. 29.  On June 13, 2022, Magistrate Judge Teresa J. James issued a text order setting the deadline for Plaintiffs to re-file a motion for preliminary approval by June 24, 2022.  Thereafter, the Settling Parties drafted an Amended Stipulation of Settlement with supporting exhibits, executed on June 24, 2022, and filed the Amended Stipulation of

Settlement along with an Amended Unopposed Motion for Preliminary Approval.  *See* ECF No. 35-1, Ex. 1 to Joint Declaration of Thomas J. McKenna and Herbert W. Mondros in Support of Plaintiffs' Amended Unopposed Motion for Preliminary Approval of Settlement ("Joint Decl.").

On July 19, 2022, this Court granted the Preliminary Approval and Scheduling Order (the "Preliminary Approval Order"), and scheduled the Final Settlement Hearing for October 27, 2022 at 9:00 a.m. in Courtroom No. 440 of the Robert J. Dole U.S. Courthouse, 500 State Avenue, Suite 529, Kansas City, KS 66101.

## C.     The Related Securities Action

The allegations in the Actions are predicated, in part, on those previously before this Court in *Yellowdog Partners, LP v. CURO Group Holdings Corp. et al.*, Case No. 18-cv-2662-JWL-KGG, which was vigorously litigated for over two years, and included briefing and decision on a motion to dismiss.  *See e.g.*, ECF Nos. 53, 104, 105.  The settlement of the *Yellowdog* Action required those defendants to pay $8,980,000 to a class of investors who purchased CURO common stock between April 27, 2018 and October 24, 2018.

## D.     Terms of the Settlement

The full terms of the proposed Settlement are set forth in the Amended Stipulation of Settlement (ECF No. 35-1) filed on June 24, 2022.  The Reforms secured by Plaintiffs – the benefits of which are detailed in Section III(E), *infra* – are reflected below.

> **Time Period:**  The Company shall maintain the following agreed-to reforms for a period of five (5) years.

### A. Board Training

> CURO shall require that each current director attend eight hours of training on corporate governance and best-in class practices conducted by an outside entity specializing in director education.
>
> CURO shall require every new member of the Board to attend similar training within one year of their election or appointment to the Board.

8

CURO shall require every member of the Board to attend regular trainings on corporate governance matters, which CURO's Chief Legal Officer or outside counsel would conduct. The trainings would address compliance with laws and regulations, disclosure to stockholders, and fiduciary duties in the context of a heavily regulated public company, including compliance with Generally Accepted Accounting Principles, the Sarbanes-Oxley Act, corporate governance, assessment of risk, compliance training, and reporting requirements for publicly traded corporations.

**B. Whistleblower Policy**

CURO will adopt a stand-alone Whistleblower Policy. The stand-alone Whistleblower Policy will provide that CURO employees have a duty to report any known or suspected violations of (i) accounting, internal accounting controls, and auditing matters; (ii) laws, governmental rules, and regulations; or (iii) CURO policies. The stand-alone Whistleblower Policy will also detail the avenues CURO provides for employees to report concerns, including to a supervisor or manager; to the Chief Human Resources Officer, the Chief Legal Officer, or the Vice President of Internal Audit; or through CURO's Ethics Hotline or online reporting system.

The Whistleblower Policy will also provide that CURO will take steps to reasonably protect whistleblowers' confidentiality. The Whistleblower Policy will prohibit retaliation against any employees who raise concerns, whether through CURO's whistleblower program or to regulators.

The Whistleblower Policy will also be made publicly available on CURO's website and CURO would agree to send an annual reminder of the Whistleblower Policy to all employees.

CURO will also ensure that all whistleblower complaints reported through the third- party hotline are reported to the Ethics Committee (comprised of the Chief Human Resources Officer, the Chief Legal Officer, and the Vice President of Internal Audit, or their designees) and appropriately investigated. The Chief Legal Officer will provide quarterly reports to the Audit Committee of all whistleblower complaints made through the third-party hotline.

**C. Risk And Compliance Committee Reporting**

CURO will amend the Charter of the Risk and Compliance Committee to require the Chief Compliance Officer to provide formal written reports to the Risk and Compliance Committee on at least a quarterly basis and, in addition, to report promptly to that Committee any concerns relating to the discovery of any material risk or failure to

resolve any material risk already identified.  The Chief Compliance Officer's written reports and/or prompt to the Risk and Compliance Committee shall address the following areas, as identified in the Charter of the Risk and Compliance Committee:

1.    Identification of Risks.

2.    Risk Management Systems.

3.    Operating Environment.

4.    Enterprise Risk.

5.    Risk Mitigation.

6.    Significant Transactions.

7.    Coordination with other Committees.

8.    Compliance matters.

9.    Compliance Programs, Policies and Procedures.

10.    Code of Business Conduct and Ethics.

11.    Investigations.

12.    Compliance Risk Assessment Plan.

13.    Review of Complaints.

**D.  Confirmatory Discovery**

Defendants will provide to Plaintiffs' counsel reasonable confirmatory discovery as described below to confirm that the terms of the Settlement have been implemented as follows:

1.  CURO shall provide as soon as practicable an agenda of the Board meeting and Board minutes reflecting the Board's approval of the settlement of the Derivative Actions.

Plaintiffs will complete such reasonable discovery, as soon as practicable. The Settlement as contemplated is contingent upon the Parties' satisfactory completion of this reasonable confirmatory discovery.

