# UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

CINDY MALONEY, Derivatively on Behalf of CURO GROUP HOLDINGS CORP. and as Executrix of Estate of Melvyn Klein,

        Plaintiff,

v.

DONALD F. GAYHARDT, CHRIS MASTO, DOUG RIPPEL, DALE E. WILLIAMS, DAVID M. KIRCHHEIMER, MIKE MCKNIGHT, ELIZABETH WEBSTER, CHAD FAULKNER, ANDREW FRAWLEY, GILLIAN VAN SCHAICK, KAREN WINTERHOF, WILLIAM BAKER, AND ROGER W. DEAN,

        Defendants,

and

CURO GROUP HOLDINGS CORP.,

        Nominal Defendant

Case No. 2:21-cv-02308-KHV-TJJ

*Additional Caption on Next Page*

| | |
|---|---|
| PATRICK AYERS AND JOHN WATT, Derivatively on Behalf of CURO GROUP HOLDINGS CORP., <br><br> Plaintiff, <br><br> v. <br><br> CHAD FAULKNER, ANDREW FRAWLEY, DON GAYHARDT, DAVID M. KIRCHHEIMER, CHRIS MASTO, MIKE MCKNIGHT, DOUG RIPPEL, DALE E. WILLIAMS, KAREN WINTERHOF, WILLIAM BAKER, ROGER W. DEAN, FRIEDMAN FLEISCHER & LOWE CAPITAL PARTNERS II, L.P., FFL EXECUTIVE PARTNERS II, L.P., AND FFL PARALLEL FUND II, L.P., <br><br> Defendants, <br><br> and <br><br> CURO GROUP HOLDINGS CORP., <br><br> Nominal Defendant. | Case No. 2:21-cv-02311-KHV-TJJ |

**JOINT DECLARATION OF THOMAS J. MCKENNA AND HERBERT W. MONDROS IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES**

We, Thomas J. McKenna and Herbert W. Mondros, declare as follows:

1. I, Thomas J. McKenna, am a partner in the firm Gainey McKenna & Egleston ("GME").

2. I, Herbert W. Mondros, am special counsel in the law firm Rigrodsky Law, PA. ("Rigrodsky Law").

3. GME and Rigrodsky Law, along with the law firm of Shuman, Glenn & Stecker ("SGS"), are Counsel for Plaintiffs in the two above-captioned, related shareholder derivative

actions (the "Actions")[1] brought on behalf of nominal defendant CURO Group Holdings Corp. ("CURO" or the "Company").

4. We respectfully submit this Declaration in support of Plaintiffs' Unopposed Motion For Final Approval Of Derivative Settlement And Motion For An Award Of Attorneys' Fees And Litigation Expenses (the "Motion"). The Motion seeks an order: (i) granting final approval of the settlement set forth in the Amended Stipulation of Settlement ("Amended Stipulation") ECF No. 35-1); and (ii) granting Plaintiffs' Motion for an Award of Attorneys' Fees and Litigation Expenses.

5. We have overseen and participated in all material aspects of the initiation, prosecution, and settlement of these Actions. Accordingly, we have personal knowledge of the following facts and if called upon to testify, we could and would testify competently thereto.

6. This Declaration is intended to present to the Court a detailed factual background of the various events underlying the efforts of Plaintiffs' Counsel in prosecuting the Actions to assist the Court in evaluating the fairness of: (i) the proposed Settlement; (ii) the quality of the legal services rendered on behalf of Plaintiffs by Plaintiffs' Counsel; and (iii) the reasonableness of Plaintiffs Counsel's application for attorneys' fees and expenses. The facts set forth in this Declaration principally derive from the pleadings and proceedings in the Actions, and from Plaintiffs' Counsel's review of the Company's SEC filings and public statements, and relevant documents filed with the Court during the course of the Actions.

**Factual Background**

7. The following facts were developed through the investigation conducted by

---

[1] Unless noted otherwise, all capitalized terms used herein shall have the same meaning as set forth in the Amended Stipulation of Settlement. ECF No. 35-1.

Plaintiffs and Plaintiffs' Counsel before, during, and after the filing of the Actions.