## III.    THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL

### A.    <u>Settlements Are Generally Favored</u>

Courts strongly favor settlement as a method for resolving disputes.  *See Amoco Prod. Co. v. Fed. Power. Comm'n*, 465 F.2d 1350, 1354 (10th Cir. 1972).  This is particularly true with respect to derivative litigation, "because such litigation is notoriously difficult and unpredictable."

*Make a Difference Found., Inc. v. Hopkins*, 2012 U.S. Dist. LEXIS 36251, at * 7-8 (D. Colo. Mar. 19, 2012).  Therefore, courts strongly favor settlement in these circumstances.  *Mohammed v. Ells*, 2014 U.S. Dist. LEXIS 118796, at *11 (D. Colo. Aug. 26, 2014).

    **B.**    <u>**Standards for Final Approval of Settlement of a Derivative Action**</u>

At the fairness hearing to be held on October 27, 2022, the Court will be asked to determine whether the proposed Settlement is fair, reasonable, and adequate. "The authority to approve a settlement of a class or derivative action is committed to the sound discretion of the trial court." *Jones*, 741 F.2d at 324.  "In exercising its discretion, the trial court must approve a settlement if it is fair, reasonable and adequate." *Id.*  In assessing whether the settlement is fair, reasonable, and adequate the trial court should consider: (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable. *Id.* (citing *In re King Res. Co. Securities Litig.*, 420 F. Supp. 610 (D. Colo. 1976)).

    **C.**    **The Proposed Settlement Was Fairly and Honestly**
                <u>**Negotiated and Is Not the Product of Collusion or Fraud**</u>

The Settlement was achieved through hard-fought, arm's-length negotiations among the sophisticated Settling Parties, represented by experienced counsel.  *See* Joint Decl., ¶¶ 27, 28, 39. There is no evidence of collusion and the Settling Parties "vigorously advocated their respective positions throughout the pendency of the case."  *See Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 284 (D. Colo. 1997); *see also Gubricky v. Ells*, 2018 U.S. Dist. LEXIS 57123, at *16 (D. Colo. Apr. 4, 2018) (accepting representations of counsel as officers of the court that negotiations were at arm's-length). *See* Joint Decl., ¶¶ 27, 28, 39.

Here, all Settling Parties are represented by experienced counsel, well-versed in shareholder litigation with significant track records of honest and fair dealing. Indeed, counsel for Plaintiffs—Gainey McKenna & Egleston, Rigrodsky Law P.A., and Shuman, Glenn & Stecker— are three separate law firms that initially came to the Actions independently, representing different shareholders who initiated investigations unbeknownst to one another. Likewise, Defendants are ably represented by counsel at Willkie Farr & Gallagher LLP and Berkowitz Oliver Williams Shaw & Eisenbrandt LLP. There is simply no evidence of any collusion between the Settling Parties.

### D.    The Ultimate Outcome of the Litigation Was Unquestionably In Doubt

The second factor requires the Court to examine "whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt. The presence of such doubt tips the balance in favor of settlement because settlement creates a certainty of some recovery, and eliminates doubt, meaning the possibility of no recovery after long and expensive litigation." *McNeely v. Nat'l Mobile Health Care, LLC*, 2008 U.S. Dist. LEXIS 86741, at *37 (W.D. Okla. Oct. 27, 2008) (*citing In re Qwest Commc'n Int'l, Inc. Sec. Litig.,* 2006 U.S. Dist. LEXIS 71039, at *16-18 (D. Colo. 2006)).

"Settlements of shareholder derivative actions are particularly favored because such litigation is notoriously difficult and unpredictable." *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983); *see also In re Davita Healthcare Partners, Inc.*, 2015 U.S. Dist. LEXIS 74372, 2015 WL 3582265, at *3 (D. Colo. June 5, 2015); *Mohammed,* 2014 U.S. Dist. LEXIS 118796 at *11. For this reason, Courts "do not reject such settlements." *Gubricky*, 2018 U.S. Dist. LEXIS 57123, at *19. The challenges facing Plaintiffs here were particularly formidable.

Significantly, Plaintiffs' breach of fiduciary duty claim against the Individual Defendants is based on alleged failures of oversight under *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). The Actions allege that the Individual Defendants breached their duty

of loyalty by failing to oversee the accuracy of the public statements they caused CURO to make and to ensure the integrity of CURO's internal controls.  ¶¶ 209-213.  Courts have recognized that so-called "*Caremark* claims" are premised on "'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'"  *Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006) (citing *In re Caremark*, 698 A.2d at 967).

To defeat Defendants' anticipated motion to dismiss[5] or withstand summary judgment and prevail at trial, Plaintiffs would have been required to prove that "(a) the Defendants utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *In re Caremark,* 698 A.2d at 370.  Certainly, this presented great risk for Plaintiffs.

Moreover, Plaintiffs determined that the risks of securing a better recovery, if any, through trial were significant and that the proposed Settlement's benefits exceed the risk-adjusted value of the Actions.  Accordingly, this factor supports the Settlement's approval.