8. According to its public filings, CURO provides lending products to nonprime, underbanked consumers in the United States, Canada, and the United Kingdom.[2] The Company operated as a payday lender. For years, the Company's most profitable business was the Canadian payday (or "single-pay") loans, which generated yields in excess of 400% and had modest, predictable credit losses. As a result, the Company's Canadian segment, and the Ontario market (which generated the bulk of the Canadian revenues), was critical to its operations and its ability to meet its financial forecasts. In fact, revenues from Ontario alone comprised approximately 13% of the Company's total consolidated revenues for the year ended December 31, 2017. ¶ 2.[3]

9. As a payday lender, the Company is heavily regulated by agencies at various levels of government in the jurisdictions in which it operates. Regulators in Canada began regulating the payday lending industry by passing laws concerning borrowing disclosure requirements, caps on the cost of borrowing, and restrictions on certain types of lending practices. The new regulations helped protect consumers from becoming trapped in a cycle of debt. For instance, in 2016 and 2017, Alberta, Ontario, and British Columbia passed regulations lowering the amount the Company could charge borrowers for its payday loans, limiting the borrowing rate at C$15 in Alberta and Ontario, and C$17 in British Columbia for every C$100 borrowed. ¶ 3.

10. As a result, the yields on the Company's Canadian single-pay loans declined during 2016 and 2017 from approximately 400% in 2016 down to approximately 250% by the first quarter of 2018 ("1Q18"), which had a material adverse effect on the Company's Canadian operations.

---

[2] In February 2019, the Company exited the United Kingdom.

[3] Unless otherwise noted, all references to "¶ __" or "¶¶ __" are to the Verified Shareholder Derivative Complaint (ECF No. 1) filed by plaintiff Melvyn Klein on July 15, 2021 (the "Klein Complaint").

Given these new lending regulations, the Actions allege that the Defendants knew that the Company's ability to secure a replacement for its highly profitable Canadian single-pay loans was essential to the Company's ongoing financial success and was one of the "key drivers" of its continued growth. Thus, the Actions allege that the Individual Defendants implemented a strategy to transition the Company's Canadian business from single-pay loans to installment and line of credit ("open-end") loan products. ¶ 4.

11. As the Company transitioned customers from smaller balance single-pay loans to higher balance installment and open-end loans, applicable accounting standards required that the Company record an increased provision for loan losses at the time these loans were originated, even though revenues on installment and open-end loans are recognized over a longer period of time than single-pay loans. Because the Company was required to account for expected loan losses at the time of loan origination, and revenue and yields on those loans take months to build, the Company's open-end loan products were initially less profitable than single-pay loans. These "up-front provisions" were material to the Company's earnings and were an important financial metric that Defendants reported in the Company's SEC filings and routinely discussed. ¶ 7.

12. The Actions also allege that the Individual Defendants also gave the market the false impression that to the extent the Company's operations experienced any negative impact from the transition out of single-pay to installment and open-end loans, the impact would be minimal, confined to the second quarter of 2018 ("2Q18") and had been anticipated and factored into the Company's internal forecast and publicly reported full year 2018 financial guidance ("FY18 guidance"). ¶ 9.

13. According to the Actions, stockholders were not aware that during July 2018 the Company completed its transition to open-end loans in Ontario. As a result of the rapid transition

5

in Ontario, the Company experienced larger open-end loan balances, materially higher up-front loan loss provisions, and increased marketing spend, which decreased the Company's earnings. ¶ 11.

14. The Actions allege that on July 30 and 31, 2018, after the "majority" of the losses stemming from the rapid transition to open-end loans in Ontario had already occurred, the Individual Defendants reaffirmed the Company's FY18 guidance, representing that there was a "good likelihood" that the Company would come out "ahead" of its published guidance, knowing or disregarded that the FY18 guidance was not achievable. Rather than disclose the Company's true financial condition, the Actions allege that the Individual Defendants continued to provide the market with the false impression that single-pay loans were still extraordinarily viable, and that any impact from the initiation of the Canadian transition had occurred in the just-reported 2Q18, but would not negatively impact the Company's overall financial results for the second half of the year. ¶ 12.