### E.      The Proposed Settlement Confers a Substantial Benefit on CURO

The third *Jones* factor requires the Court to examine whether the value of the recovery obtained outweighs the mere possibility of future relief after protracted and expensive litigation. If the Settlement is approved, substantial benefits will be secured for CURO and Current CURO Shareholders.  These benefits far outweigh the uncertain possibility of future relief.  Plaintiffs brought the Actions to remedy alleged failures by the Individual Defendants to oversee adequately

---

[5] Courts in this Circuit have recognized that the mere pendency of a motion to dismiss, let alone the success of such a motion, creates uncertainty as to the outcome of a case. *See e.g. Ryskamp v. Looney*, 2012 U.S. Dist. LEXIS 114190, *2 (D. Colo. Aug. 14, 2012) ("Indeed, with various Motions to Dismiss still pending at the time of the settlement, the Plaintiff's prospects for success in this action were certainly in question").

CURO's internal corporate governance controls and accuracy of its public statements.  If the proposed Settlement is approved, Plaintiffs will have secured CURO's agreement to the Reforms, which are designed to ensure the Board's and management's enhanced oversight of risk and compliance issues, improvement of internal controls, enhanced Board education on proper internal controls, and creation of a stand-alone Whistleblower policy to encourage stakeholders to come forward if false statements to the public or faulty internal corporate controls are identified.  *See* Exhibits A and A-1 to Amended Stipulation. Put simply, the Reforms confer economic value far greater than any one-time monetary award Plaintiffs might hope to achieve through further litigation.

Courts have observed that corporate governance reforms such as those achieved here are very often the most important relief that shareholder-plaintiffs can secure in stockholder derivative litigation.  For example, the Fifth Circuit explained:

> [W]here, as here, the derivative suit is largely an attack on past corporate management practices, as well as on some present officers and directors, the dollar amount of a possible judgment, which is essentially the sole goal in [a] class action damage suit, is not the sole, and may well not be the most important, matter to be considered, for the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor in the particular action.

*Maher*, 714 F.2d at 461; *see also Mohammed*, 2014 U.S. Dist. LEXIS 118796, at *11 ("The fact that the settlement involves only corporate governance reforms (in addition to payment of attorneys' fees) does not weigh against approval of the settlement. To the contrary, the corporate governance reforms provided for as part of the settlement are specifically and appropriately designed to prevent the recurrence of the alleged misconduct that formed the basis for this action."); *Ryskamp v. Looney*, 2012 U.S. Dist. LEXIS 114190, at *10  ("The fact that the settlement involves some corporate governance reforms also weighs in favor of approval of the settlement."); *see also*, *e.g.*, *Davita*, 2015 U.S. Dist. LEXIS 74372 at *10 ("The fact that the settlement  involves only  corporate  governance  reforms  (in  addition  to  payment  of attorneys' fees) does not

weigh against approval of the settlement. To the contrary, the corporate governance reforms provided for as part of the settlement are specifically and appropriately designed to prevent the recurrence of the alleged misconduct that formed the basis for this action.").

As detailed below, the benefits conferred by the proposed Settlement's Reforms are substantial and are specifically targeted to prevent the type of alleged misconduct Plaintiffs sought to remedy and prevent by commencing the Actions. *See Sved v. Chadwick*, 783 F. Supp. 2d 851, 864 (N.D. Tex. 2009) (approving derivative settlement because it "offers tangible, long-term remedial measures that are specifically designed to avoid the alleged missteps in [the company's] past and protect shareholders as the company moves forward"); *Make a Difference Found., Inc.*, 2012 U.S. Dist. LEXIS 36251 at *8 (same). The substantial benefits conferred plainly outweigh the possibility that future relief would be more favorable for CURO and its shareholders. Accordingly, this factor strongly supports approval.

Specifically, the Settlement commits the Board to the adoption and maintenance of a package of Reforms designed to prevent lapses in Board and management supervision of core operations and enterprise risks, which Plaintiffs allege contributed to CURO's failure to disclose material facts concerning, *inter alia*, its single-pay and open-end loan businesses. The Reforms, which must be maintained for no less than five years, combine enhancements to the Risk and Compliance Committee's ("RCC") oversight of core operations, critical enterprise initiatives and risks, and disclosures, with enhancements to monitoring and reporting by key management personnel to ensure oversight is continuous, fully informed, and effective. Taken together with the new director education requirements and a new, standalone Whistleblower Policy, the Reforms materially reduce the likelihood that similar missteps will be repeated in connection with CURO's critical business initiatives and public disclosures.

First, as part of the Settlement, the RCC's Charter will be amended to require that CURO's Chief Compliance Officer ("CCO") provide the RCC with formal written reports on at least a quarterly basis. In addition, the CCO will be required to report promptly to the RCC any concerns relating to the discovery of any material risk or failure to resolve any material risk already identified. The CCO's written reports must address at least all of the following areas, which will now be identified in the RCC's Charter: (1) Identification of Risks; (2) Risk Management Systems; (3) Operating Environment; (4) Enterprise Risk; (5) Risk Mitigation; (6) Significant Transactions; (7) Coordination with other Committees; (8) Compliance matters; (9) Compliance Programs, Policies and Procedures; (10) Code of Business Conduct and Ethics; (11) Investigations; (12) Compliance Risk Assessment Plan; and (13) Review of Complaints.