15. The Actions allege that by not disclosing the true, negative, near-term financial impact stemming from the Company's rapid transition to open-end loans in Canada, the Company's Forms 10-Q violated SEC disclosure rules, including Item 303 of SEC Regulation S-K, which required the Company to report "any known trends or uncertainties that have had," or that the Company "reasonably expects will have, a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." ¶ 13.

16. Moreover, the Actions allege that the Individual Defendants' misstatements and omissions had their intended effect, as the price of the Company's stock was artificially inflated, reaching $31.33 per share on September 25, 2018. Plaintiffs alleged that taking advantage of the Company's favorable, but misrepresented, financial position, in August 2018, the Individual

Defendants caused the Company to sell $690 million in senior secured notes in a debt offering that would not have been on such favorable terms had the truth been known. ¶ 14.

17.     On October 24, 2018, the Company announced poor third quarter 2018 ("3Q18") financial results, reporting adjusted diluted Earnings Per Share ("EPS") of only $0.23, widely missing analysts' consensus EPS by over 50%. The Individual Defendants reported that "[b]y far the biggest impact to quarterly results," including an 8.8% year-over-year decline in Canadian revenue, "was the ongoing product migration in Canada, specifically in the province of Ontario." In addition, the Actions allege that despite the Individual Defendants' representations just months earlier that they had a "very high degree of confidence" in achieving or even surpassing the Company's FY18 guidance, the Company slashed its FY18 guidance for adjusted EPS, net income, and adjusted earnings before interest, tax, depreciation, and amortization ("EBITDA"). ¶ 15.

18.     During the Company's 3Q18 earnings conference call, defendant Gayhardt "acknowledg[ed] that this quarter fell short of our expectations, and probably your expectations, and quite simply, is not up to our standards" and, according to the Actions, all but admitted that the Individual Defendants knew the Company's FY18 guidance was unachievable at the time they reaffirmed it on April 27 and July 31, 2018, reporting, "we did a less than stellar job of explaining in our – probably our July call or even back into our April call . . . the impact of [the Canadian transition] . . . in the near term   . . we probably didn't lay it out for everybody as explicitly as we probably should have. And we'll try not to make that mistake again." Defendant Dean further confirmed that the "majority" of the loss for 3Q18 "came in July," prior to the Individual Defendants' allegedly false statements and omissions on July 30-31, 2018.  In response to this news, the price of the Company's common stock tumbled by almost 34%. ¶ 16.

19.     According to the Actions, the Individual Defendants admitted that the decision to

move up the introduction of open-end loans in Ontario from 2019 to 2018 was made during 1Q18; they intentionally chose not to moderate the transition to open-end loans in Ontario, despite the known operational risks; the transition to open-end loans in Canada "came at the expense of single-pay loan balances," which declined 50% in 3Q18 year-over-year; the rapid transition was "dilutive to Canadian earnings in the near term"; Canadian adjusted EBITDA dropped more than 50% year-over-year as a result of the transition; and the Company had converted almost 40,000 customers to open-end loans in 3Q18, but expected to convert only 4,000 to 5,000 customers a month going forward. ¶ 17.

20. The Actions alleged substantially similar facts to those previously adjudicated by this Court in *Yellowdog Partners, LP v. CURO Group Holdings Corp. et al.*, Case No. 18-cv-2662-JWL-KGG (the "*Yellowdog* Action"). The *Yellowdog* Action was vigorously litigated for more than two years, including briefing and decision on a motion to dismiss and the eventual approval of a settlement and final judgment. *See e.g.*, Dkt. Nos. 53 and 104, 105. The settlement of the *Yellowdog* Action required the defendants to the *Yellowdog* Action to pay $8,980,000 to a class of CURO investors who purchased CURO common stock between April 27, 2018 and October 24, 2018.

**Procedural Background**

21. Plaintiffs filed their initial derivative complaints on behalf of nominal defendant CURO, entitled *Klein et al. v. Gayhardt et al.*, Case No. 2:21-cv-02308-KHV-TJJ (D. Kan.) (the "Klein Complaint") and *Ayers et al. v. Faulkner et al.,* Case No. 2:21-cv-02311-KHV-TJJ (D. Kan.) (the "Ayers-Watt Complaint"), in the U.S. District Court for the District of Kansas (the "Court") on July 15, 2021 and July 16, 2021, respectively.