Second, the Settlement requires each current CURO director – including certain Individual Defendants – to attend eight hours of training on corporate governance and best-in class practices conducted by an outside entity specializing in director education. Every Board member must also attend regular trainings on corporate governance matters, which CURO's Chief Legal Officer ("CLO") or outside counsel would conduct and oversee. The trainings would address compliance with laws and regulations, disclosure to stockholders, and fiduciary duties in the context of a heavily regulated public company, including compliance with Generally Accepted Accounting Principles, the Sarbanes-Oxley Act, corporate governance, assessment of risk, compliance training, and reporting requirements for publicly traded corporations. Finally, the Settlement requires every new Board member to attend similar training within one year of their election or appointment to the Board.

Third, CURO will adopt a stand-alone Whistleblower Policy, pursuant to which all CURO employees will be responsible for reporting any known or suspected violations of: (i) accounting policies, internal accounting controls, and auditing matters; (ii) laws, governmental rules, and

regulations; or (iii) CURO policies.  As part of the policy, CURO will ensure that all whistleblower complaints reported through the third-party hotline are reported to the Ethics Committee (comprised of the Chief Human Resources Officer ("CHRO"), the CLO, and the Vice President of Internal Audit, or their designees) and appropriately investigated.  Significantly, the CLO will provide quarterly reports to the Audit Committee regarding all whistleblower complaints made through the third-party hotline. The Whistleblower Policy will also detail the avenues CURO provides for employees to report concerns, including to a supervisor or manager; to the CHRO, the CLO, or the Vice President of Internal Audit; or through CURO's Ethics Hotline or online reporting system. The Whistleblower Policy, which includes protections against retaliation, will also be made publicly available on CURO's website. CURO has also agreed to send an annual reminder of the Whistleblower Policy to all employees.

Plaintiffs believe these Reforms will prevent similar breaches of fiduciary duty in the future and that they are targeted directly at the wrongdoing alleged in the Actions.  The Reforms will, therefore, provide substantial benefits and lasting value to CURO and its shareholders.

### F.    The Settling Parties Believe the Settlement Is Fair, Adequate and Reasonable

The final *Jones* factor requires the Court to consider whether the Settling Parties believe the Settlement is fair and reasonable.  It is well-established that significant weight should be attributed to the belief of experienced counsel that the settlement is in the best interest of the parties.  *See Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 548 (D. Colo. 1989) (opinion of experienced counsel is entitled to considerable weight); *In re New Mexico Nat. Gas Antitrust Litig.*, 607 F. Supp. 1491, 1506 (D. Colo. 1984) (placing "great weight" on recommendation by counsel that the proposed settlement should be approved by the court as fair and reasonable).

Here, all Settling Parties are represented by counsel with extensive experience in derivative litigation.  The Board has also determined, in an exercise of its independent business

judgment, that the Settlement confers a substantial benefit upon CURO and Current CURO Shareholders and that each element of the Settlement is in the best interests of CURO and Current CURO Shareholders. *See* Stip. Ex. A. Further, Plaintiffs are represented by three separate firms with extensive experience in derivative litigation. All three firms have determined, based on their experience, the record developed through their investigations, and the procedural posture of the Actions, that the proposed Settlement is in the best interests of CURO and Current CURO Shareholders. As a result, this factor strongly supports final approval.

Given that each of the relevant factors militates in favor of approval, Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement.

### G.   The Settling Parties Provided Adequate Notice To Current CURO Shareholders

"Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c). "To satisfy procedural due process, the Company's stockholders must be given notice and opportunity for a hearing. *Jones*, 741 F.2d at 325. "Both the right to be heard from and the right to be told why are integral elements of this notion of due process." *Id.* Here, the form of notice and its method of dissemination to shareholders were specifically approved by the Court. The Court's Order required multiple methods of informing shareholders of this Proposed Settlement, including:

> Within ten (10) business days after the issuance by the Court of the Preliminary Approval Order, CURO shall cause the notice of the Settlement to be given in the following manner: (1) filing the Notice and the Amended Stipulation with the SEC as exhibits to a Current Report on Form 8-K or a Quarterly Report on Form 10-Q; (2) publishing the Summary Notice of Proposed Settlement for one day in *The Wall Street Journal*; and (3) posting the Notice and the Amended Stipulation on CURO's website such that visitors to the "Investors—Corporate Governance" section of the website will find a hyperlink to the Notice, which posting will be maintained through the date of the Court's Settlement Hearing. Within twenty-one (21) business days after the issuance by the Court of the Preliminary Approval Order, CURO shall cause the Notice to be mailed to all Current CURO Shareholders, and

to request that any brokerage firms, banks, and other persons send the Notice promptly to any beneficial owners for which they are record owners.

The Notice contained a statement as to why it was issued; a summary of the Actions; a description of the proposed Settlement; a statement on the Fee Award for Plaintiffs' Counsel;[6] an explanation of the reasons for the proposed Settlement; notice of the Settlement Hearing, right to attend, and how to object; and instructions for obtaining additional information. *See* Ex. 9 to Joint Decl.; *see also* Joint Decl., ¶¶ 45-47. Counsel for the Defendants has represented that the Notice was disseminated as ordered and will file an affidavit to that effect. Joint Decl., ¶ 48. The Notices and proposed methods for disseminating them—including mailing individual notice to all Current CURO Shareholders, consistent with the Court's May 11, 2022 text order—therefore satisfy the requirements of Rule 23.1 and due process, and are the best notices and procedures practicable under the circumstances.