22. The Klein Complaint asserted claims for breach of fiduciary duty and waste of

corporate assets under Delaware law against defendants Gayhardt, Masto, Rippel, Williams, Kirchheimer, McKnight, Webster, Faulkner, Frawley, Van Schaick, and Winterhof; unjust enrichment under Delaware law against defendant Baker; violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10(b)-5 against all of the Individual Defendants; and violations of Section 20(a) of the Exchange Act against defendant Gayhardt.

23. The Ayers-Watt Complaint asserted claims for breach of fiduciary duty, unjust enrichment, abuse of control and waste of corporate assets under Delaware law against defendants Gayhardt, Masto, Rippel, Williams, Kirchheimer, McKnight, Faulkner, Frawley, and Winterhof, a claim for contribution under Sections 10(b) and 21D of the Exchange Act, a claim of insider trading against defendants Gayhardt and McKnight, and claims of aiding and abetting breach of fiduciary duty and insider trading against the FFL Defendants.

24. The Actions further allege that, contradicting certifications made on the Company's quarterly reports filed with the SEC, the Individual Defendants disclosed that the Company's "disclosure controls and procedures were not effective" and did not provide reasonable assurance "to ensure that information required to be disclosed in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms." ¶ 18.

25. Specifically, the Klein Complaint and the Ayers-Watt Complaint both alleged that the Individual Defendants lacked proper internal controls and failed to accurately disclose the short-term negative impact that CURO's transition from single-pay to open-end loans in the Ontario market would have on its ability to achieve its financial guidance. The Complaints also alleged that pre-suit demand on the Company's Board of Directors (the "Board") would be futile

9

under Delaware law because there was reason to doubt that a majority of the members of the Board could respond disinterestedly and/or independently to a demand.

26. On September 30, 2021, counsel for Plaintiff Klein filed a Suggestion of Death as to Plaintiff Klein after counsel for Plaintiff informed counsel for Defendants that Plaintiff Klein had recently passed away; that an Estate proceeding had been commenced in Surrogate's Court in the State of New York; and that the Executor, once appointed by the New York Court, intended to substitute into the litigation. On March 4, 2022, Cindy Maloney, the Executrix of the Klein Estate, moved that the Court substitute Maloney in Plaintiff Klein's place as Plaintiff in the Klein action, which the Court granted on March 7, 2022. The case is now entitled *Maloney v. Gayhardt*, Case No. 2:21-cv-02308-KHV-TJJ (D. Kan.) ("*Maloney Action*").

27. After the filing of the Actions, the Settling Parties engaged in good faith, arms' length discussions regarding the most efficient way to proceed with the Actions, including settlement. During those negotiations, the Court granted several motions for an extension of time for Defendants to answer or otherwise respond to the Complaint.

28. These negotiations involved numerous telephonic and written communications between Plaintiffs' Counsel and counsel for Defendants. These negotiations were hard-fought, and each of the corporate governance reforms was painstakingly negotiated.

29. On March 10, 2022, the Settling Parties informed the Court that the Settling Parties had reached an agreement in principle to settle the Related Derivative Actions and jointly requested that the Court vacate Defendants' March 14, 2022 deadline to answer or otherwise respond to the Related Derivative Action Complaints. The Court granted this joint motion on March 11, 2022, which provided that Plaintiffs file a Stipulation of Settlement and motion for preliminary approval of the settlement by May 9, 2022, subject to the Court's approval.

30. The general terms of the agreement to settle the Related Derivative Actions were memorialized in a Memorandum of Understanding, which was executed on March 14, 2022.

31. Thereafter, the Settling Parties drafted a formal Stipulation of Settlement with supporting exhibits, which was executed and filed on May 6, 2022 along with an Unopposed Motion for Preliminary Approval.