In response to the Notice, the Settling Parties received to date only two inquiries, neither of which could be fairly characterized as an objection. In those inquiries, two individuals who implied they were CURO shareholders asked to join or participate in the "class action" and to be represented by "class counsel." Plaintiffs' Counsel informed both individuals that the Actions are not a class action and provided the Notice materials. Joint Decl., ¶ 49. Accordingly, the Notice provided was adequate to satisfy due process and the Settlement should be approved.

For all of the foregoing reasons, consideration of each of the factors considered by Courts in the Tenth Circuit when presented with proposed settlements of derivative actions counsels the Court to grant final approval of the proposed Settlement in this matter.

---

[6] The Notice informed shareholders that Plaintiffs would seek an aggregate award of no more than $345,000 including attorneys' fees and expenses, and a reasonable service award for Plaintiffs of no more than $10,000, to be paid from the Fee Award. *See* Ex. 9 to Joint Decl.

## IV.   PLAINTIFFS' COUNSEL'S MOTION FOR ATTORNEYS' FEES AND EXPENSES SHOULD BE GRANTED

Plaintiffs seek approval of the agreed-to Fee Award in the amount of $345,000, including a $10,000 service award collectively to Plaintiffs, to be paid by CURO or its insurers.  For the reasons set forth below, that Fee Award is fair and reasonable and should be granted.

Plaintiffs' Counsel respectfully submits that the Fee Award should be approved as fair and reasonable in light of: (i) the specific and targeted corporate governance Reforms that form the basis of the Settlement; (ii) the efforts expended in achieving the Settlement; (iii) the significant risk incurred by Plaintiffs' Counsel in litigating the complex and challenging Actions on a contingent fee basis; and (iv) the public policy interest in vindicating shareholders' rights by encouraging experienced counsel to assert well-supported derivative claims.

The amount comprising the Fee Award is the result of vigorous arm's-length negotiations that took place between counsel for the Settling Parties only after the terms of the Settlement had been negotiated.  Those negotiations were based upon a thorough analysis of what an appropriate fee would be for the benefits achieved  and the fees awarded in similar derivative settlements.  Although the deadline for objections has not yet passed, to date, no Current CURO Shareholder has objected to the proposed Fee Award.   Accordingly, for the reasons set forth herein, and in the Declarations, Plaintiffs and Plaintiffs' Counsel respectfully request that the Court issue an Order approving attorneys' fees in the amount of $345,000.00, which includes reimbursement of $4,104.54 in costs and expenses and a $10,000 collective service award for Plaintiffs.

### A.   Attorneys' Fees Should Be Awarded Pursuant to the Substantial Benefit Doctrine

Courts exercising their equitable powers have permitted plaintiffs to recoup attorneys' fees and costs of litigation directly from the parties enjoying the benefits of the litigation.  *Alyeska*

*Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 257 (1975).  Under the "substantial benefit"

doctrine, counsel who prosecute shareholder derivative litigation which confers benefits on the

corporation are entitled to an award of attorneys' fees and costs.  *Boeing Co. v. Van Gemert*, 444

U.S. 472, 476 (1980).  As explained by the Third Circuit:

> The plaintiffs in a shareholders' derivative action may … recover their expenses,
> including attorneys' fees, from the corporation on whose behalf their action is taken
> if the corporation derives a benefit, which may be monetary or nonmonetary, from
> their successful prosecution or settlement of the case.

*Shlensky v. Dorsey*, 574 F.2d 131, 149 (3d Cir. 1978).  *See also Mills v. Elec. Auto-Lite Co.*, 396

U.S. 375, 395 (1970) ("a corporation may receive a 'substantial benefit' from a derivative suit,

justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature").  A

benefit is "substantial," and thus deserving of a fee award, where it corrects or prevents an abuse

that would harm the corporation.  *See id*. at 396.  Robust corporate governance reforms easily

satisfy this standard. *See, e.g.*, *In re Rambus Inc. Deriv. Litig.*, 2009 U.S. Dist. LEXIS 131845, at

*11 (N.D. Cal. Jan. 20, 2009) ("courts consistently have approved attorneys' fees [ ] in shareholder

actions where the plaintiffs' efforts resulted in significant corporate governance reforms").

Here, the Settlement achieved by Plaintiffs will benefit CURO and its shareholders by

enabling CURO to avoid costly litigation and governmental or regulatory intervention, by

improving the efficiency of certain business practices, and by protecting CURO against future

damages related to disclosure of material information in public statements.  In short, as Defendants

acknowledge, the Reforms confer substantial benefits upon CURO and its shareholders.  All of the

elements of the substantial benefit doctrine are met, and  an award of attorneys' fees is appropriate.

### B.        Courts Accord Great Weight to the Fee Negotiated by the Settling Parties

CURO has agreed to pay, or have its insurer pay, any Court-approved award of attorneys'

fees and expenses up to $345,000.00. Amended Stipulation at ¶5.1.  Courts encourage these types

of agreements and, where, as here, there is no indicia of collusion, have held that an agreed-upon fee is entitled to substantial deference. *See e.g., Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation.  Ideally, of course, litigants will settle the amount of a fee"); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 861 (E.D. Mo. 2005) (applying Delaware derivative law) ("where, as here, the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference").