32. On May 11, 2022, the Court issued a text order overruling Plaintiffs' Motion for Preliminary Approval, which stated that "the Court cannot find that publication of the Notice in the manner set forth in 3.3 of the Stipulation is the best notice practicable under the circumstances and constitutes due and sufficient notice to all persons entitled to notice of the proposed settlement. Specifically, the parties have not shown that . . . individual notice in addition to notice set forth in 3.3 is otherwise impracticable." Text Order, *Maloney et al. v. Gayhardt et al.*, Case No. 2:21-cv-02308-KHV-TJJ (D. Kan.), ECF No. 31; Text Order, *Ayers et al. v. Faulkner et al.,* Case No. 2:21-cv-02311-KHV-TJJ (D. Kan.), ECF No. 29.

33. On June 13, 2022, Magistrate Judge Teresa J. James issued a text order setting the deadline for Plaintiffs to re-file a motion for preliminary approval by June 24, 2022. Thereafter, the Settling Parties drafted an Amended Stipulation of Settlement ("Amended Stipulation") with supporting exhibits, executed on June 24, 2022, and filed the Amended Stipulation of Settlement along with an Amended Unopposed Motion for Preliminary Approval. *See* ECF No. 35-1, Exhibit 1 to the Joint Declaration of Thomas J. McKenna and Herbert W. Mondros in Support of Plaintiffs' Amended Unopposed Motion for Preliminary Approval of Settlement.

34. The Amended Stipulation, together with its exhibits, including a Term Sheet attached thereto as Exhibit A, consisting of the proposed corporate governance reforms, is attached hereto as Exhibit 1.

**The Settlement**

35.     The full terms of the proposed Settlement are set forth in the Amended Stipulation, ECF No. 35-1, filed on June 24, 2022. Those terms are summarized below.

In consideration for a full and final release, settlement, and discharge of any and all claims that were or could have been asserted by Plaintiffs, individually and derivatively on behalf of CURO, against Defendants in the Actions, the Settling Parties agreed to the following:

Within ninety (90) days of the date that the Court enters the Judgment, CURO or the Board, as applicable, shall adopt and implement the Settlement Terms identified in Exhibit A attached to the Amended Stipulation of Settlement ("Amended Stipulation"), and incorporated by reference therein and shall maintain them pursuant to the terms set forth in Exhibit A.

Without admitting any wrongdoing, Defendants acknowledge and agree that the commencement, prosecution, and Settlement of the Related Derivative Actions caused the Board to adopt and implement the settlement terms set forth in the Memorandum of Understanding, attached to the Amended Stipulation as Exhibit A.

The Board has determined, in an exercise of the Board's independent business judgment, that the Settlement confers a substantial benefit upon CURO and Current CURO Shareholders and that each element of the Settlement is in the best interests of CURO and Current CURO Shareholders.

The Settlement Terms set forth on Exhibit A to the Amended Stipulation are as follows:

**Time Period:** The Company shall maintain agreed-to reforms for a period of five (5) years.

**A.     Board Training**

CURO shall require that each current director attend eight hours of training on corporate governance and best-in class practices conducted by an outside entity specializing in director education.

CURO shall require every new member of the Board to attend similar training within one year of their election or appointment to the Board.

CURO shall require every member of the Board to attend regular trainings on corporate governance matters, which CURO's Chief Legal Officer or outside counsel would conduct. The trainings would address compliance with laws and regulations, disclosure to stockholders, and fiduciary duties in the context of a heavily regulated public company, including compliance with Generally Accepted

Accounting Principles, the Sarbanes-Oxley Act, corporate governance, assessment of risk, compliance training, and reporting requirements for publicly traded corporations.

B.  **Whistleblower Policy**

CURO will adopt a stand-alone Whistleblower Policy. The stand-alone Whistleblower Policy will provide that CURO employees have a duty to report any known or suspected violations of (i) accounting, internal accounting controls, and auditing matters; (ii) laws, governmental rules, and regulations; or (iii) CURO policies. The stand-alone Whistleblower Policy will also detail the avenues CURO provides for employees to report concerns, including to a supervisor or manager; to the Chief Human Resources Officer, the Chief Legal Officer, or the Vice President of Internal Audit; or through CURO's Ethics Hotline or online reporting system. The Whistleblower Policy will also provide that CURO will take steps to reasonably protect whistleblowers' confidentiality. The Whistleblower Policy will prohibit retaliation against any employees who raise concerns, whether through CURO's whistleblower program or to regulators.