The agreed-to attorneys' fees and reimbursement of out-of-pocket expenses were negotiated only after the substantive terms of the Settlement were agreed upon and were conducted at arm's length by highly experienced counsel.  Joint Decl., ¶ 41.

Deference is also appropriate here because negotiations between sophisticated parties serve as a proxy for the market for legal services, which is what courts seek to replicate when determining a reasonable fee. *See Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan.*, 157 F.3d 1243, 1256 (10th Cir. 1998).   Indeed, the virtue in the negotiation of a fair fee by the adversary parties to a settlement (the defendants who must pay the fee versus the lawyers who wish to receive it) is that "[m]arkets know market values better than judges do." *Matter of Hunt's Health Care, Inc.*, 161 B.R. 971, 978 (Bankr. N.D. Ind. 1993).

Here, the amount negotiated and agreed to reflects the Settling Parties' experience as to what is appropriate for the benefits obtained.  The result here is a fee which approximates the market, and which is, therefore, reasonable. *See Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005); *see also Strube v. Am. Equity Inv. Life Ins. Co.,* 2006 U.S. Dist. LEXIS 28582, at *6 (M.D. Fla. May 5, 2006) ("[B]oth parties had an incentive to bargain vigorously and in good faith.  Plaintiffs' counsel sought to maximize its fees, and Defendant was aware that because the terms of the settlement had already been agreed upon, it could bargain for lower

fees using the risk of delay and the potential conflict of interest which could have arisen if Plaintiffs' counsel delayed settlement for a higher fee.").

Accordingly, the negotiated fee should be accorded substantial deference.

### C. Applicable Legal Standards for Consideration of the Fee Award

Courts in the Tenth Circuit often utilize the "*Johnson*" factors in assessing the reasonableness of a requested attorney fee. *Mohammed*, 2014 U.S. Dist. LEXIS 118796, at *13. The twelve *Johnson*[7] factors are: (1) the time and labor involved;  (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case;  (5) the customary fee; (6) any prearranged fee; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Not all *Johnson* factors will apply in every case; the Court has wide discretion as to which factors to apply and the relative weight to assign to each. *See*, *e.g.*, *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 853 (10th Cir. 1993) ("Rarely are all of the Johnson factors applicable").

As demonstrated below, the requested Fee Award for Plaintiffs' Counsel is well within the range of what is customary in complex derivative litigation similar to this matter, and an analysis of the *Johnson* factors underscores the reasonableness of the attorney's fee request.

---

[7] *Johnson* was a statutory fee case.  In  *Stalcup v. Schlage Lock Co.*, 505 F. Supp. 2d 704, 705-706 the District of Colorado applied the *Johnson* factors where the case was neither a common fund case, nor a statutory fee case.  In *Stalcup,* as here, defendants agreed to non-monetary prophylactic measures that the court found benefitted the class and to pay attorneys' fees and expenses to plaintiffs' lead counsel as part of the settlement. *Stalcup* at *5-6.  *See also Salone v. United States*, 645 F.2d 875, 879 (10th Cir. 1981) (*Johnson* standards should generally be applied where attorney's fees are authorized by the court); *EEOC v. St. Louis-San Francisco Ry. Co.,* 1982 U.S. Dist. LEXIS 12255 (N.D. Okla Jan. 22, 1982) (same).

1.      **The Time and Labor Required**

Bringing this litigation to a successful conclusion demanded a significant commitment of time and resources by a team of experienced lawyers. *See* Joint Decl., ¶¶ 53.   Plaintiffs' Counsel pursued this litigation for over two years, including, *inter alia*, extensive pre-suit investigation involving the review of the Company's SEC filings and public statements, and extensive settlement efforts. Plaintiffs' Counsel collectively expended 1,006.4 hours of time working on this matter.  Using current billable rates,[8] this equates to a lodestar of $779,012.25. *See* Joint Decl., ¶¶ 53, 54; *see also* Joint Decl. Exs. 5-8. Collectively, this represents a negative multiplier of 2.258. Plaintiff's Counsel has also incurred $4,104.54 in as-yet unreimbursed litigation expenses. *See* Joint Decl., ¶ 53.  These are substantial investments of time and money, and they strongly support the reasonableness of the requested fee.

2.      **Novelty and Difficulty of the Issues**

"Settlements of shareholder derivative actions are particularly favored because such litigation is notoriously difficult and unpredictable." *Maher*, 714 F.2d at 455.  It is for this reason that Courts "do not reject such settlements." *Gubricky,* 2018 U.S. Dist. LEXIS 57123 at *19; quoting *Maher*, 714 F.2d at 455. The challenges facing Plaintiffs in the Actions are particularly

---

[8] In conducting a lodestar analysis, "current rates, rather than historical rates, should be applied in order to compensate for the delay in payment." *Konits v. Valley Stream Cent. High Sch. Dist.*, 350 Fed. Appx. 501, 505 n.2 (2d Cir. 2009).  Plaintiffs' Counsel's current rates are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). *See e.g.*, *Voulgaris v. Array Biopharma*, 2021 U.S. Dist. LEXIS 249646 (D. Colo.) (approving hourly rates ranging from $ 455 to $ 1,050); *In re Comverse Tech., Inc. Sec. Litig.*, Case No. 06-cv-1825, 2010 U.S. Dist. LEXIS 63342, at *13 (E.D.N.Y. June 24, 2010) (noting that hourly rates of $125 to $880 were "not extraordinary for top New York law firms"); *In re Hi-Crush Partners L.P. Sec. Litig.*, Case No. 12-cv-8557, 2014 U.S. Dist. LEXIS 177175, at *38 (S.D.N.Y. Dec. 19, 2014) ("The rates billed by Lead Counsel (ranging from $425 to $825 per hour) for attorneys, are comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude.").

formidable, as Plaintiffs' primary theory of liability—breaches of fiduciary duty based upon the alleged failures of internal corporate governance oversight by certain CURO directors and officers—has been recognized by Delaware courts as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Stone*, 911 A.2d at 372.