The Whistleblower Policy will also be made publicly available on CURO's website and CURO would agree to send an annual reminder of the Whistleblower Policy to all employees.

CURO will also ensure that all whistleblower complaints reported through the third- party hotline are reported to the Ethics Committee (comprised of the Chief Human Resources Officer, the Chief Legal Officer, and the Vice President of Internal Audit, or their designees) and appropriately investigated. The Chief Legal Officer will provide quarterly reports to the Audit Committee of all whistleblower complaints made through the third-party hotline.

C.  **Risk And Compliance Committee Reporting**

CURO will amend the Charter of the Risk and Compliance Committee to require the Chief Compliance Officer to provide formal written reports to the Risk and Compliance Committee on at least a quarterly basis and, in addition, to report promptly to that Committee any concerns relating to the discovery of any material risk or failure to resolve any material risk already identified. The Chief Compliance Officer's written reports and/or prompt to the Risk and Compliance Committee shall address the following areas, as identified in the Charter of the Risk and Compliance Committee:

1. Identification of Risks.
2. Risk Management Systems.
3. Operating Environment.
4. Enterprise Risk.
5. Risk Mitigation.
6. Significant Transactions.

7. Coordination with other Committees.
8. Compliance matters.
9. Compliance Programs, Policies and Procedures.
10. Code of Business Conduct and Ethics.
11. Investigations.
12. Compliance Risk Assessment Plan.
13. Review of Complaints.

### D. Confirmatory Discovery

Defendants will provide to Plaintiffs' counsel reasonable confirmatory discovery as described below to confirm that the terms of the Settlement have been implemented as follows:

1. CURO shall provide as soon as practicable an agenda of the Board meeting and Board minutes reflecting the Board's approval of the settlement of the Derivative Actions.

Plaintiffs will complete such reasonable discovery, as soon as practicable. The Settlement as contemplated is contingent upon the Parties' satisfactory completion of this reasonable confirmatory discovery.

## Reasons for the Settlement

36. Plaintiffs' Counsel believed and continue to believe that the claims asserted in the Actions have merit and that the evidence developed to date supports the claims. However, Plaintiffs' Counsel recognize and acknowledge the expense and length of continued proceedings that would be necessary to prosecute the Actions against the Individual Defendants and the FFL Defendants through trial and through appeals. Plaintiffs' Counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex litigation such as the Actions, as well as the difficulties and delays inherent in such litigation.

37. Multiple courts have recognized that litigation of stockholder derivative actions is notoriously difficult and unpredictable. The challenges facing Plaintiffs are particularly formidable in the Actions, as Plaintiffs' primary theory of liability—breaches of fiduciary duty based upon the alleged failures of internal corporate governance oversight by certain CURO directors and officers—has been recognized by Delaware courts as possibly the most difficult theory in

corporate law upon which a plaintiff might hope to win a judgment. In the event Defendants were to file a motion to dismiss or a motion for summary judgment, in order to prevail Plaintiffs would be required to prove that: (a) the Defendants utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In the informed judgment of Plaintiffs' Counsel, there was certainly great risk that Plaintiffs might not prevail.

38. Plaintiffs' Counsel also are cognizant of the inherent problems of establishing standing in derivative litigation under Delaware law and the possible defenses to the claims alleged in the Actions. Plaintiffs' Counsel believe that the Settlement set forth in the Amended Stipulation confers substantial benefits upon CURO and Current CURO Shareholders. Based on their evaluation, Plaintiffs' Counsel have determined that the Settlement set forth in the Amended Stipulation is in the best interests of CURO and Current CURO Shareholders and is fair, reasonable, and adequate, and accordingly, Plaintiffs have agreed to settle the Actions upon the terms and subject to the conditions set forth in the Amended Stipulation.

39. We state for the record, having negotiated the Settlement, that there was no collusion of any sort between the Settling Parties, and all negotiations were at arms-length and hard-fought.