In the event Defendants were to file a motion to dismiss[9] or a motion for summary judgment, in order to prevail Plaintiffs would be required to prove that "(a) the Defendants utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *In re Caremark*, 698 A.2d at 370.  Certainly, there was great risk that Plaintiffs might not prevail.

### 3.    Skill Required: the Experience, Reputation, and Ability of the Attorneys

The third and ninth *Johnson* factors, the skill required and the experience, reputation, and ability of the attorneys, also support the Plaintiffs' Counsel's fee request.    Plaintiffs' Counsel have decades of experience in complex civil litigation, particularly in shareholder class and derivative actions. *See* Joint Decl. Exs. 2-4; *see also* Joint Decl., ¶¶ 51-52.

It is also important to recognize that Defendants were represented by highly experienced lawyers from well-respected law firms – Willkie Farr & Gallagher LLP and Berkowitz Oliver Williams Shaw & Eisenbrandt LLP.  These firms have successfully litigated a multitude of derivative actions throughout the country.  The ability of Plaintiffs' Counsel to obtain a favorable settlement for CURO and its shareholders in the face of such formidable legal opposition confirms the superior quality of their representation. Accordingly, this factor also supports the

---

[9] This Court has recognized that the mere pendency of motions to dismiss, let alone their success, creates uncertainty as to the outcome of a case. *See Ryskamp*, 2012 U.S. Dist. LEXIS 114190 at *2, ("Indeed, with various Motions to Dismiss still pending at the time of the settlement, the Plaintiff's prospects for success in this action were certainly in question").

requested Fee Award. *See Horton v. Leading Edge Mktg., Inc.,* 2008 U.S. Dist. LEXIS 11761, at 9* (D. Colo. Feb. 4, 2008) (quality of opposing counsel is important in evaluating the services rendered by plaintiffs' counsel).

### 4. The Preclusion of Other Employment

Plaintiff's Counsel spent 1,006.4 hours litigating the Actions. Joint Decl., ¶ 53. This is time counsel could have devoted to other matters. Consequently, this factor further supports approval of the Fee Award. *See Burford v. Cargill, Inc.*, 2012 WL 5471985, at *3 (W.D. La. Nov. 8, 2012) ("The affidavits of Class Counsel prove that while this case did not preclude them from accepting other work, they were often times precluded from working on other cases due to the demands of the instant matter. This factor weighs in favor of a substantial award.").

### 5. The Customary Fee and Awards in Similar Cases

The $345,000 Fee Award is appropriate and well within the range of fees typically awarded in similar cases involving corporate governance reforms and similar non-monetary relief. *In Re Capstone Turbine Corp. Stockholder Derivative Litigation*, Case No. 2:16-cv-01569 (C.D. Cal.) (approving $500,000 fee award for corporate governance reforms that included committee level oversight and reporting enhancements and improvements to the Company's whistleblower policy); *In Re Ideanomics, Inc. Derivative Litigation*, Case No. 20-cv-05333 (S.D.N.Y.) (approving $450,000 fee award for reforms that included enhanced committee responsibilities, an amended whistleblower policy, and employee and director training); *In Re Ormat Technologies, Inc. Derivative Litigation*, Case No. 18-cv-00439 (D. Nev.) (approving $399,000 fee award for reforms that included enhanced committee responsibilities, adoption of a standalone Clawback policy, and employee and director training). Other similarly situated derivative cases have settled for substantial corporate governance changes like those detailed in the Settlement, with significantly higher fees being awarded to plaintiffs' counsel. *See e.g., Cohn*, 375 F. Supp. 2d at 862 (approving

$2.25 million fee in corporate governance derivative settlement, which equated to a 2.9 multiplier).

Thus, the fee sought by Plaintiffs here is modest compared to other cases settled for corporate governance reforms, and this factor, along with the other *Johnson* factors, weighs in favor of granting the Fee Award.

### 6.    Whether the Fee Is Fixed or Contingent

"The contingent nature of counsel's compensation has long been recognized as justifying a larger fee." *In re King Res. Co. Sec. Litig.*, 420 F.Supp. 610, 632 n. 8 (D. Colo. 1976). As one court observed when addressing the resolution of a derivative case that, like this one, arose under Delaware law, "[i]n shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation." *Cohn*, 375 F. Supp. 2d at 862.

Here, Plaintiff's Counsel undertook this complex and risky matter on a fully contingent basis and litigated it for over two years with the understanding that there was no assurance of a fee, or even reimbursement for out-of-pocket expenses. *See* Joint Decl., ¶¶ 36, 37, 58. "Given the risk of non-recovery, this factor weighs heavily in favor of the requested fee." *Lucas v. Kmart Corp.*, 2006 U.S. Dist. LEXIS 51420, at *19 (D. Colo. July 27, 2006); *Tuten v. United Airlines, Inc.*, 41 F. Supp. 3d 1003, 1009 (D. Colo. 2014) ("Class Counsel took the case on a contingent basis, which permits a higher recovery to compensate for the risk of recovering nothing for their work."). This factor also supports the requested Fee Award.