40. In the Settlement, the Defendants, without admitting any wrongdoing, acknowledge and agree that the commencement, prosecution, and Settlement of the Related Derivative Actions caused the Board to adopt and implement the Settlement Terms set forth in Exhibit A to the Amended Stipulation, and the CURO Board has determined, in an exercise of the Board's independent business judgment, that the Settlement confers a substantial benefit upon CURO and Current

CURO Shareholders and that each element of the Settlement is in the best interests of CURO and Current CURO Shareholders.

**The Fee Award**

41. Only after the corporate governance reforms reflected on Exhibit A to the Amended Stipulation were agreed upon, did the Settling Parties begin to negotiate an attorneys' fee and expense award ("Fee Award") for Plaintiffs' Counsel and service awards for the Plaintiffs.

42. After multiple rounds of further hard-fought negotiations, the Settling Parties eventually agreed that the Company and/or its insurers would pay a Fee Award in the amount of $345,000 for all Plaintiffs' Counsel, and a case service award of $10,000 in total for the Plaintiffs to be paid from the Fee Award, subject to this Court's approval.

43. The negotiations concerning the Fee Award were based upon a thorough analysis of what an appropriate fee would be for the benefits achieved and the fees awarded in similar derivative settlements.

44. Plaintiffs therefore also seek approval of the agreed-to Fee Award in the amount of $345,000, which includes a $10,000 service award collectively to Plaintiffs, to be paid by CURO or its insurers. For the reasons set forth below, that Fee Award is reasonable and should be granted.

45. On July 19, 2022, this Court granted the Preliminary Approval and Scheduling Order (the "Preliminary Approval Order"), approved the Amended Notice to be disseminated to Current CURO Shareholders. and scheduled the Final Settlement Hearing for October 27, 2022 at 9:00 a.m. in Courtroom No. 440 of the Robert J. Dole U.S. Courthouse, 500 State Avenue, Suite 529, Kansas City, KS 66101. *See* ECF No. 36.

46. The Amended Notice of (I) Pendency And Proposed Settlement Of Shareholder Derivative Actions; (II) Settlement Hearing; and (III) Motion For An Award Of Attorneys' Fees

And Expenses, (ECF 35-5), disseminated to CURO Stockholders by Defendants is attached hereto as Exhibit 9.

47. That Notice informed Current CURO Shareholders that Plaintiffs would seek an aggregate award of no more than $345,000 including attorneys' fees and expenses, and a reasonable service award for Plaintiffs of no more than $10,000, to be paid from the Fee Award.

48. Counsel for the Defendants has represented that the Notice was disseminated in accordance with the terms of the Preliminary Order, and will file an affidavit to that effect according to the schedule set by this Court.

49. In response to the Notice, the Settling Parties received to date only two inquiries, neither of which could be fairly characterized as an objection. In those inquiries, two individuals who implied they were CURO shareholders asked to join or participate in the "class action" and to be represented by "class counsel." Plaintiffs' Counsel responded by informing both individuals that the Actions are not a class action and provided the Notice materials.

50. Although the deadline for objections has not yet passed, to date no Current CURO Shareholder has objected to the proposed Fee Award. Accordingly, for the reasons set forth herein, Plaintiffs and Plaintiffs' Counsel respectfully request that the Court issue an Order approving attorneys' fees in the amount of $345,000.00, including reimbursement of $4,104.54 in costs and expenses and a $10,000 collective service award for Plaintiffs.

51. Plaintiffs' Counsel respectfully submits that the Fee Award should be approved as fair and reasonable in light of: (i) the specific and targeted corporate governance Reforms that form the basis of the Settlement; (ii) the efforts expended in achieving the Settlement; (iii) the significant risk incurred by Plaintiffs' Counsel in litigating the complex and challenging Actions on a contingent fee basis; and (iv) the public policy interest in vindicating shareholders' rights by

encouraging experienced counsel to assert well-supported derivative claims.

52. Plaintiffs' Counsel's services to obtain the benefits achieved through the Settlement required extensive experience and expertise in derivative shareholder litigation.