### 7.    The Amount Involved and the Results Obtained

As discussed in the Joint Decl., the Reforms agreed upon in the Settlement directly target the organizational and corporate compliance failures alleged by Plaintiffs. Numerous courts have recognized the substantial value of such relief. *See Mohammed*, 2014 U.S. Dist. LEXIS 118796, at *11 ("The fact that the settlement involves only corporate governance reforms (in addition to payment of attorneys' fees) does not weigh against approval of the settlement. To

the contrary, the corporate governance reforms provided for as part of the settlement are specifically and appropriately designed to prevent the recurrence of the alleged misconduct that formed the basis for this action.").

Consideration of this factor also supports approval of the proposed Fee Award.

### 8.    The Undesirability of the Case

Derivative cases carry with them elevated risks, a requirement of lengthy investigation, or alternatively meeting the high burden of demand futility, high out-of-pocket costs, and a possibility of no recovery, all of which speak to the undesirability of such a case. *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (the "odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful."). Thus, this factor supports approval of the Fee Award.[10]

### 9.    Plaintiffs' Counsel's Expenses Were Reasonable and Necessary to Litigate This Case

Counsel in class and derivative actions are "entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *Cendant*, 232 F. Supp. 2d at 343. Of the proposed Fee Award, $4,104.54 represents various expenses, including court filing fees, online legal research and data management fees, and other miscellaneous expenses. *See* Joint Decl., Exs. 5-7; Joint Decl. ¶ 53. Courts have held that these items are properly incurred and recoverable. *In re Cendant Corp. Deriv. Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (consultants and computer-assisted research); *Hall v. AT&T Mobility LLC,* 2010 U.S. Dist. LEXIS 109355, at *75 (D.N.J. Oct. 13, 2010) ("Courts have

---

[10] The remaining *Johnson* factors, the nature and length of the professional relationship with the client, and the time limitations imposed by the client or the circumstances, do not pertain to this case.

generally approved expenses arising from photocopying, use of the telephone and fax, postage, witness fees, and hiring of consultants"); *Katz v. China Century Dragon Media, Inc.*, No. LA CV11-02769, 2013 U.S. Dist. LEXIS 189987, at *7-8 (C.D. Cal. Oct. 10, 2013) (notice expenses reasonable). These categories of expenses for which Plaintiffs' Counsel seeks reimbursement are the type routinely billed by defense firms to hourly clients and therefore are properly recoverable by Plaintiffs' Counsel.

### D.     Plaintiffs' Requests for Service Awards Should Be Approved.

Plaintiffs also request that the Court approve a $10,000 service award to be divided among the three Plaintiffs and paid from the Fee Award.

In deciding whether an incentive award is proper, and, if so, in what amount, "relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (approving incentive award of $25,000); *Tuten*, 41 F. Supp. 3d at 1010. Notably, "[a]n incentive payment to come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected." *In re Cendant*, 232 F. Supp. 2d at 344.

Here, Plaintiffs dutifully participated in this litigation and willingly undertook the responsibilities and risks attendant with bringing this derivative litigation. In so doing, Plaintiffs have devoted many hours to litigation-related activities. Plaintiffs diligently and patiently participated in the prosecution of the Actions for more than two years by, *inter alia*, reviewing and discussing with Plaintiffs' Counsel the results of the pre-suit investigation, the Complaints, the Settlement-related documents, and the Preliminary Approval Order, as well as numerous other consultations and conferences with Plaintiffs' Counsel. *See* Joint Decl., ¶¶ 55-56. Consequently,

Plaintiffs and Plaintiffs' Counsel respectfully request that the Court grant the requested $10,000 service award.  *See, e.g., Gubricky*, 2018 U.S. Dist. LEXIS 57123 at *27 (approving $5,000 service award); *Tuten*, 41 F. Supp. 3d at 1010 (awarding $15,000 to lead plaintiff).

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court enter the Final Order Approving the Settlement and Plaintiffs' Counsel's request for attorneys' fees and expenses.

Dated: September 29, 2022

Respectfully submitted,

By: */s/ Earl Wayne Taff*

Earl Wayne Taff, USDC No. 70588
**LAW OFFICES OF E. WAYNE TAFF**
3401 N. Perrin Road
Independence, Missouri 64058
Telephone: 816-786-5083
Email: ewt@tafflawfirm.com

*Liaison Counsel for Plaintiffs*

Thomas J. McKenna
**GAINEY McKENNA & EGLESTON**
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Email: tjmckenna@gme-law.com

*Counsel for Plaintiff Cindy Maloney*

Rusty E. Glenn
**SHUMAN, GLENN & STECKER**
600 17th Street, Suite 2800
South Denver, CO 80202
Telephone: (303) 861-3003
Email: rusty@shumanlawfirm.com

*Counsel for Plaintiff John Watt*

Herbert W. Mondros
**RIGRODSKY LAW P.A.**
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
(302) 295-5304
Email: hwm@rl-legal.com

*Counsel for Plaintiff Patrick Ayers*