53. Plaintiffs' Counsel have expended significant time, effort, and resources in the successful prosecution of the Actions and settlement negotiations. Plaintiffs' Counsel collectively expended 1,006.4 hours prosecuting the Actions, and pursuing settlement negotiations and incurred approximately $4,104.54 in unreimbursed litigation expenses. Plaintiffs' Counsel's collective lodestar in the Actions is $779,012.25, which amounts to a negative multiplier of 2.258.

54. The details concerning the time expended by Plaintiffs' Counsel, their hourly rates, lodestar, and expenses incurred are set forth in the Declarations of the respective Plaintiffs' Counsel, attached here to as Exhibits 5-8. The lodestar for each of Plaintiffs' Counsel's law firms is summarized as follows:

Rigrodsky Law, P.A. – $307,512.50

Gainey McKenna & Egleston – $154,967.25

Shuman, Glenn & Stecker – $300,532.59

Law Office of E. Wayne Taff – $16,000.00

55. In addition, as noted above, Plaintiffs respectfully request a service award totaling $10,000 for Plaintiffs Ayers, Watt, Klein, and after Klein passed away, Maloney. Each of these Plaintiffs dutifully participated in the Actions and willingly undertook the responsibilities and risks attendant with bringing this derivative litigation. These Plaintiffs devoted many hours to litigation-related activities, and diligently and patiently participated in the prosecution of the Actions for more than two years. Among other things, these Plaintiffs reviewed and discussed with Plaintiffs' Counsel the results of the pre-suit investigation, the Complaints, the Settlement-related documents, and the Preliminary Approval Order, as well as numerous other consultations

and conferences with Plaintiffs' Counsel.

56. Consequently, Plaintiffs and Plaintiffs' Counsel respectfully request that the Court grant the requested $10,000 service award, which is well in line with incentive awards approved by courts in similar cases.

**Exhibits**

57. Attached hereto are true and correct copies of the following exhibits:

| Exhibit 1 | Amended Stipulation of Settlement with Exhibits |
| Exhibit 2 | Firm Résumé of Gainey McKenna & Egleston |
| Exhibit 3 | Firm Résumé of Rigrodsky Law, PA. |
| Exhibit 4 | Firm Résumé of Shuman, Glenn & Stecker |
| Exhibit 5 | Declaration Of Herbert W. Mondros On Behalf Of Plaintiff Ayers In Support Of The Proposed Settlement And The Agreed Amount Of Attorneys' Fees And Expenses |
| Exhibit 6 | Declaration Of Rusty Glenn On Behalf Of Plaintiff Watt In Support Of The Proposed Settlement And The Agreed Amount Of Attorneys' Fees And Expenses |
| Exhibit 7 | Declaration Of Thomas J. McKenna On Behalf Of Plaintiff Cindy Maloney In Support Of The Proposed Settlement And The Agreed Amount Of Attorneys' Fees And Expenses |
| Exhibit 8 | Declaration of Earl Wayne Taff In Support Of The Proposed Settlement And The Agreed Amount Of Attorneys' Fees And Expenses |
| Exhibit 9 | AMENDED NOTICE OF (I) PENDENCY AND PROPOSED SETTLEMENT OF SHAREHOLDER DERIVATIVE ACTIONS; (II) SETTLEMENT HEARING; AND (III) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES |

**Conclusion**

58. Given the substantial benefits conferred through the efforts of Plaintiffs and Plaintiffs' Counsel and the numerous litigation risks and complexities Plaintiffs would have confronted had the Actions been prosecuted to trial, we respectfully submit that the proposed

Settlement is fair, reasonable, and adequate, and should be approved by the Court.

59. Additionally, given the material benefits achieved, and services rendered by Plaintiffs' Counsel, we respectfully submit that an aggregate award of attorneys' fees and expenses for Plaintiffs' Counsel in the amount of $345,000, which includes a $10,000 collective service award for the Plaintiffs, is fair and reasonable and fully merits the Court's approval.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 29th day of September 2022, at Yonkers, New York.

>*/s/ Thomas J. McKenna*
>Thomas J. McKenna

Executed this 29th day of September 2022, at Wilmington, Delaware.

>*/s/ Herbert W. Mondros*
>Herbert W. Mondros